# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Plumbing Holdings Corporation, et al.,[1] | ) | Case No. 09- _____ (___) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

## AFFIDAVIT OF ED MOULIN, CHIEF FINANCIAL OFFICER, IN SUPPORT OF CHAPTER 11 PETITION AND FIRST-DAY ORDERS

STATE OF ALABAMA        :

                                :    ss

COUNTY OF ST. CLAIR    :

Ed Moulin, declares under penalty of perjury:

1.     I am the Chief Financial Officer of Plumbing Holdings Corporation ("PHC"), which together with its wholly owned subsidiary Jones Stephens Corp. ("Jones Stephens" or "JSC"), are the debtors and debtors-in-possession in the above captioned chapter 11 cases (the "Debtors").

2.     I am familiar with the Debtors' day-to-day operations, business affairs, books and records.

3.     On the date hereof (the "Petition Date"), the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), thereby commencing the above-captioned bankruptcy cases (the "Bankruptcy Cases"). The Debtors ar e operating their business and managing their property as debtors-in-possession pursuant to sections 1107(a) and 1108 of the

---

[1]   The Debtors are the following two entities: Plumbing Holdings Corporation and Jones Stephens Corp.

Bankruptcy Code. To minimize the uncertainty and adverse effects on their business associated with the commencement of these Bankruptcy Cases, the Debtors have filed a number of motions requesting various types of relief from the Court (each a "First Day Motion" and, collectively, the "First Day Motions"). The First Day Motions seek relief intended, among other things, to preserve the business, bolster employee morale and streamline administration of the Bankruptcy Case. Each First Day Motion is critical to the Debtors' effort to preserve the value of their bankruptcy estates and avoid immediate and irreparable harm to the business. In accordance with the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for this District (the "Local Rules"), the Debtors are requesting that the Court schedule a hearing at its earliest convenience to consider the First Day Motions.

4. I submit this Affidavit ("Affidavit") concurrently with the Debtors' chapter 11 petitions (i) to assist the Court and other parties-in-interest in understanding the circumstances that compelled the commencement of the Bankruptcy Cases and (ii) in support of the petitions and various motions and applications of the Debtors, *i.e.*, the First Day Motions, filed contemporaneously herewith. Except as otherwise indicated, all facts set forth in this Affidavit are based upon my personal knowledge, upon information supplied to me by others at the Debtors, upon my review of relevant documents, or upon my opinion based upon my experience, knowledge, and information concerning the Debtors' operations and financial affairs. If I were called upon to testify, I could and would testify competently to the facts set forth in this Affidavit. I am authorized to submit this Affidavit on behalf of the Debtors.

5. This Affidavit describes the Debtors' business, the circumstances surrounding the filing of the Debtors' Bankruptcy Cases, the relevant facts in support of the Debtors' various

2

first-day and other applications, motions and papers filed concurrently herewith, and the Debtors' objectives in these Bankruptcy Cases.

## I. BACKGROUND

### The Debtor's Business

6. Jones Stephens is a leading designer, marketer and distributor of specialty plumbing supplies, primarily to the wholesale commercial plumbing trade and to do-it-yourself retailers and hardware stores. Founded in 1993 by Butch Jones and Joey Stephens, two veterans of the plumbing products industry, Jones Stephens supplies a wide range of tubular products, decorative plumbing products, pipe accessories, brass fittings and valves, plastic specialties, copper fittings and coils, liquid drain cleaner, gaskets, couplings, among numerous other plumbing products.

7. Jones Stephens employs approximately 200 non-unionized employees in two locations comprising approximately 370,000 square feet. The Debtors are headquartered in a modern built 258,000 square-foot facility Moody, Alabama which is approximately 20 miles east of Birmingham. Jones Stephens operates a second facility located in Pottsville, Pennsylvania, which is approximately 50 miles northeast of Harrisburg. The Pottsville facility is a new facility, containing approximately 95,000 and 5,000 square feet of warehouse and office space, respectively.

8. Jones Stephens supplies a wide range of tubular products, decorative plumbing products, pipe accessories, brass fittings and valves, plastic specialties, copper fittings and coils, liquid drain cleaner, gaskets, couplings, among numerous other plumbing products. Jones Stephens is differentiated from many other distributors in that it: (i) markets products both under

3

its own brands as well as leadings brands of third party manufacturers, (ii) offers an extensive range of product (more than 20,000 SKUs) which exhibit limited product obsolescence, (iii) helps customers minimize their inventory levels and offer high fill rates by "breaking boxes" (i.e., willingness to sell in less than full carton quantities), (iv) provides exceptional customer service and fill rates, (v) operates as a virtual manufacturer, and (v) serves a broad customer base operating in diverse construction markets (i.e., new residential, commercial, HVAC, remodeling, and repair).

9.   In May 2007, the Debtors further expanded its product offering and customer base through the acquisition of D.A. Fehr, Inc. ("D.A. Fehr" or "DAF"). D.A. Fehr utilized a similar outsourced manufacturing business model to Jones Stephens, but focused primarily on copper fittings, copper coils, valves, tubing, malleables, fixtures and other HVAC plumbing products.

10.   As of the Petition Date, the Debtor had aggregate assets (including goodwill) and liabilities of approximately $84,000,000[2] and approximately $101,000,000 respectively. Of this amount, approximately $4.8 million was comprised of cash and cash equivalents, approximately $13 million was comprised of accounts receivable, approximately $21 million was comprised of inventory, and approximately $46 million was comprised of other assets. Total net sales for fiscal year 2009 are projected to decline from approximately $100 million in 2008 to approximately $78 million.

---

[2]  Reported at book value.

**Capital Structure**

11.     Prior to August 2006, Jones Stephens was the wholly owned subsidiary of Holdings JSC, Inc., a Delaware corporation ("Holdings"). By that certain Merger Agreement dated August 19, 2006, as amended by Amendment No. 1 dated as of September 7, 2006, PHC acquired all of the shares of Holdings from American Capital Strategies, Ltd., Butch Jones and Donald J. Stephens. Contemporaneous therewith and in consecutive transactions, Jones Stephens Acquisition Corp., a Delaware corporation, was merged with and into Holdings with Holdings as the surviving entity and Holdings was merged with and into Jones Stephens with Jones Stephens as the surviving entity. By Merger Agreement dated as of December 15, 2008, D.A. Fehr was merged with and into Jones Stephens with Jones Stephens as the surviving entity.

12.     Jones Stephens is the wholly owned subsidiary of PHC. Cortec Group Fund IV, L.P. and Cortec Co-Investment Fund, LLC (collectively, "Cortec") own approximately 86% of the common stock of PHC.

**Debt Structure**

13.     Jones Stephens is the borrower under that certain Credit Agreement dated as of September 7, 2006, as amended by the First Amendment to Credit Agreement dated May 15, 2007 (the "First Amendment"), with CIT Lending Services Corporation, as administrative agent (the "Administrative Agent"), and the lenders (the "Lenders") under the loan agreement (as further amended, modified, restated or supplemented from time to time, the "Loan Agreement" and together with any other agreements, documents, instruments and certificates executed in connection with the Loan Agreement, the "Loan Documents"). Holdings is a guarantor of Jones Stephens' obligations under the Loan Agreement. Pursuant to the First Amendment, among

5

other things, D.A. Fehr was added as a borrower under the Loan Agreement. As discussed above, by Merger Agreement dated as of December 15, 2008, D.A. Fehr was merged with and into Jones Stephens with Jones Stephens as the surviving entity.

14.     The Obligations (defined below) of Jones Stephens to the Lenders and the Administrative Agent were secured by all of the personal property of Jones Stephens and PHC (and its then existing subsidiaries) (subject to limited exceptions) (the "Prepetition Collateral") pursuant to the Omnibus Pledged and Security Agreement dated as of September 7, 2006 by Jones Stephens and PHC in favor of the Administrative Agent (as amended, modified or supplemented, the "Security Agreement").

15.     Pursuant to the Loan Documents, the Lenders agreed to provide Jones Stephens with revolving loans up to $10,000,000 and a term loan in the amount of $46,000,000 (which was increased to $67,000,000 pursuant to the First Amendment). As of the Petition Date, the Debtors were indebted to the Administrative Agent and the Lenders under the Loan Documents in the approximate outstanding principal amount of $61.46 million, together with all other liabilities and obligations of the Debtors arising out of or in connection with the Loan Agreement and other Loan Documents, including, but not limited to all accrued and unpaid interest, fees, costs and expenses including professional fees (the "Obligations"). No principal amount of revolving loans were outstanding as of the Petition Date.

16.     The Debtors are party to that certain Amended and Restated Note Purchase Agreement with American Capital Financial Services, Inc., as agent ("ACAS" or "Mezz Agent") and certain purchasers (collectively, with Mezz Agent, the "Mezz Lenders") dated as of September 7, 2006 (as amended, restated, modified or supplemented, the "Subordinated Note

6

Purchase Agreement") pursuant to which Jones Stephens issued and sold Senior Secured Subordinated Notes in the principal amount of $11,182,500 with a maturity date of September 7, 2013 and Junior Secured Subordinated Notes in the principal amount of $11,182,500 with a maturity date of September 7, 2014. All documents executed in connection with the Purchase Agreement are referred to herein as the "Subordinated Debt Documents."

17.     The indebtedness under the Subordinated Note Purchase Agreement is secured by a pledge of Holdings' equity interests in Jones Stephens and not by any other collateral. Pursuant to that certain Intercreditor and Subordination Agreement among the Administrative Agent, ACAS, as administrative agent under the Subordinated Note Purchase Agreement, and the Debtors (as amended, the "Subordination Agreement"), such equity pledge is subordinated in priority to the Administrative Agent's security interest therein, and the indebtedness under the Subordinated Note Purchase Agreement is subordinated in right of payment to the Obligations.

18.     As of the Petition Date, the total amount outstanding under the Subordinated Note Purchase Agreement, including accrued interest, fees and expenses is approximately $26,720,295 million (the "Mezzanine Subordinated Debt").

19.     The Debtors' primary liabilities consist of (a) the Obligations, (b) the Mezzanine Subordinated Debt, (c) unsecured trade debt and (d) lease obligations (collectively, the "Pre-Petition Debt").

**Events Leading to Commencement of the Debtors' Bankruptcy Cases**

20.     Following the acquisition and merger of DAF in 2008, the Debtors experienced a substantial reduction in sales due to several factors including (i) the downturn in the overall United States economy; (ii) a substantive decrease in the amount of new commercial and

7

residential construction; (iii) declines in remodeling expenditures; (iv) major swings in raw material costs, including copper and brass; and (v) difficulties in the integration of DAF into the Jones Stephens organization.

21.     In late 2008 and 2009, the Debtors dedicated a significant effort to reduce operating costs in line with lower sales and complete the DAF integration. The Debtors also took steps to monitor and ensure adequate liquidity. Examples include reductions in headcount, salary freezes, reductions in benefits, hiring a COO to reduce fulfillment costs and inventory investments and the elimination of non-essential spending. In addition, the company increased its efforts to sell more products into the retail channel and expand in the HVAC channel. Management also focused on recapturing lost DAF customers and trained JSC's sales organization to sell DAF's products and manage the company's copper exposure and pricing. Finally, Jones Stephens implemented a new ERP System to provide better visibility of the business operations and provide a more seamless network between its Moody and Pottsville operations.

22.     As a result of the economic downturn and overall poor performance of the Debtors' business, the Debtors triggered a number of covenant defaults under the Loan Agreement. In connection with the triggering of their covenant defaults, the Debtors commenced discussions with Cortec, the Administrative Agent and Mezz Lenders regarding: (i) a proposed out-of-court restructuring of the Debtors' senior secured credit facility and outstanding Mezzanine Subordinated Debt; and (ii) an infusion of new capital into the Debtors. The purpose of these discussions was to restructure the finances of the Debtors in a manner sufficient to avoid the need to resort to chapter 11 relief.

23.     Pursuant to discussions among the various parties, the Debtors, Cortec, Administrative Agent and certain Lenders ("Consenting Lenders") entered into that certain Restructuring and Plan Support Agreement (the "Plan Support Agreement") thereby establishing the terms pursuant to which the Administrative Agent, Consenting Lenders and Cortec will support the Debtors' plan of reorganization.   Consistent with the terms of the Plan Support Agreement and unable to reach an agreement with the Mezz Lenders, the Debtors determined that commencement of the instant bankruptcy cases is in the best interests of all stakeholders and necessary to carry out the Debtors' restructuring goals. The Debtors anticipate filing their disclosure statement and plan of reorganization within thirty days of the Petition Date. The Debtors believe that chapter 11 will allow the Debtors to implement their restructuring plan in accordance with the Plan Support Agreement, maximize use of their cash collateral, preserve jobs, maximize the value of assets for creditors, and emerge from bankruptcy with a restructured balance sheet and more profitable operations in an expeditious manner.

## II.  FIRST DAY MOTIONS AND APPLICATIONS

24.     This section will set forth, in summary fashion, the factual background and support for each of the First Day Motions.[3]  In general, I believe that the approval of the Debtors' First Day Motions is critical and necessary to the success of these Bankruptcy Cases.

---

[3]  The summary in Part II that follows is qualified in its entirety by reference to the each of the specific First Day Motions.  To the extent of any inconsistency between this Part II of the Affidavit and the First Day Motions, the First Day Motions govern.  Further, capitalized terms used but not defined in this section will have the meanings ascribed to them in such respective First Day Motion.

9

## Motion Concerning Joint Administration

25.　The Debtors seek the joint administration of these chapter 11 cases for **procedural purposes only** pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 1015-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for this District (the "Local Rules").

26.　There are a total of two debtors covered by these chapter 11 cases, therefore, joint administration is appropriate because it will ease the administrative burden of the Court and parties-in-interest. It is anticipated that that each of these chapter 11 cases will proceed on the same timetable and that most of the notices, applications, motions and other pleadings filed and orders entered in these cases will affect both of the Debtors. Joint administration will allow the Clerk of the Court to use a single docket for these cases rather than maintaining two different dockets. Similarly, joint administration will eliminate the need for duplicative notices, applications, motions and orders, thereby allowing the Debtors and other parties-in-interest to (a) file one pleading in a consolidated case rather than separate pleadings in each chapter 11 case, (b) combine and streamline the service of pleadings and notices on creditors and other parties-in-interest and (c) monitor these chapter 11 cases by reviewing only one docket.

27.　Finally, the rights of the Debtors' creditors will not be adversely affected by the proposed procedural joint administration of these chapter 11 cases. Joint administration is for procedural purposes only and each creditor and party-in-interest will maintain whatever claims or rights it has against the particular Debtors' estate in which it allegedly has a claim or right.

FP01/ 6134752.9

28.     Based on the foregoing, I believe that joint administration of these chapter 11 cases is in the best interests of the Debtors, their creditors, and all parties-in-interest, and should be granted in all respects.

**Motion Regarding Cash Management, Bank Accounts and Business Forms**

29.     The Debtors seek the entry of an order that authorizes the Debtors: (i) to continue their existing cash management system; (ii) to maintain their existing bank accounts; and (iii) to continue to use their existing business forms.

30.     Before the Petition Date, the Debtors in the ordinary course of their businesses, used an automated, centralized cash management system to collect, transfer and disburse funds generated by their operations and to accurately record all such transactions as they were made (the "Cash Management System"). The Cash Management System provides a substantially unified system for the Debtors, which allows for an integrated method of accounting for revenues and expenses to be collected and paid. The Cash Management System consists of a number of accounts, each of which is described in detail below.

31.     The Debtors maintain approximately nine (9) bank accounts out of which they manage cash receipts and disbursements (the "Bank Accounts"). The Debtors believe that all of the Bank Accounts are in financially stable banking institutions with FDIC insurance (up to an applicable limit per Debtor per financial institution). These Bank Accounts are maintained at RBS Citizens Bank, Union Bank of California, Regions Bank, Wachovia Bank and Sovereign Bank (collectively the "Banks"). Of these Bank Accounts, approximately three (3) are deposit

11

accounts into which sales proceeds are deposited (the "Deposit Accounts"). These Deposit Accounts are held by Regions Bank, Wachovia Bank and Sovereign Bank.

32. Generally, once a day, each of the Debtors deposit receipts from sales (in the form of cash, check or credit card payment) and lock box deposits into the applicable Deposit Account. Most of these Deposit Accounts are swept daily automatically into the Debtors' main operating account held at Union Bank of California (the "Operating Account"). ACH and credit card transactions are also routed to the Operating Account.

33. Disbursements are made from a number of the Bank Accounts. Payments to the Debtors' vendors are made from the Operating Account. Weekly payments are made from the Operating Account to the Debtors' payroll accounts at Regions Bank and Wachovia Bank in order to satisfy the Debtors' payroll and other related obligations. The Debtors also maintain a flexible spending account at Union Bank of California, which is funded by transfers from the Operating Account.

34. The cash management procedures employed by the Debtors constitute ordinary, usual, and essential business practices and are similar to those used by other major corporate enterprises. The Cash Management System provides significant benefits to the Debtors, including the ability to control corporate funds centrally and to ensure the availability of funds when necessary. Compelling the Debtors to adopt a new, segmented cash management system during their stay in chapter 11 would be expensive and would create unnecessary administrative problems. Any disruption of the Cash Management System would have a severe and adverse effect upon the Debtors' ability to restructure its balance sheet and operate its business.

FP01/ 6134752.9

35.     Based on the foregoing, I believe that maintenance of the Cash Management System is in the best interests of the Debtors, their creditors, and all parties-in-interest, and should be granted in all respects.

36.     I am also advised that it is necessary for the Debtors to seek a waiver of the U.S. Trustee's requirement that the existing accounts be closed and that new postpetition accounts be opened. The existing accounts are a part of the carefully-constructed cash management system and allow for the Debtors to fund operations in a streamlined and cost-efficient manner. In order to avoid delays in payments to administrative creditors and to ensure minimal disruption to operations and a smooth transition into chapter 11, it is critical that the Debtors be permitted to maintain their existing bank accounts and, if circumstances require, add new accounts. Based on the foregoing, I believe that maintenance of the Bank Accounts is in the best interests of the Debtors, their creditors, and all parties-in-interest, and should be granted in all respects.

37.     To minimize expenses to their estates, the Debtors also request authorization to continue using all correspondence and business forms (including, but not limited to, letterheads, purchase orders, and invoices) existing immediately prior to the Petition Date without reference to the Debtors' status as debtors in possession. The Debtors will obtain new check stock and update their electronic check stock reflecting their status as debtors-in-possession.

38.     It is anticipated that parties doing business with the Debtors will be aware of their status as debtors-in-possession. A requirement that the Debtors change their business forms would be expensive and burdensome to the Debtors' estates and extremely disruptive to operations. In light of the above, the costs and potential disruption are not justified. Based on

13

the foregoing, I believe that continued use of the existing business forms is in the best interests of the Debtors, their creditors, and all parties-in-interest, and should be granted in all respects.

## Motion Concerning Utilities

39.     In the normal conduct of their business operations, the Debtors receive service from many utility companies and other providers (collectively, the "Utility Companies") for the provision of water, waste, electric, telephone, cellular, cable, technology infrastructure and other similar utility services (the "Utility Services").

40.     The Debtors' access to uninterrupted Utility Services is essential to operations. Should a Utility Company refuse or discontinue service, even for a brief period, the Debtors' operations could be severely disrupted, which would cause immediate and irreparable harm to the business. It is therefore critical that the Utility Services continue uninterrupted.

41.     The Debtors estimate that, in the three months prior to the Petition Date, they paid approximately $40,000 in aggregate monthly payments, on average, to the Utility Companies for Utility Services rendered. The Debtors anticipate that they will have sufficient availability of funds with which to pay all postpetition charges for Utility Services by virtue of cash on hand as of the Petition Date, expected cash flows from postpetition operations, and the consensual use of cash collateral.

42.     As an additional measure, the Debtors propose to deposit a sum equal to approximately fifty percent (50%) of their average aggregate monthly payment for Utility Services, or $20,000, into an account maintained by the Debtors to provide adequate assurance

14

of payment for future services to the Utility Companies. I believe that the Utility Deposit Account constitutes sufficient adequate assurance to the Utility Companies of payment for postpetition Utility Services.

43. Based on the foregoing, I believe that the relief sought in this motion is necessary, appropriate and in the best interests of the Debtors, their creditors, and all parties-in-interest, and therefore should be granted in all respects.

## Motion to Pay Pre-Petition Taxes

44. In the ordinary course of business, the Debtors incur certain taxes and fees (collectively, the "Taxes"; individually a "Tax") that are payable directly to various state and local taxing authorities (collectively, the "Taxing Authorities") as such payments become due.

45. Although the Debtors' records reflect that they are current on all Taxes that have become due as of the Petition Date, there is typically a lag between the time when the Debtors incur an obligation to pay the Taxes and the date such Taxes become due. Various Taxing Authorities may therefore have claims against the Debtors for Taxes that accrued prepetition but remain unpaid as of the Petition Date.

46. The Debtors estimate the total amount of prepetition Taxes owing to the various Taxing Authorities will not exceed $41,500. Any amounts that are actually due, but have not yet been paid to the Taxing Authorities because of the bankruptcy filings, represent a small fraction of the Debtors' total assets. Moreover, some of these outstanding tax liabilities are for trust fund

taxes the Debtors have collected and hold in trust for the benefit of the Taxing Authorities. Such funds do not constitute property of the estate and could not otherwise be used by the estates.

47. The Debtors' failure to pay the prepetition Taxes could have a material adverse effect on the Debtors' ability to operate in the ordinary course of business. I am advised that some, if not all, of the Taxing Authorities may initiate audits of the Debtors if the Taxes are not timely paid, which would divert the Debtors' attention from the liquidation process. In addition, if the Debtors do not pay the prepetition Taxes in a timely manner, the Taxing Authorities may attempt to suspend the Debtors' operations, file liens, seek to lift the automatic stay, and pursue other remedies harmful to the Debtors' estates.

48. I have also been advised that, to the extent the Debtors incurred "trust fund" taxes prior to the Petition Date that remain unpaid, the Taxing Authorities could subject the Debtors' directors and officers to lawsuits or criminal prosecution during the pendency of the Debtors' chapter 11 cases. The threat of a lawsuit or a criminal prosecution, and any ensuing liability, would distract these personnel from the Debtors' liquidation to the detriment of all parties-in-interest. The dedicated and active participation of the Debtors' directors and officers is integral to the Debtors' orderly administration of these chapter 11 cases.

49. The Debtors have determined, in the exercise of their business judgment, that paying the prepetition Taxes is in the best interests of their estates, their creditors, and all parties-in-interest. Failure to pay the prepetition Taxes could have a material adverse effect on the Debtors' operations as Taxing Authorities may take actions against the Debtors for such non-payment, resulting in significant administrative problems for the estates which would consume

16

Debtors' valuable time and resources. Prompt and regular payment of the prepetition Taxes would avoid those unnecessary and distracting governmental actions and also would avoid actions against directors and officers, who might otherwise be held personally liable for the non-payment of "trust fund" taxes.

50. Based on the foregoing, I believe the relief requested in this motion is necessary, appropriate and in the best interests of the Debtors' estates, creditors, and other parties-in-interest.

**Employee Wage Motion**

51. To minimize the personal hardships the Debtors' employees (the "Employees") will suffer if prepetition employment-related obligations are not paid when due or as expected, as well as to maintain employee morale during this critical time, the Debtors seek entry of an order authorizing, but not directing, the Debtors to: (i) pay all prepetition wages, salaries, and other accrued compensation to employees; (ii) reimburse all prepetition employee business expenses; (iii) make all payments for which prepetition payroll deductions, withholdings, or matching employer contributions were made; (iv) make all contributions to prepetition employee benefit programs and continue such programs in the ordinary course of business; (v) honor workers' compensation program obligations; and (vi) pay all processing costs and administrative expenses relating to the foregoing payments and contributions, including any payments to third-party administrators or other administrative service providers.

52. To assist in the implementation of the relief requested, the Debtors further request that their banks be authorized to honor: (i) prepetition payroll checks or wires and (ii) all other

checks or wires issued for payments approved by this Motion, regardless of whether such checks or wires were drawn prior to or after the Petition Date. The Debtors also seek authorization to reissue prepetition checks or wires for payments approved by this Motion that are dishonored notwithstanding the foregoing authorizations.

53.     The Debtors currently employ approximately 200 employees (the "Employees") in the United States, of whom 195 are full-time employees and 5 are part-time employees. Approximately 155 Employees (78%) are paid on an hourly basis, and approximately 40 Employees (20%) receive a salary. Certain Employees who work in the Debtors' warehouse ("Warehousemen") are also entitled to monthly productivity and safety incentive payments ("Warehouse Incentives").

54.     In the ordinary course of the Debtors' business, Employees are issued payroll checks by the Debtors on a weekly basis and are paid with a one week lag. On average, the Debtors have current payroll expenses of approximately $142,000 per weekly pay period, exclusive of the deductions and exclusions detailed below. The Debtors' payroll is funded through a combination of direct deposit and payments made via check.

55.     Due to the filing of the Bankruptcy Cases, some of the Employees have not received wages for time worked prior to the Petition Date. Moreover, some payroll checks issued to Employees prior to the Petition Date may not have been presented for payment or cleared the banking system prior to the Petition Date and, accordingly, may not have been honored and paid as of the Petition Date.

FP01\ 6134752.9

56.     The Debtors estimate that the aggregate amount of accrued prepetition wages, salaries, overtime pay, and other cash compensation that remains unpaid to the Employees as of the Petition Date is approximately $200,000 (the "Unpaid Employee Compensation"). To the best of the Debtors' knowledge, no Employee is owed more than $10,950 for Unpaid Employee Compensation.

57.     In addition to the Employees, the Debtors also retain the services of (a) approximately five to fifteen independent contractors and from time to time use temporary labor for its office, administration sales, and warehouse operations (the "Contract Service Personnel") some of whom are arranged through various agencies and other third-party providers (the "Contract Personnel Suppliers") and (b) independent sales representatives (the "Sales Representatives") who are authorized to sell the Debtors' products.

58.     In the ordinary course of business, the Debtors reimburse Employees for certain expenses incurred in the scope of their employment on the Debtors' behalf, Contract Service Personnel and Sales Representatives for actual and necessary expenses incurred on behalf of the Debtors (the "Reimbursable Expenses"). The Debtors generally reimburses the Reimbursable Expenses within one or two weeks of the submission of a proper expense report. Reimbursable Expenses include expenses for travel (including for meals, tickets, lodging, and automobile mileage), business supplies, leased vehicles, and other business-related expenses. The Debtors are unable to provide a detailed listing of unpaid Reimbursable Expenses at this time because it is likely that Employees will submit requests for reimbursement of expenses incurred prepetition after the Petition Date. Based on past experience, Debtors estimates that the Reimbursable Expenses will total approximately $75,000 as of the Petition Date.

FP01/ 6134752.9

59.     During each applicable pay period, the Debtors routinely deduct certain amounts from paychecks (collectively, the "Deductions"), including, without limitation: (i) garnishments for child support and similar deductions; (ii) voluntary charitable contributions; (iii) pre-tax contributions to health and dependent care spending accounts; and (iv) other pre-tax and after-tax deductions payable pursuant to certain of the Employee benefit plans discussed below and other miscellaneous deductions. The Debtors forward the amount of the Deductions to the appropriate third-party recipients. On average, the Debtors deduct a current total of approximately $16,500 from the Employee's per pay period for the Deductions. As of the Petition Date, certain Deductions may not have been forwarded to the appropriate third- party recipients.

60.     The Debtors also are required by law to (i) withhold from an Employee's wages amounts related to, among other things, federal, state, and local income taxes, social security, and Medicare taxes (collectively, the "Withheld Amounts") for remittance to the appropriate federal, state, or local taxing authorities and (ii) make matching payments for social security and Medicare taxes and pay additional amounts, based upon a percentage of gross payroll, for state and federal unemployment insurance (the "Employer Payroll Taxes," and together with the Withheld Amounts, the "Payroll Taxes"). In aggregate, the Payroll Taxes, including both the Employee and the employer portions, total approximately $45,000 per pay period.

61.     The Contract Service Personnel work in various positions for the Debtors including, but not limited to, managerial and professional positions, IT positions, sales, administration, marketing roles, and operations. The Debtors generally pay Contract Service Personnel directly, or through Contract Personnel Suppliers, on a weekly basis. The Debtors estimate that, as of the Petition Date, no more than approximately $75,000 remains outstanding

20

to Contract Service Personnel and/or Contract Personnel Suppliers (the "Unpaid Contract Personnel Compensation"). To the best of the Debtors' knowledge, none of the Contract Service Personnel are individually owed more than $10,950 on account of services provided prior to the Petition Date.

62. The Sales Representatives earn sale-based commissions and incentives and are typically paid monthly, one month in arrears. Historically, Debtors made approximately $325,000 in incentive and commission payments each month. Based on this historical information, the Debtors estimate that between $200,000 and $250,000 is due and owing as of the Petition Date, which represents incentives and commissions from November 1, 2009 through Petition Date (the "Unpaid Commissions") and together with the Unpaid Employee Compensation, the Reimbursable Expenses, the Deductions, the Payroll Taxes, and Unpaid Contract Personnel Compensation, the "Unpaid Compensation").

63. The Debtors also offer or provide Employees (and their dependents) with a variety of benefits. These employee benefits include, but are not limited to: (i) healthcare, dental, and other related coverage; (ii) certain leave benefits; (iii) a 401(k) plan in which Employees can participate and for which the Debtors pay the administrative fee; and (iv) other miscellaneous benefits described in greater detail below. The Debtors believe that as of the Petition Date, the total amount owed or accrued in connection with the Employee Benefits Programs (as defined below) due to Employees is approximately $37,400, for an average of approximately $192 per Employee.

21

64.     The Debtors offer coverage to Employees (and their dependents) for medical and prescription drugs and certain other related benefits and, in certain instances, have healthcare-related funding obligations relating to employees collecting severance benefits (collectively, the "Medical Benefits"). These benefits are offered to all full-time Employees who have completed at least 90 days of continuous service. Medical Benefits provided to all Employee's are funded through a "self insured" program administered by Blue Cross and Blue Shield PPO. The Debtors estimate that the aggregate amount due and owing on account of the Medical Benefits as of the Petition Date is approximately $125,000.

65.     Employees eligible for the Medical Benefits pay a flat per pay period contribution for their own coverage and/or family coverage. The Debtors pay claims, subject to employee co-pays and deductibles for the medical claims. The Debtors maintains insurance for their benefit for claims above $35,000 per covered employee. Currently, the Debtors provide Medical Benefits to 152 Employees. On average, Debtors pay approximately $12,000 per week to Blue Cross and Blue Shield to administer and fund the program (the "Health Plan"). Employees contribute approximately $5,400 per pay period. As of the Petition Date, the Debtors believe that there is approximately $25,000 due to Blue Cross and Blue Shield. Due to the normal lag time in receiving claims, the Debtors cannot be sure of the total amount due as of the Petition Date.

66.     The Debtors provide comprehensive dental benefits ("Dental Benefits") to all full-time Employees who have completed at least 90 days of continuous service. The Dental Benefits for Alabama and Pennsylvania Employees are provided by Southland National Insurance Corporation Group Policy Number Southland-2041. Employees eligible for the Dental Benefits

22

pay a flat per pay period contribution for single or family coverage. The coverage is funded on a "pass thru" basis. Debtors agree on a cost of coverage with the insurance carrier and collect the cost of coverage via payroll deduction (from Employees) and remit same to Southland National. Currently, the Debtors provide Dental Benefits to 132 Employees. On average, the Debtors pay Southland National approximately $5,000 per month. Employees contribute approximately $1,200 per pay period, not accounted for in previously stated Debtors' expense to Southland National. As of the Petition Date, the Debtors believe that there is a pre-petition contribution of approximately $5,000 to be paid to Southland National. The Debtors also provide comprehensive vision benefits on a voluntary basis (similar to the Dental plan) to all full-time Employees who have completed at least 90 days of continuous service. The vision benefits are provided by CompBenefits (together with the Dental Benefits, the "Dental and Vision Plan"). Employees eligible for the vision benefits pay a flat per pay period contribution for single and/or family coverage. Currently, the Debtors provide vision benefits to 101 Employees. On average, the Debtors pay approximately $1,400 per month in connection with vision benefits. Employees contribute approximately $290 per pay period. As of the Petition Date, the Debtors believe that there is approximately $1,200 due to CompBenefits

67. The Debtors provide most Employees with paid time-off benefits, depending upon the Employee's classification and length of employment. The Debtors provide some form of paid leave in connection with vacation time, sick days, holidays, personal leave, jury duty, and bereavement leave (collectively the "Leave Policies"). Vacation time for the Employees functions on a "use it or lose it" system, whereby Employees lose any accrued but unused vacation at the end of each calendar year or upon termination. The remainder of the Leave

Policies are obligations ultimately satisfied in the ordinary course of business through salary and payroll continuation.

68. The Debtors' 401(k) plan (the "401(k) Plan") is maintained for the benefit of certain eligible hourly and salaried Employees. The 401(k) Plan generally allows participants to make automatic pre-tax salary Deductions of eligible compensation up to the limits set by the Internal Revenue Code. The Debtors suspended matching contributions to the plan effective January 1, 2009. At the time matching was in place, the plan called for the Debtors to match participating Employees' contributions at 20% for every dollar contributed. Approximately 93 eligible Employees currently participate in the 401(k) plan. The Debtors deduct contributions and loans when applicable from participating Employee's paychecks and remits the Employee contribution and employer matching amounts to Nationwide Financial Services, the Third Party Administrator. The approximate aggregate amount withheld from Employee paychecks for contributions and loans to the 401(k) Plan is approximately $6,000 per pay period. As of the Petition Date, the Debtors believe that the approximate amount of deductions and contributions that needs to be forwarded to Nationwide Financial Services is $6,000.

69. The Debtors provide basic life insurance and accidental death and dismemberment coverage ("Life and AD&D Insurance Coverage") to all full-time Employees, *at no cost,* through Jefferson Pilot/Lincoln Financial. Currently, the Debtors provide Life insurance to approximately 150 Employees. The Life insurance costs the Debtors a total of approximately $1,500 per month. As of the Petition Date, the Debtors believe that there is approximately $1,500 is owed to Jefferson Pilot/Lincoln Financial.

24

70.     Eligible Employees may supplement the Life and AD&D Insurance Coverage with additional personal life insurance and optional accidental death and dismemberment coverage ("Supplemental Insurance"). Employees, at their option, can purchase additional term life insurance (on a pass though basis) from Metropolitan Life Insurance Company or additional whole life insurance through Boston Mutual Life Insurance Company. The Debtors believe that they owe approximately $1,500.00 for prepetition amounts in connection with the Supplemental Insurance.

71.     The Debtors provide both short term and long term disability coverage (collectively, the "Disability Coverage") to all full-time Employees. Salaried employees are provided three (3) months short term disability through a salary continuation program funded by the Debtors. Hourly employees are offered the opportunity to purchase short term disability insurance offered by Jefferson Pilot, via payroll deduction. Currently 68 hourly employees participate in the short term disability program at an approximate weekly cost of $400. After the three month short term disability program, the Debtors provide, at no cost to salaried and administrative Employees and warehouse supervisors, a long term disability program through Jefferson Pilot/Lincoln Financial Group. Currently, the Debtors provide Disability Insurance to approximately 73 Employees. The Disability Insurance costs the Debtors a total of approximately $2,700 per month. As of the Petition Date, the Debtors believe that there is approximately $2,700 owed to Jefferson Pilot related to Disability Coverage.

72.     The Debtors provide Hospital Indemnity and Cancer Insurance (the "Hospital Indemnity and Cancer Coverage") through Sun Life Financial. Coverage is voluntary and costs are 100% covered by employee payroll deductions. Cancer coverage has been purchased by

25

approximately 35 Employees. Approximately 29 Employees are provided hospital indemnity coverage. On average, the Debtors collect approximately $1,000 per month via payroll deduction. As of the Petition Date, the Debtors believe that there is approximately $1,000 due Sun Life.

73. The laws of the states in which the Debtors operate or in which the Employees reside require the Debtors to maintain workers' compensation policies and programs to provide their Employees with compensation for injuries arising from or related to their employment with the Debtors (such programs, and the financing thereof, the "Workers' Compensation Program", and together with the Medical Benefits, the Leave Policies, the 401(k) Plan, and the Additional Employee Benefits, the "Employee Benefits Programs"). This insurance is underwritten and administered by the Alabama Self Insured Worker's Compensation Fund in the State of Alabama and Sentry Insurance Co. in Pennsylvania. The annual cost of the benefit is approximately $110,000. By this Motion, the Debtors seek authority to continue to pay these benefits, as required by applicable law, as part of the Workers' Compensation Programs.

74. In the ordinary course of business the Debtors utilize the services of numerous third-party administrators to whom the Debtors outsource tasks associated with the payment of compensation and benefits to Employees. Those administrative services include (a) administering or assisting in the administration of the Debtors' payroll processes, benefit plans, and workers' compensation obligations; (b) facilitating the administration and maintenance of its books and records; (c) assisting with legal compliance issues; and (d) conducting special administrative and legal compliance projects in respect of Employee benefit plans and programs (the costs associated therewith, the "Third-Party Administrative Costs", and together with the

FP01/ 6134752.9

Unpaid Compensation and the Employee Benefits Programs, the "Employee Wages and Benefits"). The ordinary course services provided by these third-parties ensure that the Debtors' obligations with respect to Employees continue to be administered in the most cost-efficient manner and comply with all applicable laws.

75.     The Debtors also seek the entry of an order authorizing and directing all banks and financial institutions to receive, process, honor, and pay any and all checks or electronic transfers drawn on the Debtors' payroll and general disbursement accounts related to ordinary course Employee Compensation, including wages, salaries, incentives, and other compensation, COBRA obligations, Employee Benefits, Employee Benefit Plans, sick time, reimbursable expenses, and Independent Contract or Claims, whether presented before or after the Petition Date, and without further order of Court, provided that sufficient funds are on deposit in the applicable accounts to cover such payments.

76.     Based on the foregoing, I believe that the relief requested in the wage motion is necessary, appropriate and is in the best interests of the Debtors' estates, creditors, and other parties-in-interest.

**Claims Agent Retention Motion**

77.     The Debtors respectfully submit that the retention of The Garden City Group, Inc. ("GCG") as the Claims and Noticing Agent in the case will promote the economical and efficient administration of their estates. Utilizing GCG as the Claims and Noticing Agent in these cases will allow the Debtors to avoid duplication in claims administration and in providing notices to creditors. Additionally, the large number of creditors and other parties in interest involved in the

Debtors' Chapter 11 cases would almost certainly impose heavy administrative and other burdens upon the Court and the Office of the Clerk of the Court (the "Clerk's Office"). To relieve the Court and the Clerk's Office of these burdens, the Debtors propose to engage GCG as the Claims and Noticing Agent in their Chapter 11 cases.

78. GCG is a data processing firm that specializes in Chapter 11 administration and related tasks, including noticing, claims processing, voting and other administrative tasks in Chapter 11 cases. The Debtors desire to engage GCG to send out certain designated notices and to maintain claims files and a claims and voting register. The Debtors believe that such assistance will expedite service of notices, streamline the claims administration process and permit the Debtors to focus on their reorganization efforts.

79. Based on the foregoing, I believe that this retention in connection with these chapter 11 cases is in the best interests of the Debtors' estates and especially creditors and should be granted in all respects.

**Motion Confirming Administrative Expense Status for Post-Petition Deliveries**

80. In the normal operation of its business, the Debtors relies on providers of goods, materials and services including, but not limited to, manufacturers and suppliers, as well as transporters, and product servicers (collectively, the "Vendors").

81. In the ordinary course of its business, the Debtors had approximately $5.6 million (at cost value) of purchase orders outstanding (the "Outstanding Orders") as of the Petition Date,

28

with various Vendors for goods and merchandise ordered by the Debtor prepetition, which will be delivered to the Debtors postpetition.

82.     As a consequence of the commencement of the Bankruptcy Cases, Vendors may be concerned that goods, materials and/or services ordered prior to the Petition Date pursuant to the Outstanding Orders, which will be delivered to the Debtors postpetition, will render the Vendors general unsecured creditors of the Debtors' estates with respect to such goods or services. Vendors may refuse to ship or transport such goods (or recall shipments) with respect to such Outstanding Orders unless the Debtors issue substitute purchase orders postpetition or obtain an order of the Court granting all undisputed obligations of the Debtors arising from the Debtors' postpetition receipt and acceptance of goods subject to Outstanding Orders administrative expense priority status under section 503(b) of the Bankruptcy Code and authorizing the Debtors to satisfy such obligations in the ordinary course of its business under section 363(c) of the Bankruptcy Code.

83.     Based on the foregoing, the Debtors submit and I believe that the relief requested is essential and in the best interest of the Debtors' estates and creditors, and therefore should be granted to avoid immediate and irreparable harm.

**Motion Concerning Continuation of Customer Programs**

84.     In the ordinary course of business, the Debtors engage in certain practices to develop and sustain positive relationships with its customers. These practices center around customer incentive and rebate programs (the "Rebates"), refund, exchange, and warranty

29

programs (collectively, the "Customer Programs"). The goal of the Customer Programs is to meet competitive pressures, ensure customer satisfaction, and generate goodwill for the Debtors.

85.     Rebates are available to all of the Debtors' customer types – wholesale, retail and Heating, Ventilation and Air Conditioning (HVAC) customers – and are offered to approximately 32 buying groups, which are groups of customers linked for the purpose of buying goods and receiving the Rebates, and approximately 162 individual accounts.

86.     The Rebates are calculated by multiplying a percentage of total sales of a buying group or individual account in a product category. The annual volume incentive and sales target set for the year vary by customer and are based on that buying group or individual account's prior year's sales. In addition, some customers require support in the sale of the Debtors' products in the form of advertising, marketing and promotion allowances and payments. As such, the Rebates incentivize buying groups and individual account holders to purchase more than the year before and the greater the prior year's sales, the more attractive the Rebate program is for the following year.

87.     The timing of payments of Rebate is customized for each Rebate program for a buying group or individual account. The Rebates may be paid either monthly, quarterly, semi-annually or annually.

88.     The Rebates are a critical component of the Debtors' sales: of the Debtors' $100 million in sales in 2008, rebates were paid on approximately 69% of sales. As of the Petition Date, the Debtors estimate that there may be approximately $575,000 in Rebates earned by customers.

FP01/ 6134752.9

89.     All merchandise sold by the Debtors is guaranteed against defects in material and workmanship for a period of one year. Pursuant to the warranty program, the warranty is limited to replacement or credit, not to exceed the purchase price, and such warranty does not include any related labor or installation charges of any kind. In the first ten months of 2009, the Debtors paid less than $20,000 on account of the warranty program.

90.     The Debtors' return policy provides that a customer who obtains prior authorization from the Debtors, may, in certain circumstances, return most purchased items to one of the Debtors' warehouses for a full refund or credit (subject to the handling charge described herein) within 30 days of receipt of an RGA number. Unless otherwise agreed to, a handling charge of 15% of original invoice value is applied to such returns. In order to be eligible to participate in the return program, the customer must ship the item to the Debtors and pre-pay the freight charges all within 30 days following the receipt of the RGA number. Only items that were originally sold by the Debtors and are clean and are in resalable condition are eligible for return. Special orders and non-stock items are non-returnable. The average return rate is approximately 2.4%. This policy provides the Debtors' customers with comfort that they will be able to return merchandise if, for example, the merchandise purchased is not the correct size or does not conform to the end-user specification or requirements.

91.     The Debtors seek to honor and continue the Customer Programs because those programs have been successful in the past and are directly responsible for generating goodwill and increased revenue, margins, and profitability for their business. In some cases they also represent an effective means to help secure the Debtors' market share. The Debtors believe that

31

maintaining those benefits throughout the Bankruptcy Cases is essential to the continued operation of their business and, ultimately, to its prospects for a successful reorganization.

92.     The relief requested by this Motion is essential to mitigate any negative attitudes associated with a chapter 11 filing and to limit any negative effect of such filing on customer behavior. In particular, the Debtors' goodwill and ongoing business relationships are likely to suffer if its customers or the representatives that sale the Debtors' products (the "Sales Reps") perceive that the Debtors are unable or unwilling to fulfill the prepetition promises they made through the Customer Programs. The same would be true if customers or Sales Reps believe the Debtors will no longer offer the full package of benefits or quality of products that customers demand.

93.     The Debtors believe the Customer Programs benefit customer development and retention, solidify customer relationships, allow the Debtors to retain the services of the Sales Reps, and bolster sales of new and existing products. Potential purchasers of the Debtors' products have many options in the marketplace and will be less likely to purchase the Debtors' products if there are interruptions in the Customer Programs. Without the continued support of its customers and Sales Reps, the Debtors' business will suffer significant harm.

94.     Based on the foregoing, the Debtors submit and I believe that the relief requested is essential and in the best interest of the Debtors' estates and creditors, and therefore should be granted to avoid immediate and irreparable harm.

32

## Motion Concerning Critical Shippers

95.  The Debtors' supply and delivery system depends upon the use of reputable common carriers (the "Shippers"), as well as a network of third-party warehousemen who store goods in transit on behalf of the Debtors (the "Warehousemen"). In addition, the Debtors utilize the services of customs agents to facilitate the shipment of goods into and out of the United States.

96.  In many instances, the Debtors, as well as their customers, carry limited inventory. In some cases the Debtors are dependent on daily receipts of goods, materials, displays, and components to service their customers. In turn, customers are dependent on Debtor's on-time delivery of goods and displays to assure that they can meet the requirements of their customers and avoid extensive investments in inventory. The Debtors employ various third parties, including the Shippers and Warehousemen, to ensure that their delivery network runs smoothly. The Debtors engage Shippers to transport, store and deliver raw materials, goods and components to the Debtors, as well as finished products to the Debtors' customers. The Debtors contract with Warehousemen to store raw materials and finished goods which are in inventory.

97.  As a result, in the ordinary course of business, Shippers and Warehousemen regularly have possession of raw materials and supplies, as well as finished goods, components, and displays offered by the Debtors and intended for delivery to their customers. The Debtors expect that, as of the Petition Date, certain of the Shippers and Warehousemen will have outstanding invoices for goods that were delivered to the Debtors and Debtors' customers prior to the Petition Date.

33

98. Under most state laws, a Shipper or a Warehouseman may have a lien on the goods in its possession, which lien secures the charges or expenses incurred in connection with the transportation or storage of such goods. Additionally, pursuant to section 363(e) of the Bankruptcy Code, the Shippers or Warehousemen, as bailees, may be entitled to adequate protection in the form of a possessory lien. As a result, certain Shippers and Warehousemen may refuse to deliver or release goods in their possession or control, as applicable, before the prepetition amounts owed to them by the Debtors (collectively, the "Shipping and Warehousing Claims") have been satisfied and their liens redeemed.

99. The Debtors' businesses are necessarily shipping intensive and are dependent upon timely delivery and receipt of raw materials, packaging, components and finished goods. The Debtors receive daily shipments of the materials, goods, components, and supplies that are required to operate their facilities and reliably supply on a timely basis the full range of products ordered by their customers. Additionally, the Debtors routinely ship finished goods from mills to their numerous plants and to warehouses prior to shipping such goods to their customers. Finally, the Debtors ship finished goods and displays from various locations to their customers.

100. The Debtors believe that the value of the goods and materials in the possession of the Shippers and Warehousemen, and the potential injury to the Debtors if they are not timely released, is likely to substantially exceed the amount of Shipping and Warehousing Claims asserted by such parties. Indeed, even if the Shippers and Warehousemen did not have valid liens under applicable state law, their possession (and retention) of the Debtors' goods would severely disrupt, and potentially cripple, several of the Debtors' customers' operations because of their reliance on Debtor's timely supply of products and displays as well as their inability to get paid

34

(in some cases) if they are unable to complete job or as well as risk the loss of their own customers. Similarly, some of the Debtor's customers measure on-time performance and impose significant fines and/or order cancellation if the Debtors' fail to timely deliver.

101.   For these reasons, the Debtors and I believe that it is necessary and essential to their reorganization efforts and the enhancement and preservation of the value of their estates that they be permitted to make payments on account of certain Shipping and Warehousing Claims.

102.   Based on the foregoing, the Debtors submit and I believe that the relief requested is essential and in the best interest of the Debtors' estates and creditors, and therefore should be granted to avoid immediate and irreparable harm.

**Cash Collateral Motion**

103.   The Debtors' estates will suffer immediate and irreparable harm if the Debtors do not obtain immediate access to the Lenders' cash collateral.

104.   Over the last several months, the Debtors have engaged in extensive negotiations with the Administrative Agent, the Lenders and Cortec in an effort to reach a consensual resolution that will allow the Debtors a chance to reorganize for the benefit of their creditors. Towards that end, the Debtors reached an agreement with the Administrative Agent and Consenting Lenders concerning the consensual use of the Lenders' Cash Collateral.

105.   The Cash Collateral will be used to pay for expenses identified in the budget attached as Exhibit "A" to the Interim Order (the "Budget"). Such expenses include, but are not

35

limited to, employee payroll and other benefits, rent, and other expenses related to the Debtors' business operations. The Budget prepared by the Debtors, with the assistance of their advisors, shows the Debtors' projected expenditures over a 13 week period and estimates the period in which such cash expenditures need to be paid. At the present time, the Debtors believe that the use of Cash Collateral will be sufficient to fund their operations.

106. The reasons supporting the Debtors' need to use Cash Collateral during the course of the Debtors' cases are compelling. Without use of Cash Collateral, the Debtors will not be able to fund the day-to-day operating expenses, including payments to employees and sustaining

*[Remainder of page intentionally left blank]*

the going concern value of the Debtors' businesses. Unless the Court authorizes the use of Cash Collateral, the Debtors will be unable to pay for services and expenses necessary to preserve and maximize the value of the Debtors' assets while it attempts to obtain confirmation of its plan of reorganization. Indeed, absent sufficient funds to support the Debtors' business operations, the value of the Debtors' assets are likely to quickly erode. Therefore, authorization to use Cash Collateral pending the Final Hearing is in the best interests of the Debtors' estates and creditors.

107.    Based on the foregoing, the Debtors submit and I believe that the relief requested in the Cash Collateral Motion is essential and in the best interest of the Debtors' estates and creditors, and therefore should be granted to avoid immediate and irreparable harm.

### III. The Debtors' Objectives

108.    The Debtors believe that the commencement of the Bankruptcy Case is in the best interests of creditors, the estates and other parties in interest, providing among other things, the ability to maximize returns to creditors and other stakeholders of the Debtors. As it did during the pre-petition period, the Debtors, with the assistance of its professionals, will continue to maintain its going concern value while actively pursuing the restructuring as set forth in the Plan Support Agreement executed with the Administrative Agent and Consenting Lenders. In sum, the relief requested in these First Day Motions is in the best interests of the Debtors, their estates, creditors, and all parties-in-interest, and should be granted in all respects.

109.    I declare under penalty of perjury that the foregoing is true and correct.

Name: Ed Moulin
Title: Chief Financial Officer

Subscribed and sworn to before
me this 15th day of _Dec._ , 2009.

_Ramona Maddox_
NOTARY PUBLIC

My Commission expired July 6, 2011.