## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Plumbing Holdings Corporation, et al.,[1] | ) | Case No. 09-14413 (CSS) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| _____ | ) | |

## DISCLOSURE STATEMENT IN SUPPORT OF THE DEBTORS' SECOND AMENDED JOINT PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

### IMPORTANT DATES

- Date by which ballots must be received:  December 15, 2010 at 4:00 p.m. (prevailing Eastern time)
- Date by which objections to Confirmation of the Plan must be filed and served: December 15, 2010 at 4:00 p.m. (prevailing Eastern time)
- Hearing on Confirmation of the Plan:  December 21, 2010 at 10:00 a.m. (prevailing Eastern time)

Dated: November 12, 2010

**DRINKER BIDDLE & REATH LLP**
Andrew C. Kassner (DE 4507)
Howard A. Cohen (DE 4082)
1100 N. Market Street, Suite 1000
Wilmington, DE 19801-1254
Telephone: (302) 467-4200
Facsimile:  (302) 467-4201

- and -

Michael P. Pompeo (admitted *pro hac vice*)
500 Campus Drive
Florham Park, NJ  07932-1047
Telephone: (973) 360-1100
Facsimile: (973) 360-9831

Attorneys for the Debtors and
Debtors in Possession

---

**THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN DESCRIBED HEREIN IS DECEMBER 15, 2010 AT 4:00 P.M., PREVAILING EASTERN TIME, UNLESS THE DEBTORS EXTEND THIS DATE PRIOR TO THE VOTING DEADLINE.  TO BE COUNTED, THE VOTING AGENT MUST RECEIVE YOUR BALLOT OR MASTER BALLOT ON OR BEFORE THE VOTING DEADLINE.**

---

[1]   The Debtors in these cases, along with the last four digits of each of the Debtor's federal tax identification number, are: Plumbing Holdings Corporation (5376) and Jones Stephens Corp. (8381).

<u>**PLEASE READ THIS IMPORTANT INFORMATION**</u>

**THE BANKRUPTCY CODE REQUIRES THAT THE PARTY PROPOSING A CHAPTER 11 PLAN OF REORGANIZATION PREPARE AND FILE A DOCUMENT WITH THE BANKRUPTCY COURT CALLED A "DISCLOSURE STATEMENT." THIS DOCUMENT IS THE DISCLOSURE STATEMENT (THE "DISCLOSURE STATEMENT") FOR THE PLAN DESCRIBED HEREIN. THE DISCLOSURE STATEMENT INCLUDES CERTAIN EXHIBITS, EACH OF WHICH ARE INCORPORATED INTO AND MADE A PART OF THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.**

**THE BANKRUPTCY COURT HAS REVIEWED THIS DISCLOSURE STATEMENT, AND HAS DETERMINED THAT IT CONTAINS ADEQUATE INFORMATION AND MAY BE SENT TO YOU TO SOLICIT YOUR VOTE TO ACCEPT THE PLAN.**

**ALL HOLDERS OF CLAIMS AND INTERESTS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ AND CAREFULLY CONSIDER THIS <u>ENTIRE</u> DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS CITED HEREIN AND THE PLAN ATTACHED HERETO, BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.**

**THE STATEMENTS AND OTHER INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT WERE MADE AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFIED. HOLDERS OF CLAIMS AND INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THE DATE SET FORTH ON THE COVER PAGE HEREOF. HOLDERS OF CLAIMS AND INTERESTS MUST RELY ON THEIR OWN EVALUATION OF THE DEBTORS AND THEIR OWN ANALYSIS OF THE TERMS OF THE PLAN IN DECIDING WHETHER TO ACCEPT OR REJECT THE PLAN.**

**THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT SOLELY FOR PURPOSES OF SOLICITING HOLDERS OF CLAIMS AND INTERESTS TO ACCEPT OR REJECT THE PLAN. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE USED BY ANY PERSON FOR ANY OTHER PURPOSE. THE CONTENTS OF THIS DISCLOSURE STATEMENT SHALL NOT BE DEEMED AS PROVIDING ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE. THE DEBTORS URGE EACH HOLDER OF A CLAIM OR INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY SUCH LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT AND THE PLAN. MOREOVER, THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER.**

**THE DEBTORS HAVE NOT AUTHORIZED ANY PARTY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OR THE DEBTORS OR THE**

VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.  HOLDERS OF CLAIMS AND INTERESTS SHOULD NOT RELY UPON ANY OTHER INFORMATION, REPRESENTATIONS, OR INDUCEMENTS MADE TO OBTAIN ACCEPTANCE OR REJECTION OF THE PLAN.

THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.

NEITHER THIS DISCLOSURE STATEMENT NOR THE PLAN HAS BEEN FILED WITH OR REVIEWED BY, AND THE NEW PLAN SECURITIES TO BE ISSUED PURSUANT TO THE PLAN WILL NOT HAVE BEEN THE SUBJECT OF A REGISTRATION STATEMENT FILED WITH, THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC") UNDER THE SECURITIES ACT OF 1933 (THE "SECURITIES ACT"), OR ANY SECURITIES REGULATORY AUTHORITY OF ANY STATE UNDER ANY STATE SECURITIES LAW ("BLUE SKY LAW").  THE PLAN HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SEC OR ANY STATE SECURITIES COMMISSION AND NEITHER THE SEC NOR ANY STATE SECURITIES COMMISSION HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN.

THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF THE NEW PLAN SECURITIES BEING ISSUED PURSUANT TO THE PLAN CONSULT THEIR OWN ADVISORS CONCERNING ANY RESTRICTIONS ON THE TRANSFERABILITY OF SUCH SECURITIES.

THIS DISCLOSURE STATEMENT SUMMARIZES CERTAIN PROVISIONS OF THE PLAN, CERTAIN OTHER DOCUMENTS, AND CERTAIN FINANCIAL INFORMATION.  THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE.  IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION CONTAINED IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR THE OTHER DOCUMENTS OR FINANCIAL INFORMATION INCORPORATED HEREIN BY REFERENCE, THE PLAN, OR SUCH OTHER DOCUMENTS, AS APPLICABLE, SHALL GOVERN FOR ALL PURPOSES.

THE DEBTORS URGE ALL HOLDERS OF CLAIMS WHOSE VOTES ARE BEING SOLICITED TO VOTE TO ACCEPT THE PLAN.

## **TABLE OF EXHIBITS**

| Exhibit | Name |
|---------|------|
| A | Joint Plan of Reorganization |
| B | Financial Projections |
| C | Liquidation Analysis |
| D | Lender/ACAS Term Sheet |

# I.
# BACKGROUND

## Section 1.01   Introduction

Plumbing Holdings Corporation ("PHC" or "Parent") and Jones Stephens Corp. ("Jones Stephens" or "JSC"), debtors and debtors-in-possession (collectively, the "Debtors") are providing this Disclosure Statement[2] to you pursuant to section 1125 of the Bankruptcy Code for use in connection with (i) the solicitation of acceptances or rejections of the Debtors' Plan and (ii) the Confirmation Hearing scheduled for December 21, 2010, at 10:00 a.m. prevailing Eastern time.

The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code.  No materials other than the Disclosure Statement and any exhibits and schedules attached thereto or referenced therein have been authorized by the Debtors for use in soliciting acceptances or rejections of the Plan.

## Section 1.02   Company History

Jones Stephens was founded by Butch Jones and Donald J. Stephens, two veterans of the plumbing products industry.  The two began working together in 1980 while at Jones Manufacturing, a manufacturer of plumbing and related products founded by Butch's father. Jones Manufacturing was a subsidiary of Jones Plumbing Systems, Inc., and its operations included a foundry as well as chroming and plastic injection-molding capabilities.  Jones Plumbing Systems, Inc. grew rapidly and was sold in 1984.

Following his departure from Jones Manufacturing in 1991, Mr. Jones served a two-year non-compete term, and upon its expiration in 1993, founded Jones Stephens with Mr. Stephens. The founders employed a strategy that avoided competing in areas dominated by large, well-known players with branded products, choosing instead to focus on products that were less visible to end users, but critical to plumbing systems.

The company began with a product catalog which included fittings, gaskets, drains, a variety of tools, and specialty decorative items for bathrooms and kitchens.  Capitalizing on the extensive knowledge and industry contacts of its founders, Jones Stephens grew, expanding its product offering as well as distribution to include retail customers in 1996.

In 1999, Butch Jones and Donald J. Stephens began to increasingly delegate responsibilities to the company's management team, led by Byron Shaw.  Over the next four years Jones Stephens continued to grow, constructed a new warehouse facility, and developed a infrastructure to support its expanding product portfolio.

In November of 2003, American Capital Strategies, Ltd. completed the acquisition of Jones Stephens.  During American Capital's ownership, Jones Stephens continued to grow by

---

[2]   All capitalized terms used but not defined herein shall have the meanings ascribed to them in the Plan.

further supplementing the company's product portfolio, adding new customers and expanding the number of products sold to existing customers.

In 2006, Cortec Group Fund IV, L.P. and Cortec Co-Investment Fund, LLC purchased Jones Stephens from American Capital. Jones Stephens executed the purchase of D.A. Fehr, Inc. ("DAF") in May 2007 and subsequently merged DAF into Jones Stephens in December 2008. DAF, based in Pottsville, Pennsylvania, was a supplier of various branded plumbing supplies to wholesalers, HVAC vendors, OEMs, industrial groups, and plumbing service providers. Most of its copper products are marketed under the LT Connections brand.

### Section 1.03   Overview of the Company's Business

Jones Stephens is a leading designer, marketer and distributor of specialty plumbing supplies, primarily to the wholesale commercial plumbing trade and to do-it-yourself retailers and hardware stores.

Jones Stephens employs approximately 200 non-unionized employees in two locations comprising approximately 370,000 square feet. The Debtors are headquartered in a modern built 258,000 square-foot facility in Moody, Alabama located approximately 20 miles east of Birmingham. Jones Stephens operates a second facility located in Pottsville, Pennsylvania, which is approximately 50 miles northeast of Harrisburg. The Pottsville facility is a new facility, containing approximately 95,000 and 5,000 square feet of warehouse and office space, respectively.

Jones Stephens supplies a wide range of tubular products, decorative plumbing products, pipe accessories, brass fittings and valves, plastic specialties, copper fittings and coils, liquid drain cleaner, gaskets, couplings, among numerous other plumbing products. Jones Stephens is differentiated from many other distributors in that it: (i) markets products both under its own brands as well as leadings brands of third party manufacturers, (ii) offers an extensive range of product (more than 20,000 SKUs) which exhibit limited product obsolescence, (iii) helps customers minimize their inventory levels and offer high fill rates by "breaking boxes" (i.e., willingness to sell in less than full carton quantities), (iv) provides exceptional customer service and fill rates, (v) operates as a virtual manufacturer, and (v) serves a broad customer base operating in diverse construction markets (i.e., new residential, commercial, HVAC, remodeling, and repair).

As of the Petition Date, the Debtors had aggregate assets (including goodwill) and liabilities of approximately $84,000,000[3] and approximately $101,000,000 respectively. Of this amount, approximately $5.7 million was comprised of cash and cash equivalents, approximately $10.5 million was comprised of accounts receivable, and approximately $21.7 million was comprised of inventory. Total net sales for fiscal year 2009 declined from approximately $100 million in 2008 to approximately $78 million.

---

[3]   Assets are recorded at book value.

**Section 1.04  The Debtors' Corporate Organizational Structure**

Prior to August 2006, Jones Stephens was the wholly owned subsidiary of Holdings JSC, Inc., a Delaware corporation ("Holdings").  By that certain Merger Agreement dated August 19, 2006, as amended by Amendment No. 1 dated as of September 7, 2006, debtor, Plumbing Holdings Corporation ("PHC") acquired all of the shares of Holdings from American Capital Strategies, Ltd., Butch Jones and Donald J. Stephens.  Contemporaneous therewith and in consecutive transactions, Jones Stephens Acquisition Corp., a Delaware corporation, was merged with and into Holdings with Holdings as the surviving entity and Holdings was merged with and into Jones Stephens with Jones Stephens as the surviving entity.  By Merger Agreement dated as of December 15, 2008, DAF was merged with and into Jones Stephens with Jones Stephens as the surviving entity.  Jones Stephens is the wholly owned subsidiary of PHC.  Cortec owns approximately 86% of the common stock of PHC.

**Section 1.05  The Debtors' Management**

The Debtors management team consists of:

- *Mr. Byron Shaw – President and Chief Executive Officer*

Mr. Shaw joined Jones Stephens in 1993 and has been responsible for all of the Company's day-to-day operations and overseeing its management team since 2000.  Prior to joining the Company, Mr. Shaw was Finance Director of Jones Manufacturing and Chief Financial Officer at Simsco, Inc., a cast manufacturer of forged and machined components for the capital durable-goods industries.  Previously, Mr. Shaw was an accountant with McGriff Dowdy & Associates, a CPA firm in Alabama.  Mr. Shaw earned a Bachelor of Business Administration degree in Accounting from the University of Montevallo.

- *Mr. Edward Moulin – Chief Financial Officer*

Mr. Moulin joined Jones Stephens in 2007.  Prior to that Mr. Moulin was Vice President and Chief Financial Officer of Ames Taping Tools, Inc. , a position he assumed in 2000.  Before joining Ames, he was with SPX Corporation, a major supplier to the auto industry, as Director of Finance. He served 15 years in progressively more responsible management positions with the Newell Company, a manufacturer of household and hardware products.  Mr. Moulin held the position of VP Controller for Newell's international operations during his last assignment with the company.  He holds graduate (MBA) and undergraduate degrees from Ohio University in Athens, Ohio.

- *Mr. Larry Waldron – Vice President Wholesale Sales*

Mr. Waldron joined Jones Stephens in 1993 and was promoted to his current position in 1999.  He has 25 years of experience in sales, marketing, and product development.  Prior to joining Jones Stephens, Mr. Waldron was a Regional Sales Manager for Jones Manufacturing, where he was responsible for its sales representatives.  Mr. Waldron is a master plumber and has been involved in the plumbing-products industry for over 35 years.

- *Mr. Mark Williams – Vice President Supply Chain*

Mr. Williams joined Jones Stephens in April of 1996 as a purchasing agent. In June of 2001, he became a Regional Sales Manager at the company's request, and in August of 2004, he accepted the position of Director of Purchasing. In 2009 Mr. Williams was promoted to the position of Vice President Supply Chain. Mr. Williams has worked in the plumbing industry since 1988, when he began working for Jones Manufacturing in the sales and purchasing departments. Between his time at Jones Manufacturing and Jones Stephens, Mr. Williams managed the purchasing department for Braxton Harris Co. from 1994 to 1996. Mr. Williams earned a Bachelor or Arts degree in Advertising and Marketing from the University of Alabama.

**Section 1.06   The Debtors' Capital Structure**

**(a)      Material Pre-Petition Obligations**

Jones Stephens is the borrower under that certain Credit Agreement dated as of September 7, 2006, as amended by the First Amendment to Credit Agreement dated May 15, 2007 (the "First Amendment"), with CIT Lending Services Corporation, as administrative agent (the "Existing Agent"), and the lenders (the "Lenders") thereunder (as further amended, modified, restated or supplemented from time to time, the "Loan Agreement" and together with any other agreements, documents, instruments and certificates executed in connection with the Loan Agreement, the "Prepetition Loan Documents"). PHC is a guarantor of Jones Stephens' obligations under the Loan Agreement. Pursuant to the First Amendment, among other things, DAF was added as a borrower under the Loan Agreement. As discussed above, by Merger Agreement dated as of December 15, 2008, DAF was merged with and into Jones Stephens with Jones Stephens as the surviving entity.

The Prepetition Secured Obligations (defined below) of Jones Stephens to the Lenders and the Existing Agent were secured by all of the personal property of Jones Stephens and PHC (and its then existing subsidiaries) (the "Prepetition Collateral") pursuant to the Omnibus Pledged and Security Agreement dated as of September 7, 2006 by Jones Stephens and PHC in favor of the Existing Agent (as amended, modified or supplemented, the "Security Agreement").

Pursuant to the Prepetition Loan Documents, the Lenders agreed to provide Jones Stephens with revolving loans up to $10,000,000 and a term loan in the amount of $46,000,000 (which was increased to $67,000,000 pursuant to the First Amendment). As of the Petition Date, the Debtors were indebted to the Existing Agent and the Lenders under the Prepetition Loan Documents in the approximate outstanding principal amount of $61.46 million, together with all other liabilities and obligations of the Debtors arising out of or in connection with the Prepetition Loan Agreement and other Prepetition Loan Documents, including, but not limited to all accrued and unpaid interest, fees, costs and expenses including professional fees (the "Prepetition Secured Obligations"). No principal amount of revolving loans was outstanding as of the Petition Date.

The Debtors are party to that certain Amended and Restated Note Purchase Agreement with American Capital, Ltd. (as successor by merger to, American Capital Financial Services, Inc.), as agent ("ACAS" or "Mezz Agent") and certain purchasers (collectively, with Mezz

Agent, the "Mezz Lenders") dated as of May 15, 2007 (as amended, restated, modified or supplemented, the "Subordinated Note Purchase Agreement") pursuant to which Jones Stephens issued and sold to Senior Secured Subordinated Notes in the principal amount of $11,182,500 with a maturity date of September 7, 2013 and Junior Secured Subordinated Notes in the principal amount of $11,182,500 with a maturity date of September 7, 2014. All documents executed in connection with the Purchase Agreement are referred to herein as the "Subordinated Debt Documents." As of the Petition Date, the total amount outstanding under the Subordinated Note Purchase Agreement, including accrued interest, fees and expenses is approximately $26,720,295 (the "Mezzanine Subordinated Debt").

The Mezzanine Subordinated Debt is secured by a pledge of PHC's equity interests in Jones Stephens and not by any other collateral. Pursuant to that certain Intercreditor and Subordination Agreement among the Existing Agent, ACAS, as administrative agent under the Subordinated Note Purchase Agreement, and the Debtors (as amended, the "Intercreditor Agreement"), such equity pledge is subordinated in priority to the Existing Agent's security interest therein, and the indebtedness under the Subordinated Note Purchase Agreement is subordinated in right of payment to the Prepetition Secured Obligations to the extent set forth therein. The Intercreditor Agreement sets forth the relative rights and priorities of the Mezz Lenders and the Lenders in the event of insolvency proceedings such as the Chapter 11 Cases.

As a result of the economic downturn and poor financial performance of the Debtors' business, the Debtors triggered a number of covenant defaults under the Loan Agreement. Such defaults resulted in the Existing Agent issuing a Senior Blocking Notice under the Intercreditor Agreement preventing the Debtors from making payments under the Subordinated Note Purchase Agreement. The Debtors did not make interest payments scheduled to be made on April 1, 2009 under the Subordinated Note Purchase Agreement and, since such defaults under the Loan Agreement continue, no subsequent interest payments have been made.

As of the Petition Date, the Debtors' primary liabilities consisted of (a) the Prepetition Secured Obligations, (b) the Mezzanine Subordinated Debt, (c) unsecured trade debt in the approximate amount of $2.5 million, (c) unpaid Management Fees in the amount of $715,725 and (d) lease obligations (collectively, the "Pre-Petition Debt").

## Section 1.07   Events Leading to Chapter 11

Following the merger of DAF in 2008, the Debtors experienced a substantial reduction in sales and earnings due to several factors including (i) the downturn in the overall United States economy; (ii) a substantive decrease in the amount of new commercial and residential construction; (iii) declines in remodeling expenditures; (iv) major swings in raw material costs, including copper and brass; and (v) difficulties in the integration of DAF into the Jones Stephens organization.

In late 2008 and 2009, the Debtors dedicated significant time and resources to reduce operating costs in line with lower sales and complete the DAF integration. The Debtors also took steps to monitor and ensure adequate liquidity. Examples include reductions in headcount, salary freezes, reductions in benefits, hiring a COO to reduce fulfillment costs and inventory investments and the elimination of non-essential spending. In addition, the company increased

its efforts to sell more products into the retail channel and expand in the HVAC channel. Management also focused on recapturing DAF customers who had stopped buying from DAF and trained JSC's sales organization to sell DAF's products and manage the company's copper exposure and pricing. Finally, Jones Stephens implemented a new ERP System to provide better visibility and controls, and improve coordination between its Moody and Pottsville operations.

In connection with the triggering of their covenant defaults under the Loan Agreement, the Debtors commenced discussions with Cortec, the Existing Agent and ACAS regarding: (i) a proposed out-of-court restructuring of the Debtors' senior secured credit facility and outstanding Mezzanine Subordinated Debt, and (ii) an infusion of new capital into the Debtors. The Debtors' principal purpose for entering discussions was to restructure its finances in a manner sufficient to avoid the need to resort to chapter 11 relief. ACAS made proposals to the Debtors, the Existing Agent and Lenders which proposals were not accepted and ACAS did not accept restructuring proposals and rejected the opportunity to invest in the restructured Debtors on the terms designated by Cortec.

As a result and prior to the Petition Date, the Debtors, Cortec, the Existing Agent and certain Lenders (the "Consenting Lenders") entered into that certain Restructuring and Plan Support Agreement (the "Plan Support Agreement"), thereby establishing the terms pursuant to which the Existing Agent, the Consenting Lenders and Cortec would support a plan of reorganization of the Debtors. Under the Plan Support Agreement, Cortec committed to fund the Debtors' Plan of Reorganization by committing to contribute $15 million in new capital on the Effective Date. The Plan Support Agreement was signed by Consenting Lenders representing approximately 74% of the Prepetition Secured Obligations and over one-half in number of the holders of such debt. Under the Plan Support Agreement, the Consenting Lenders consented to the Debtors' use of cash collateral in these chapter 11 cases. The Debtors' obligations under the Plan Support Agreement were subject to the exercise of their fiduciary duties as debtors and debtors-in-possession in these chapter 11 cases and allows the Debtors to consider alternative restructuring proposals.

The Plan Support Agreement contains certain termination events which require that the Debtors achieve certain "milestones" in connection with Confirmation of the Plan, including: (i) obtaining entry by the Bankruptcy Court of an interim Cash Collateral Order within five (5) business days of the commencement of the chapter 11 cases; (ii) filing the Plan and Disclosure Statement within thirty (30) days of the Petition Date; (iii) entry of the order approving the adequacy of the Disclosure Statement within ninety (90) days of the Petition Date; (iv) Confirmation of the Plan within 185 days of the Petition Date; and (iv) the Effective Date of the Plan within 200 days of the Petition Date. The Plan Support Agreement is no longer in effect.

During the pendency of these Chapter 11 Cases, the Debtors engaged in extensive negotiations with ACAS, the Subordinated Noteholders, the Existing Agent, Existing Lenders and Cortec concerning the treatment of their respective claims and the restructuring of the Debtors' capital structure which culminated in the formulation of a consensual plan of reorganization that will allow the Debtors to pay trade creditors in full, preserve jobs, maximize

the value of assets for creditors, and emerge from bankruptcy with a restructured balance sheet and more profitable operations.

**II.**
**THE CHAPTER 11 CASES**

**Section 2.01   Overview of Chapter 11**

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Chapter 11 authorizes a debtor to reorganize its business for its benefit and its creditors and equity interest holders.  Commencing a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the filing date.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor-in-possession."

The principal objective of a chapter 11 case is to consummate a plan of reorganization.  A plan of reorganization sets forth the means for satisfying claims against and interests in a debtor. Confirmation of a plan of reorganization by a bankruptcy court binds a debtor, any issuer of securities thereunder, any person acquiring property under the plan, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court to such plan.  Chapter 11 requires that a plan treat similarly situated creditor and similarly situated equity interest holders equally, subject to the priority provisions of the Bankruptcy Code.

Subject to certain limited exceptions, the bankruptcy court order confirming a plan of reorganization discharges a debtor from any debt that arose prior to the date of confirmation of the plan and provides for the treatment of such debt in accordance with the terms of the confirmed plan of reorganization.

Prior to soliciting acceptances of a proposed plan of reorganization, section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the plan of reorganization.  This Disclosure Statement is submitted in accordance with section 1125 of the Bankruptcy Code.

**Section 2.02   Administration of the Chapter 11 Cases**

On the Petition Date, the Debtors sought certain relief from the Bankruptcy Court to ensure that their operations continue with the least possible disruption, including but not limited to, the relief set forth below.  The Debtors intend to seek all necessary and appropriate additional relief from the Bankruptcy Court in order to expedite the process and to minimize any adverse impact on their businesses that may result from the Chapter 11 Cases.

**(a)      Entry of "First Day" Orders**

On the Petition Date, the Debtors filed a number of motions seeking entry of so-called "first day" orders intended to facilitate a debtor's transition into chapter 11 by approving certain regular business conduct for which approval of the Bankruptcy Court is required.

The first day motions filed by the Debtors consist of requests for the following:

- authority for continuation of the Debtors' cash management system, bank accounts, business forms and intercompany transactions in the ordinary course of business, in lieu of closing existing accounts and establishing an entirely new postpetition cash management system (Docket No. 4);

- approval of the Debtors' use of cash collateral on an interim basis (Docket No. 12) (discussed further below);

- authority for payment of certain prepetition obligations, including: employee's accrued prepetition wages and salaries and certain employee benefit claims (Docket No. 11), and various tax obligations (Docket No. 5);

- interim approval of the continuation of the Debtors' customer programs (Docket No. 7);

- interim approval of procedures regarding continued utility services (Docket No. 6);

- interim approval confirming administrative expense status to Debtors' undisputed obligations to vendors arising from postpetition delivery of goods ordered prepetition (Docket No. 8);

- entry of an order directing joint administration of the Debtors' Chapter 11 Cases (Docket No. 3);

- interim approval of Debtors' authority to pay common carriers and warehousemen (Docket No. 10); and

- retention of Garden City Group, Inc. as claims, noticing and balloting agent (Docket No. 9).

The first day hearing was held on December 17, 2009, and the Court entered orders with respect to all of the first day motions.

**(b)     Entry of "Next Day" Orders**

Shortly after the Petition Date, the Debtors filed a number of motions seeking entry of so-called "next day" orders that, while critical to the business, did not have the same urgency or required greater notice than the "first day" orders. The "next day" motions filed by the Debtors consist of requests for the following:

- approval of procedures for interim compensation and reimbursement of expenses of professionals (Docket No. 52);

- interim approval of procedures to address reclamation claims (Docket No. 51);

- authority to retain and employ ordinary course professionals (Docket No. 54);

- approval of procedures for filing of claims pursuant to section 503(b)(9) of the Bankruptcy Code (Docket No. 53); and

- authority to pay pre-petition claims of certain critical vendors (Docket No. 55).

On January 14, 2010, the Bankruptcy Court entered orders approving each of the "next day" motions, with the exception of the critical vendor motion, which motion is scheduled to be heard at the February 9, 2010 omnibus hearing.

### (c)     Retention Of Debtors' Professionals

On the Petition Date, the Debtors filed retention applications for (a) Drinker Biddle & Reath LLP, as restructuring counsel for the Debtors; and (b) AlixPartners LLP, as financial advisors for the Debtors, to represent and assist them in the administration of these Chapter 11 Cases.   Additionally, on January 11, 2010, the Debtors filed an application to employ and retain RSM McGladrey, Inc. and McGladrey & Pullen, LLP as tax accountants and auditors for the Debtors (Docket No. 76).

On January 14, 2010, the Bankruptcy Court entered orders (i) authorizing interim compensation and reimbursement of expenses for the Debtors' Professionals, Professionals retained by the Committee and the members of the Committee (Docket No. 99) and (ii) approving and establishing procedures for the retention and compensation of certain Professionals utilized in the ordinary course of the Debtors' business (Docket No. 97).  On January 26, 2010, the Bankruptcy Court entered orders (i) authorizing the Debtors to employ and retain AlixPartners LLP (Docket No. 139) and (ii) authorizing the Debtors to employ and retain Drinker Biddle & Reath LLP (Docket No. 140).

### (d)     Cash Collateral

In connection with the Debtors' restructuring efforts, on the Petition Date, the Debtors filed the Motion of the Debtors for Interim and Final Orders Pursuant to 11 U.S.C. Sections 105, 361, 362, 363, 364 and 507 and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (A) Authorizing Use of Cash Collateral; (B) Granting Liens and Providing Super Priority Administrative Expense Status; (C) Granting Adequate Protection to Existing Lenders; (D) Modifying the Automatic Stay; and (E) Scheduling Interim and Final Hearings and Approving Notice Procedures.  An interim order was entered approving the consensual use of cash collateral on December 18, 2009.  Both ACAS and the Committee filed separate limited objections to the entry of a final order authorizing the Debtors' use of cash collateral.  On January 26, 2010, the Bankruptcy Court entered the Stipulated Final Order Authorizing Use Of Cash Collateral, Providing Adequate Protection Including Replacement Liens, And Granting Related Relief (the "Final Cash Collateral Order").  Pursuant to the Final Cash Collateral Order, the Debtors have consensually extended their use of cash collateral through July 3, 2010.  On June 14, 2010, the Debtors filed a Motion of the Debtors and Debtors-in-Possession Pursuant to 11 U.S.C. Sections 105, 361 and 363 for Entry of an Order Further Extending Authority to Use Cash Collateral.  By Order entered on July 3, 2010, the Court granted the Debtors' request for further authority to use cash collateral with the consent of the Existing Agent and Necessary Lenders, through and including, November 15, 2010.   On October 7, 2010, the Debtors filed a Motion of the Debtors and Debtors-in-Possession Pursuant to 11 U.S.C. Sections 105, 361 and 363 for Entry of an Order Further Extending Authority to Use Cash Collateral through and including January 31, 2011.  With the filing of the Plan, the Existing Agent and Necessary Lenders consent to the relief requested in the Motion and the Debtors expect that the Motion will be granted.

FP01/ 6384629.6

### (e)   The Committee

A formation meeting was held on January 5, 2010.  At such meeting, the Office of the U.S. Trustee appointed an official committee of unsecured creditors (the "Committee") pursuant to section 1102 of the Bankruptcy Code.  The Committee consists of the following five (5) members:  (i) American Capital, Ltd.; (ii) Hi-Tec Laboratories, Inc.; (iii) Tigre USA Inc.; (iv) Nomaco Inc.; and (v) Multi Fittings Corporation.  On January 20, 2010, the Committee filed applications seeking to retain Klehr, Harrison, Harvey, Branzburg LLP as Delaware counsel to the Committee (Docket No. 116) and Orrick Herrington & Sutcliffe (Docket No. 117), as its legal advisors.  Information regarding the Committee is on file with the Clerk of the Bankruptcy Court.  On June 29, 1010, Hi-Tec Laboratories, Inc. resigned from the Committee.

### (f)   Executory Contracts and Leases

As of the Petition Date, the Debtors were parties to certain executory contracts and unexpired leases.  The Debtors are conducting an analysis and review of their executory contracts and unexpired leases.  The analysis seeks to: (a) identify whether any contracts or leases would aid or further the Debtors' operational restructuring initiatives; and (b) ensure that any contracts and leases that are assumed were priced competitively.  This evaluation process involves a review of the costs and benefits of each contract and lease and a determination of how that contract and lease fits within the Debtors' overall business plan.  The Debtors expect to file, as part of the Plan Supplement, a schedule of the executory contracts and unexpired leases they are proposing to assume or reject.

On February 12, 2010, the Debtors filed the Motion of the Debtors for an Order Pursuant to 11 U.S.C. § 365 Authorizing the Assumption of a Certain Executory Contracts (the "Contract Assumption Motion") with WDI International, Inc. ("WDI") and Hi-Tec Laboratories, Inc. ("Hi-Tec") (Docket No. 201). In February of 2007 Jones Stephens and WDI entered into an exclusive Distribution Agreement (the "WDI Distribution Agreement") whereby Jones Stephens obtained the exclusive right (subject to certain exclusions and limitations) to distribute and sell certain toilet seat products manufactured and/or sourced by WDI or incorporating certain WDI trademarks and trade names throughout the United States and Canada. Similarly, Jones Stephens and Hi-Tec are parties to an Exclusive Distribution Agreement dated December 6, 2002 (the "Hi-Tec Distribution Agreement" and together with the WDI Distribution Agreement, collectively, the "Distribution Agreements") whereby Jones Stephens has the exclusive right (subject to certain exclusions and limitations) to distribute certain of Hi-Tec's proprietary plumbing products as more specifically set forth in the Hi-Tec Distribution Agreement.  The Distribution Agreements are an integral part of the Debtors' businesses and accounted for approximately 11% of the Debtors' sales in 2009.  The Debtors believe the continuation of these agreements is necessary to preserve the Debtors' enterprise value and the ability to successfully emerge from these Bankruptcy Cases.  On or about March 1, 2010, both ACAS and the Committee filed separate limited objections to the entry of an order granting the relief requested in the Contract Assumption Motion.  On March 5, 2010, the Court entered a consent order authorizing the Debtors to assume the WDI Distribution Agreement, and on April 19, 2010 the Court entered a consent order authorizing the assumption of the Hi-Tec Distribution Agreement.

On March 17, 2010, the Debtors filed a motion seeking the entry of an order pursuant to section 365(d)(4) of the Bankruptcy Code extending the time to July 14, 2010 (the "365 Deadline") within which they must assume or reject their non-residential real property leases for their facilities in Moody, Alabama and Pottsville, Pennsylvania (the "Real Property Leases"). On April 12, 2010, the Court entered an order extending the section 365 Deadline through July 14, 2010. The Debtors have filed motions with the consent of the landlords to further extend the 365 Deadline to January 31, 2011. The Debtors intend to assume the Real Property Leases under the Plan and expect the landlords to agree to additional extensions of the 365 Deadline until such time as the Plan is confirmed.

(g)     Critical Vendors

On December 23, 2009, the Debtors filed the Motion of the Debtors and Debtors-in-Possession for an Order Authorizing the Payment of Certain Prepetition Claims of Critical Vendors. Both ACAS and the Committee filed separate objections to the Debtors' motion. During the hearing on the motion, the Debtors and the objecting parties reached a consensual resolution. On February 17, 2010, the Bankruptcy Court entered a consent order authorizing the Debtors, in their reasonable business judgment, to pay up to $200,000 of the Claims of certain vendors (without paying more than 75% of the prepetition claim of any one vendor), and to pay up to the full amount of the Claims of two foreign vendors.

**(h)     Claims Administration**

1.     *Retention of Garden City Group*

On the Petition Date, the Debtors filed an application (the "GCG Retention Application") (Docket No. 9) which sought entry of an order authorizing the employment and retention of The Garden City Group ("GCG" or "Solicitation Agent") as the Debtors' notice and claims agent in the Chapter 11 cases. On December 17, 2009, the Bankruptcy Court entered an order granting the relief requested in the GCG Retention Application (Docket No. 28).

2.     Filing of Schedules and Statements

On January 14, 2010, the Debtors timely filed their Schedules and Statements with the Bankruptcy Court.

3.     Meeting of Creditors

The U.S. Trustee conducted a meeting of the Debtors' creditors in accordance with section 341 of the Bankruptcy Code (the "341 Meeting") on January 15, 2010 at 10:00 a.m.

4.     Establishment of the Claims Bar Date

On January 15, 2010, the Debtors filed the Motion of Debtors and Debtors-in-Possession for Entry of an Order Establishing Bar Dates for Filing Proofs of Claim and Approving Form, Manner and Sufficiency of Notice Thereof (the "Bar Date Motion") (Docket No. 107). On February 4, 2010, the Bankruptcy Court entered an order (the "Bar Date Order") establishing (i) March 26, 2010 as the deadline for filing proof of claims against the Debtors (whether secured,

unsecured priority or unsecured non-priority) that arose prior to the Petition Date, including Administrative Claims under 11 U.S.C. § 503(b)(9) and (ii) June 15, 2010 as the Governmental Bar Date. The Bar Date Order provides that, any creditor that was required to file, but failed to file a proof of claim for its Claim on or before the Claims Bar Date, will not be treated as a creditor with respect to such Claim for purposes of voting and distribution with respect to the Chapter 11 cases. Written notice of the Claims Bar Date was mailed to all known Entities holding potential pre-petition Claims and served on all parties who filed requests for notice under Bankruptcy Rule 2002 as of the date of entry of the Bar Date Order. In addition, the Debtors published notice of the Claims Bar Date in accordance with the Bar Date Order.

5. Extension of Time to Remove Actions

On March 15, 2010, the Debtors filed a motion (the "Removal Date Motion") seeking the entry of an order extending the time period within which the Debtors may remove actions pursuant to 28 U.S.C. §1452 and Bankruptcy Rule 9027 to the later of July 15, 2010 or 30 days after entry of an order terminating the automatic stay with respect to any particular action. On April 12, 2010, the Court entered an order granting the Removal Date Motion.

**(i) No Unencumbered Assets; Potential Avoidance Claims**

The Debtors believe that all property of their estates is subject to valid, properly-perfected liens in favor of the Existing Agent and Existing Lenders and that these estates have no material unencumbered assets. Prior to the Petition Date and in conjunction with the negotiation of the Plan Support Agreement, the Debtors investigated and verified the liens and claims of Existing Lenders under the Prepetition Loan Documents. In addition, the Committee was empowered under the Final Cash Collateral Order to investigate and challenge the liens and claims of the Existing Agent and Existing Lenders but did not do so within the time allotted. If and to the extent that there were any assets beyond the Existing Agent's and Existing Lenders' liens, they must first be used to pay all Allowed Administrative Claims, Priority Tax Claims and Priority Claims in the Chapter 11 Cases.

The Debtors are investigating transfers that may be avoided as preferential, fraudulent or otherwise under sections 544, 545, 547, 548, 549 and 550 of the Bankruptcy Code or applicable state law such as the Uniform Fraudulent Transfer Act (collectively, "Avoidance Actions"). The transfers being considered include transfers made to insiders, transfers (if any) for which the Debtors may not have received reasonably equivalent value and transfers (if any) made while the Debtors were insolvent or by which the Debtors became insolvent as a result of the transfer. The Debtors have filed their Schedules and Statements of Financial Affairs, which set forth payments made in the 90 days prior to the Petition Date as well as payments made to insiders in the year prior to the Petition Date.

Pursuant to the bankruptcy schedules filed by the Debtors, payments made by JSC within 90 days of the Petition Date totaled $22,134,705 and payments made by JSC to insiders within 1 year of the Petition Date totaled approximately $1,797,800. PHC made no payments within 90 days of the Petition Date and made no payments to insiders within 1 year of the Petition Date. However, Debtors believe that the payments made by JSC, for purposes of whether or not they

are recoverable as preferences, may be subject to defenses and therefore Debtors cannot accurately estimate the potential recoveries with respect to same.

On the Effective Date, the Debtors and Reorganized Debtors will waive all of their rights and interests in Avoidance Actions in accordance with section 1123(b) of the Bankruptcy Code. This waiver shall not include Causes of Action other than Avoidance Actions. The Debtors believe that such a waiver is appropriate under the circumstances given the treatment of General Unsecured Claims against JSC and consensual resolution of Lender Claims, Subordinated Noteholder Claims and Management Fee Claims under the Plan.

### (j) Exclusivity

Under the Bankruptcy Code, the Debtors have the exclusive right to file and solicit acceptance of a plan or plans of reorganization for an initial period of 120 days from the Petition Date. If the Debtors file a plan within this exclusive period, then the Debtors have the exclusive right for 180 days from the Petition Date to solicit acceptances to its plan. During these exclusive periods, no other party in interest may file a competing plan of reorganization, however, a court may extend or reduce these periods upon request of a party in interest and "for cause."

On January 14, 2010, the Debtors filed the Debtors' Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code (the "Debtors Original Plan") (Docket No. 103) and related disclosure statement (Docket No. 104). Thereafter, the Debtors received a term sheet (the "ACAS Term Sheet") from the Committee which outlined the provisions of a competing plan of reorganization sponsored by ACAS. On January 23, 2010, the Committee filed a Motion to terminate the Debtors' exclusive periods to file and solicit acceptances of the Plan (the "Exclusivity Termination Motion") (Docket No. 130) so that the Committee could prosecute a plan consistent with the ACAS Term Sheet.

The Debtors, with the assistance of their professionals, reviewed and analyzed the ACAS Term Sheet and determined that certain aspects of the ACAS Term Sheet provided more favorable treatment to certain creditor constituencies despite what the Debtors believe to be certain deficiencies. Thereafter, the Debtors engaged in discussions and negotiations with the Existing Agent and Cortec regarding the modification of the Debtors Original Plan. As a result of such discussions, the Existing Agent, Necessary Lenders and Cortec agreed to support the Debtors modification of the Debtors Original Plan (the "First Amended Plan") to provide holders of General Unsecured Claims similar treatment as provided in the ACAS Term Sheet. These modifications were adopted in the First Amended Plan.

The Debtors Original Plan was a "new value plan". In other words, the Sponsor and other equity holders may acquire equity interests in the Reorganized Parent to the extent they make the New Capital Contribution. In *Bank of America National Trust and Savings Association v. 203 North LaSalle Street Partnership,* 119 S.Ct. 1411, 526 U.S. 434 (1999) ("*LaSalle*"), the United States Supreme Court held that in a cramdown scenario, a debtor's existing equity holders may not retain ownership interests in a reorganized enterprise by making a contribution of new value if that opportunity is made available exclusively to former equity holders without any kind of market test in terms of the proposed contribution. The Supreme Court did not decide

whether there is a new value corollary to the absolute priority rule, nor did it decide whether a market test would be required if there were competing plans or the right to bid for the same equity interests were sought by existing equity holders.

Because the Debtors' Original Plan was a new value plan and the Committee did not believe that the Debtors Original Plan provided an appropriate recovery to all creditors, the Committee sought to terminate the Debtors' exclusive periods to file and solicit acceptances of the Debtors Original Plan by way of the Exclusivity Termination Motion relying upon the Bankruptcy Court's decisions in *In re Global Ocean Carriers Ltd.,* 251 B.R. 31, 49 (Bankr. D. Del. 2000) (explaining "market test" requirement is met by "terminating exclusivity and allowing others to file a competing plan") and *In re Situation Mgmt. Sys., Inc.,* 252 B.R. 859 (Bankr. D. Mass. 2000) (providing "opportunity to offer competing plan is preferable procedural mechanism"). The Debtors believe the termination of exclusivity is consistent with the United States Supreme Court's decision in *LaSalle* and consented to the termination of their exclusive periods to file and solicit acceptances of the Plan to allow ACAS and any other party–in–interest, other than the Committee, to file a competing plan. On February 9, 2010, the Bankruptcy Court entered an order terminating the Debtors' exclusive right to file a plan, and permitting any party in interest, including the Committee, to file a competing plan.

### (k) Committee's Plan

On February 10, 2010, the Committee filed the Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code Proposed by the Official Committee of Unsecured Creditors and the Disclosure Statement in Support of the Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code Proposed by the Official Committee of Unsecured Creditors. On February 19, 2010, the Committee filed the First Amended Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code Proposed by the Official Committee of Unsecured Creditors. On March 4, 2010, the Committee circulated a proposed Second Amended Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code Proposed by the Official Committee of Unsecured Creditors (the "Committee Plan").

The Committee Plan differed from the Debtors' Original Plan with respect to the treatment of Holders of Subordinated Noteholder Claims, Lender Secured Claims and General Unsecured Claims. However, with the filing of the Debtors' Second Amended Plan (as defined below), the Debtors anticipate that the Committee will withdraw the Committee Plan, thereby obviating any competing plan process.

### (l) Consensual Resolution Concerning Competing Plans

Since the filing of the Debtors' First Amended Plan and the Committee Plan, the Debtors, Cortec, ACAS, the Existing Lenders, the Existing Agent, the Agent and the Revolving Lender have engaged in extensive negotiations concerning the terms of a fully consensual plan of reorganization. As a result of these discussions and based on the Global Compromise and resolution reached among the parties, the Debtors, ACAS, Cortec, the Existing Agent, the Necessary Lenders, the Agent and the Revolving Lender have agreed to the terms (the "Lender/ACAS Term Sheet") of a plan of reorganization (the "Second Amended Plan" or "Plan") and each of the aforementioned parties and is the basis by which the Debtors intend to

emerge from bankruptcy.  A copy of the Lender/ACAS Term Sheet is attached hereto as Exhibit D.

## III.
## SUMMARY OF THE DEBTORS' JOINT PLAN OF REORGANIZATION

**THE FOLLOWING SECTIONS SUMMARIZE CERTAIN KEY INFORMATION CONTAINED IN THE PLAN.  THIS SUMMARY REFERS TO, AND IS QUALIFIED IN ITS ENTIRETY BY, REFERENCE TO THE PLAN.  THE TERMS OF THE PLAN WILL GOVERN IN THE EVENT ANY INCONSISTENCY ARISES BETWEEN THIS SUMMARY AND THE PLAN.  THE COURT HAS NOT CONFIRMED THE PLAN DESCRIBED IN THIS DISCLOSURE STATEMENT.**

The Debtors' Plan is a plan of reorganization.  The Plan implements the restructuring of the Debtors' balance sheets.  It reflects certain agreements and compromises between and among the Debtors, the Necessary Lenders, ACAS, Cortec, the Revolving Lender and the Agent and provides, generally, the following:

- The Lender Secured Claims shall be reduced from approximately $61.4 million to $32.5 million.  Holders of Lender Secured Claims shall receive, among other things, their Pro Rata Share of Net Available Cash, $17.5 million in New Preferred Stock, 50.25% of the New Common Stock and participation in the Amended and Restated Credit Facility on the Effective Date and remaining Cash in the Plan Distribution Account;

- Ares Capital Corporation shall replace CIT Lending Services Corporation as agent under the Amended and Restated Credit Agreement;

- The Revolving Lender (Bank of Ireland) shall extend to the Reorganized Debtors revolving loans in an amount up to $4,000,000;

- The Mezzanine Subordinated Debt of approximately $26.7 million shall be discharged and Holders of Subordinated Noteholder Claims shall receive their Pro Rata Share of 34.25% of the New Common Stock;

- Holders of Allowed General Unsecured Claims against JSC, not otherwise satisfied pursuant to a prior Order of the Bankruptcy Court, shall be paid in full, provided, however, that in the event that the total amount of all Allowed General Unsecured Claims against JSC exceeds $1.5 million, each Holder of an Allowed General Unsecured Claim against JSC shall receive its Pro Rata Share of $1.5 million;

- Holders of Unpaid Management Fee Claims shall receive 3% of the New Common Stock;

- All Equity Interests shall be cancelled and extinguished.

The Plan provides for the classification and treatment of Claims against and Equity Interests in each of the Debtors. For classification and treatment of claims against and equity interests in the Debtor, the Plan designates eight (8) Classes of Claims and Equity Interests. These Classes and their treatment under the Plan take into account the differing nature and priority under the Bankruptcy Code of the various Claims and Equity Interests and are further described below.

## Section 3.01    Classification and Treatment of Claims and Interests

### (a)    Unclassified Claims

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims and Interests set forth in Article III of the Plan. These unclassified Claims are treated as follows:

#### (i)    Administrative Claims

This category of claims consists of those Claims, other than Professional Fee Claims, against the Debtors for costs and expenses of administration pursuant to sections 503(b), 507(b), or 1114(e)(2) of the Bankruptcy Code. Except as otherwise provided for herein, and subject to the requirements of this Plan, on, or as reasonably practicable after the later of (i) the Effective Date or (ii) the date on which an Administrative Claim becomes an Allowed Administrative Claim, the Holder of such Allowed Administrative Claim shall receive, in full settlement, satisfaction, release and discharge of and in exchange for such Allowed Administrative Claim (a) Cash equal to the unpaid portion of such Allowed Administrative Claim or (b) such other less favorable treatment as to which the Debtors, Reorganized Debtors and such Holder shall have agreed to in writing; provided however, that Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases shall be paid in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto. The Debtors estimate the total amount of all Allowed Administrative Claims, excluding ordinary course of business liabilities, as of the Effective Date to be $0.

Notwithstanding any provision in the Plan regarding payment of Administrative Claims to the contrary, and without waiver of any argument available that such Claim is already time-barred by prior orders of the Bankruptcy Court, all Administrative Claims required to be filed and not filed by the Administrative Claim Bar Date shall be deemed disallowed and discharged, exclusive of claims arising under 28 U.S.C. § 1930 for which a claim need not be filed. Without limiting the foregoing, all fees payable under 28 U.S.C. § 1930 that have not been paid, shall be paid on or before the Effective Date.

Each Holder of a Professional Fee Claim shall be treated as set forth in Section 14.01(d) of the Plan.

### (ii)    Priority Tax Claims

This category consists of claims against the Debtors of the kind specified in section 502(i), 507(a)(8) or 1129(a)(9)(D) of the Bankruptcy Code. Each Holder of an Allowed Priority Tax Claim shall receive, at the option of the Debtors, in full satisfaction, settlement, release, extinguishment and discharge of such Priority Tax Claim: (a) the amount of such unpaid Allowed Priority Tax Claim in Cash on or as soon as reasonably practicable after the later of (i) the Effective Date, (ii) the date on which such Priority Tax Claim becomes Allowed and (iii) a date agreed to by the Debtors, as the case may be, and the Holder of such Priority Tax Claim; (b) such other treatment on such other terms and conditions as may be agreed upon in writing by the Holder of such Priority Tax Claim and the Debtors or the Purchaser, as the case may be, or as the Bankruptcy Court may order; or (c) otherwise left unimpaired.  The Debtors estimate the amount of Allowed Priority Tax Claims as of the Effective Date to be $0.

### (b)    Classification of Claims and Interests

The Plan provides for the classification and treatment of seven Classes of Claims and Interests.  The categories of Claims and Interests listed below classify Claims and Interests for all purposes, including voting, Confirmation and Distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  A Claim or Interest shall be deemed classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class.  A Claim or Interest is in a particular Class only to the extent that such Claim or Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date.

The following chart[4] briefly summarizes the treatment of Creditors and Interest Holders under the Plan.  Amounts listed below are estimates.  All recoveries are approximate, and distributions may vary as a result of, among other things, the Claims adjudication process in these Chapter 11 Cases.

| Class | Designation | Impairment/Voting | Estimation of Claim/Amounts & Recovery |
|-------|-------------|-------------------|----------------------------------------|
| 1 | Priority Claims | Unimpaired-Not Entitled to Vote (Deemed Accept) | Estimated Claim Amounts:  $0 Estimated Recovery:  100% |
| 2 | Lender Secured Claims (Class 2A-Lender Secured Claims against Parent; Class 2B-Lender Secured | Impaired-Entitled to Vote | Estimated Claim Amounts: $61,460,000 Estimated Recovery:  60-70% |

---

[4]    This chart is only a summary of the classification and treatment of Claims and Interests under the Plan. References should be made to the entire Disclosure Statement and the Plan for a complete description of the classification and treatment of Claims and Interests.

| | | | |
|---|---|---|---|
| | Claims against JSC) | | |
| 3 | Subordinated Noteholder Claims(Class 3A- Subordinated Noteholder Claims against Parent; Class 3B- Subordinated Noteholder Claims against JSC) | Impaired-Entitled to Vote | Estimated Claim Amounts: $26,720,295 Estimated Recovery: 0-10% |
| 4 | Other Secured Claims | Unimpaired-Not Entitled to Vote (Deemed to Accept) | Estimated Claim Amounts: $0 Estimated Recovery: 100% |
| 5 | General Unsecured Claims against JSC | Impaired-Entitled to Vote | Estimated Claim Amounts: $1,100,000 Estimated Recovery: 100% |
| 6 | Unpaid Management Fee Claims | Impaired- Entitled to Vote | Estimated Claim Amounts: $5,765,753 Estimated Recovery: 0-1% |
| 7 | Subsidiary Equity Interests | Impaired-Not Entitled to Vote (Deemed to Reject) | Estimated Recovery: 0% |
| 8 | Equity Interests | Impaired-Not Entitled to Vote (Deemed to Reject) | Estimated Recovery: 0% |

(c)     **Voting; Presumptions**

(i)     **Acceptance by Impaired Classes**

Each Impaired Class of Claims that will (or may) receive or retain property or any interest in property under the Plan, shall be entitled to vote to accept or reject the Plan.  An Impaired Class of Claims shall have accepted the Plan if (i) the Holders (other than any Holder designated under section 1126(e) of the Bankruptcy Code) of at least two-thirds in amount of the Allowed Claims actually voting in such Class have voted to accept the Plan and (ii) the Holders (other than any Holder designated under section 1126(e) of the Bankruptcy Code) of more than one-half in number of the Allowed Claims actually voting in such Class have voted to accept the Plan.  An Impaired Class of Interests shall have accepted the Plan if the Holders (other than any Holder designated under section 1126(e) of the Bankruptcy Code) of at least two-thirds in amount of the Allowed Interests actually voting in such Class have voted to accept the Plan.

(ii)     **Voting Presumptions**

Claims and Interests in Unimpaired Classes are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.  Claims and Interests in Impaired Classes that do not entitle the Holders thereof to receive or retain any property under the Plan are conclusively deemed to have rejected

the Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

### (d)    Unimpaired Classes

#### (i)    Class 1: Priority Claims

Class 1 consists of the Priority Claims against the Debtors. Each Holder of an Allowed Priority Claim shall receive in full satisfaction, settlement, release, extinguishment and discharge of such Allowed Priority Claim, at the option of the Reorganized Debtors and with the consent of the Existing Agent which consent shall not be unreasonably withheld:  (a) the amount of such unpaid Allowed Priority Claim in Cash on or as soon as reasonably practicable after the later of (i) the Effective Date, (ii) the date on which such Priority Claim becomes Allowed, and (iii) the date such claim becomes due and payable in the ordinary course of business; (b) in Cash on such other terms and conditions as may be agreed between the Holder of each such Allowed Priority Claim and the Reorganized Debtors; or (c) in deferred Cash payments, to the extent permissible under the Bankruptcy Code.  Holders of Priority Claims are presumed to have accepted the Plan, and, therefore, are not entitled to vote to accept or reject the Plan.

#### (ii)    Class 4: Other Secured Claims

Class 4 consists of the Other Secured Claims (to the extent any such claims exist), against the Debtors.  To the extent there are any Allowed Other Secured Claims against property that is property of the Debtors, at the option of the Reorganized Company and with the consent of the Existing Agent which consent shall not be unreasonably withheld, each Holder of an Allowed Other Secured Claim shall receive, either (i) the legal, equitable and contractual rights to which such Allowed Other Secured Claim entitles the Holder thereof shall be left unaltered; (ii) the Other Secured Claim shall be left unimpaired in the manner described in section 1124(2) of the Bankruptcy Code; or (iii) the Holder of such Claim shall receive or retain the collateral securing such Other Secured Claim.  Holders of Other Secured Claims are presumed to have accepted the Plan, and, therefore, are not entitled to vote to accept or reject the Plan.

### (e)    Impaired Classes of Claims

#### (i)    Class 2: Lender Secured Claims (Class 2: Class 2A-Lender Secured Claims against Parent and Class 2B-Lender Secured Claims against JSC)

Class 2 consists of Class 2A-Lender Secured Claims against Parent and Class 2B-Lender Secured Claims against JSC.  On the Effective Date, each Holder of a Lender Secured Claim shall receive, in full and final satisfaction of the Lender Secured Claim its Pro Rata Share (according to the respective amount of the Lender Secured Claims held by each Existing Lender) of (a) Cash in the amount of the Net Available Cash; (b) the Amended and Restated Term Loan Facility; (c) the New Preferred Stock; and (d) the Lender Common Stock.  The Debtors shall pay the Lender Professional Fees in accordance with Section 5.21 of the Plan.

In addition, from time to time in the Reorganized Debtors' discretion, all Cash in the Plan Distribution Account in excess of the Reserve Fund and after payment of all Plan Related Fees, shall be remitted to the Agent, in each case on behalf of, and for distribution to, Existing Lenders in accordance with each Existing Lenders' Pro Rata Share (according to the respective amount of the Lender Claims held by each Existing Lender). As soon as practicable after the payment of all Plan Related Fees, Allowed Administrative Claims, Allowed Professional Fee Claims, Allowed Priority Tax Claims, Allowed Priority Claims and Allowed General Unsecured Claims, all remaining Cash in the Plan Distribution Account shall be remitted to the Agent on behalf of, and for distribution to Existing Lenders, in accordance with each Existing Lender's Pro Rata Share (according to the respective amount of the Lender Claims held by each Existing Lender). The post-Effective Date distributions, if any, from the Plan Distribution Account to the Agent on behalf of the Existing Lenders shall be considered distributions under the Plan and shall not be applied to the obligations arising out of the Amended and Restated Credit Facility or the New Preferred Stock.

Class 2 is impaired and entitled to vote on the Plan.

> **(ii)** **Class 3: Subordinated Noteholder Claims Subordinated Noteholder Claims (Class 3:Class 3A- Subordinated Noteholder Claims against Parent and Class 3B- Subordinated Noteholder Claims against JSC)**

Class 3 consists of Class 3A- Subordinated Noteholder Claims against Parent and Class 3B- Subordinated Noteholder Claims against JSC. The Subordinated Noteholder Claims shall be deemed Allowed under the Second Amended Plan. On the Effective Date, each Holder of an Allowed Subordinated Noteholder Claim shall receive, in full and final satisfaction of such Subordinated Noteholder Claim, its Pro Rata Share of the Subordinated Noteholder Common Stock. The Debtors shall pay the ACAS Professional Fees in accordance with Section 5.21 of the Plan.

Class 3 is impaired and entitled to vote on the Plan.

> **(iii)** **Class 5: General Unsecured Claims against JSC**

Class 5 consists of General Unsecured Claims against JSC. On or as soon as reasonably practicable after the later of (a) the Effective Date, or (b) the date on which such General Unsecured Claim becomes Allowed, each Holder of an Allowed General Unsecured Claim shall receive, in full and final satisfaction of such General Unsecured Claim, the amount of such unpaid Allowed General Unsecured Claim in Cash; provided, however, that in the event that the total amount of all Allowed General Unsecured Claims exceeds One Million Five Hundred Thousand Dollars ($1,500,000), each Holder of an Allowed General Unsecured Claim shall receive its Pro Rata Share of One Million Five Hundred Thousand Dollars ($1,500,000) in Cash.

Class 5 is impaired and entitled to vote on the Plan.

> **(iv)** **Class 6: Unpaid Management Fee Claims**

Class 6 consists of the Unpaid Management Fee Claims shall be deemed Allowed under the Second Amended Plan. On the Effective Date, Cortec shall receive, in full and final satisfaction of such Unpaid Management Fee Claims, the Cortec Common Stock. The Debtors shall pay the Cortec Professional Fees in accordance with Section 5.21 of the Plan.

Class 6 is impaired and entitled to vote on the Plan.

### (iv)    Class 7: Subsidiary Equity Interests

Class 7 consists of all Subsidiary Equity Interests. No property shall be distributed on account of Class 7 Subsidiary Equity Interests. All such Subsidiary Equity Interests shall be deemed cancelled and extinguished on the Effective Date.

### (vi)    Class 8: Equity Interests

Class 8 consists of all Equity Interests in Parent. No property will be distributed to or retained by Holders of Equity Interests. All such Equity Interests shall be deemed cancelled and extinguished on the Effective Date. Each Holder of a Class 8 Interest is conclusively deemed to reject the Plan and is not entitled to vote on the Plan.

### (f)    Special Provision Regarding Unimpaired Claims

Except as otherwise provided in the Plan, nothing shall affect the Debtors' rights and defenses, both legal and equitable, with respect to any Unimpaired Claims, including, but not limited to, all rights with respect to legal and equitable defenses to set off or recoupments against Unimpaired Claims.

### (g)    Cram Down

If any Class of Claims or Interests entitled to vote on the Plan shall not vote to accept the Plan, the Debtors shall (i) seek confirmation of the Plan under section 1129(b) of the Bankruptcy Code or (ii) amend or modify the Plan. With respect to any Class of Claims or Interests that is deemed to reject the Plan, the Debtors shall request that the Bankruptcy Court confirm or "cram down" the Plan pursuant to section 1129(b) of the Bankruptcy Code.

### (h)    Discharge of Claims

Pursuant to section 1141(c) of the Bankruptcy Code, all Claims and Interests that are not expressly provided for and preserved in the Plan shall be extinguished upon Confirmation. Upon Confirmation, the Debtors and all property dealt with in the Plan shall be free and clear of all such Claims and Interests, including, without limitation, liens, security interests and any and all other encumbrances.

## Section 3.02    Means for Implementation of the Plan

### (a)    Exit Facility/Amended and Restated Credit Documents

On the Effective Date, the Reorganized Debtors are authorized to execute and deliver the Amended and Restated Credit Documents, the terms, conditions and covenants which shall be acceptable to the Plan Document Parties, each in its sole discretion, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or vote, consent, authorization, or approval of any person, provided, that any documentation or matter consistent with a term specifically addressed in the Lender/ACAS Term Sheet and the Amended and Restated Credit Facility Term Sheet shall be deemed acceptable to the Plan Document Parties. Moreover, each Holder of a Lender Secured Claim shall be required to execute and be bound by the Amended and Restated Credit Documents as a condition precedent to such Existing Lenders' participation in the Amended and Restated Term Loan Facility.

**(b)  New Equity Holders**

In consideration of the Allowed Lender Secured Claims, Existing Lenders shall receive (i) 100% of the outstanding shares of the Lender Common Stock (representing 50.25% of the New Common Stock, fully diluted after giving effect to options granted under the Management Incentive Plan), and (b) 100% of the outstanding shares of New Preferred Stock. One or more of the Existing Lenders may choose to hold the New Preferred Stock and Lender Common Stock through a newly-formed limited liability company or other pass-through entity subject to the terms of the Plan and provided that the limited liability company or other applicable agreement will subject the Holders to effectively the same restrictions and rights as is contemplated by the New Stockholders' Agreement. On the Effective Date, in consideration of the Allowed Subordinated Noteholders Claims, Subordinated Noteholders shall receive 100% of the outstanding shares of Subordinated Noteholder Common Stock (representing 34.25% of the New Common Stock, fully diluted after giving effect to options granted under the Management Incentive Plan). On the Effective Date, in consideration of the Allowed Unpaid Management Fee Claims, Cortec shall receive 100% of the outstanding shares of Cortec Common Stock (representing 3% of the New Common Stock, fully diluted after giving effect to options granted under the Management Incentive Plan). On the Effective Date, the Reorganized Parent shall receive 100% of the new equity in the Reorganized JSC.

**(c)  Sources of Cash for Plan Distributions and Transfers of Funds Among Debtors**

All consideration necessary for the Reorganized Debtors to make payments or distributions pursuant hereto shall be obtained from Cash On Hand and Cash from business operations. Further, the Reorganized Debtors will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Reorganized Debtors to satisfy their obligations under the Plan.

**(d)  Issuance of New Plan Securities**

The issuance of the New Plan Securities, or other equity awards reserved for the Management Incentive Plan, by the Reorganized Debtors is authorized without the need for any further corporate action or, except as required by the Plan, Confirmation Order or Management Incentive Plan, without any further action by a Holder of Claims or Interests. On the Effective Date, the New Plan Securities shall be duly authorized and issued as provided for by the Plan and

the Plan Documents. All of the shares of New Plan Securities shall be duly authorized, validly issued and fully paid and non-assessable. Each distribution and issuance referred to in the Plan shall be governed by the terms and conditions set forth herein applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

**(e)**     **New Stockholders' Agreement**

Upon the Effective Date, the New Stockholders' Agreement shall be deemed to become valid, binding and enforceable in accordance with its terms. The New Stockholders' Agreement shall contain provisions governing the rights of Holders of New Plan Securities, including, without limitation, access to information regarding the Reorganized Debtors and certain transfer restrictions (subject to customary restrictions) such as drag-along and tag-along rights, a right of first refusal, preemptive rights and limits on the number of record holders. Moreover, each Holder of an Allowed Claim receiving such New Plan Securities shall be required to execute and be bound by the New Stockholders' Agreement as a condition precedent to receiving its allocation of New Plan Securities.

**(f)**     **Listing of New Stock and Transfer Restrictions**

The Reorganized Debtors shall not be obligated, and do not intend, to list the New Plan Securities on a national securities exchange. In order to ensure that the Reorganized Debtors will not become subject to the reporting requirements of the Securities Exchange Act, except in connection with a public offering, the New Certificate of Incorporation and the New Stockholders' Agreement may impose certain trading restrictions to limit the number of record holders thereof. The New Plan Securities will be subject to certain transfer and other restrictions as and to the extent provided in the New Stockholders' Agreement.

**(g)**     **Cancellation of Securities and Agreements**

On the Effective Date, except as otherwise specifically provided for in the Plan: (a) the obligations of the Debtors, Existing Agent, Existing Lenders, Subordinated Agent, Subordinated Noteholders and Cortec under the Existing Credit Agreement, Subordinated Note Purchase Agreement, Existing Management Agreement, Intercreditor Agreement and any other certificate, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Interest (except such certificates, notes, or other instruments or documents evidencing indebtedness or obligations of the Debtors that are specifically reinstated pursuant to the Plan), shall be cancelled, and neither the parties thereunder nor the Reorganized Debtors shall have any continuing obligations thereunder; (b) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, indentures, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors (except such agreements, certificates, notes, or other instruments evidencing indebtedness or obligations of the Debtors that are specifically reinstated pursuant to the Plan)

shall be released and discharged; and (c) the obligations of the Existing Agent and the Existing Lenders to the Debtors under the Existing Credit Agreement shall be cancelled as to the Existing Agent and Existing Lenders, and the Existing Agent and the Existing Lenders shall not have any continuing obligations to the Debtors or the Reorganized Debtors thereunder; *provided, however,* notwithstanding Confirmation or the occurrence of the Effective Date, any agreement that governs the rights of the Holder of a Claim shall continue in effect solely for purposes of allowing Holders to receive distributions under the Plan as provided in the Plan.

**(h)      Securities Exemption**

Pursuant to section 1145 of the Bankruptcy Code, the offering, issuance, and distribution of any New Plan Securities contemplated by the Plan and all agreements incorporated in the Plan shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable law requiring registration before the offering, issuance, distribution, or sale of securities. In addition, under section 1145 of the Bankruptcy Code, any New Plan Securities contemplated by the Plan and any and all agreements incorporated therein will be freely tradable by the recipients thereof, subject to (a) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act; (b) compliance with any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such securities or instruments; (c) the restrictions on the transferability of such securities and instruments, including those set forth in the Plan, New Stockholders' Agreement and the New Certificates of Incorporation; and (d) applicable regulatory approval.

**(i)      Continued Corporate Existence**

Following the Effective Date, the Reorganized Debtors shall continue to exist as separate corporate entities in accordance with applicable non-bankruptcy law and pursuant to their corporate documents in effect prior to the Effective Date, except to the extent that such corporate documents are amended by the terms of this Plan.

**(j)      New Certificates of Incorporation and New By-Laws**

On or immediately before the Effective Date, the Reorganized Debtors will file their respective New Certificates of Incorporation with the applicable Secretaries of State and/or other applicable authorities in their respective states of incorporation in accordance with the corporate laws of the respective states of incorporation, and upon such filing such New Certificates of Incorporation shall be authorized, adopted and approved by and on behalf of each respective Reorganized Debtor.  On the Effective Date, the New Bylaws shall be deemed to be authorized, adopted and approved as and for the bylaws of each respective Reorganized Debtor.  After the Effective Date, the Reorganized Debtors may amend and restate their respective New Certificates of Incorporation and New Bylaws and other constituent documents as permitted by the laws of their respective states of incorporation and their respective New Certificates of Incorporation and New Bylaws.

FP01/ 6384629.6

### (k)    Other General Corporate Matters

On or after the Effective Date, the Debtors and/or Reorganized Debtors shall be authorized to take and will take such action as is necessary under the laws of the State of Delaware, State of Alabama, federal law and other applicable law to effect the terms and provisions of the Plan.  Without limiting the foregoing, the authorization, adoption, and, if applicable, filing of the New Certificates of Incorporation, the New Bylaws, the issuance of the New Plan Securities, the election and appointment of directors or officers, the adoption and implementation of the Management Incentive Plan, and any other matter involving the corporate structure of the Reorganized Debtors, shall be deemed to have occurred and shall be in effect from and after the Effective Date pursuant to section 303 of the Delaware General Corporation Law (or the laws of each state pursuant to which a Reorganized Debtor is organized) without requiring any further action by the shareholders or directors of the Debtors and/or Reorganized Debtors.

### (l)    Directors And Officers

Except as expressly provided in this Plan and the New Certificates of Incorporation and New Bylaws of the Reorganized Debtors (as amended from time to time), the operation, management and control of the Reorganized Debtors shall be the general responsibility of its board of directors and senior officers.  The boards of directors of the Reorganized Debtors shall consist of no more than 5 directors.  Holders of a majority of the New Preferred Stock will have the right to nominate and elect 1 "A" director so long as there is at least $5 million of New Preferred Stock issued and outstanding and the Holders of a majority of the Lender Common Stock (if the Existing Lenders or their affiliates then own at least 25% of the Lender Common Stock issued under the Plan) will have the right to nominate and elect 1 "A" director (provided that such Holders will have the right to nominate and elect 2 "A" directors at such time as there is less than $5 million of New Preferred Stock issued and outstanding); provided, however, that if Existing Lenders own less than 25%, but at least 10% of the Lender Common Stock issued under the Plan, such Existing Lenders shall retain the right to designate one board observer. ACAS will have the right to nominate and elect 2 "B" directors so long as ACAS and its affiliates own  at least 25% of the Subordinated Noteholder Common Stock issued under the Plan (and ACAS shall retain observation rights on the boards of directors of the Reorganized Debtors so long as ACAS and its affiliates owns less than 25%, but at least 10% of the Subordinated Noteholder Common Stock issued under the Plan).  The President of the Reorganized Parent shall serve as a "C" director.  So long as there are any "A" directors, all Board committees of the Reorganized Debtors shall include at least one "A" director, and so long as there are any "B" directors, all Board committees of the Reorganized Debtors shall include at least one "B" director.  Until delivery of a Trigger Notice, "A" directors and "C" directors will have 1 vote and "B" directors will have 3 votes on all matters which come before the Board of each of the Reorganized Debtors.  Following delivery of a Trigger Notice, "B" directors and "C" directors will have 1 vote and "A" directors will have 3 votes on all matters which come before the Board of each of the Reorganized Debtors.

The existing senior officers of the Debtors shall continue to serve in their same respective capacities after the Effective Date for the Reorganized Debtors, unless and until replaced or removed in accordance with the New Certificates of Incorporation and the New Bylaws.

Management electing to remain with the Reorganized Debtors will be entitled to participate in the Management Incentive Plan.

**(m)     Management Incentive Program**

On or soon as practical after the Effective Date, the board of directors of the Reorganized Parent and the New Equity Holders of the Reorganized Parent will adopt and implement the Management Incentive Plan, which will allow the Reorganized Parent to grant options to purchase shares of New Common Stock on such terms as shall be approved by the board of directors of the Reorganized Parent.  The board of directors of the Reorganized Parent shall have the authority to reserve 12.5% of the Reorganized Parent's New Common Stock for issuance pursuant to options granted under the Management Incentive Plan and upon such issuance such shares of common stock shall be validly issued, fully paid and nonassessable by the Reorganized Parent.  In connection with the adoption of the Management Incentive Plan, granting of options thereunder, and the issuance of shares of common stock upon exercise of such options, the Reorganized Debtors may take whatever actions are necessary to comply with applicable federal, state, local and international tax withholding and other obligations.

**(n)     Employee Incentive Plan**

As soon as practical after the Effective Date, the board will adopt and implement the Employee Incentive Plan, which will provide for discretionary cash bonuses to be paid to employees of the Reorganized JSC if EBITDA for the year ending 2010 is equal to or greater than $7,000,000.

**(o)     Revesting Of Assets in Reorganized Debtors**

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated therein, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances (except for Liens granted pursuant to the Amended and Restated Credit Documents).

On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.  Without limiting the generality of the foregoing, the Debtors may, without application to or approval by the Bankruptcy Court, pay fees that they incur after the Effective Date for professional fees and expenses.

**(p)     Waiver Of Avoidance Actions and Excluded Claims; Preservation of Causes of Action**

Except as otherwise provided in the Plan or Confirmation Order or other agreement entered into in connection with the Plan, in accordance with section 1123(b) of the Bankruptcy

Code, on the Effective Date, the Debtors and Reorganized Debtors shall waive all of their respective rights and interest in Avoidance Actions and Excluded Claims that they may hold. This waiver does not include Causes of Action other than the Avoidance Actions and Excluded Claims.

Except for Excluded Claims and Avoidance Actions and except to the extent such rights, Claims, causes of action, defenses, and counterclaims are expressly and specifically released in connection with the Plan, the Confirmation Order or in any settlement agreement approved during the Chapter 11 Cases, or otherwise provided in the Confirmation Order or in any contract, instrument, release, indenture or other agreement entered into in connection with the Plan, in accordance with section 1123(b) of the Bankruptcy Code: (1) any and all rights, Claims, causes of action, defenses, and counterclaims of or accruing to the Debtors or their Estates shall remain assets of and vest in the Reorganized Debtors, whether or not litigation relating thereto is pending on the Effective Date, and whether or not any such rights, Claims, causes of action, defenses and counterclaims have been listed or referred to in the Plan, the Schedules, or any other document filed with the Bankruptcy Court, and (2) neither the Debtors nor the Reorganized Debtors waive, relinquish, or abandon (nor shall they be estopped or otherwise precluded from asserting) any right, Claim, cause of action, defense, or counterclaim that constitutes property of the Estates: (a) whether or not such right, Claim, cause of action, defense, or counterclaim has been listed or referred to in the Plan or the Schedules, or any other document filed with the Bankruptcy Court, (b) whether or not such right, Claim, cause of action, defense, or counterclaim is currently known to the Debtors, and (c) whether or not a defendant in any litigation relating to such right, Claim, cause of action, defense or counterclaim filed a proof of Claim in the Chapter 11 Cases, filed a notice of appearance or any other pleading or notice in the Chapter 11 Cases, voted for or against the Plan, or received or retained any consideration under the Plan.

Without in any manner limiting the generality of the foregoing, notwithstanding any otherwise applicable principal of law or equity, without limitation, any principals of judicial estoppel, *res judicata*, collateral estoppel, issue preclusion, or any similar doctrine, the failure to list, disclose, describe, identify, or refer to a right, Claim, cause of action, defense, or counterclaim, or potential right, Claim, cause of action, defense, or counterclaim, in the Plan, the Schedules, or any other document filed with the Bankruptcy Court shall in no manner waive, eliminate, modify, release, or alter the Reorganized Debtors' right to commence, prosecute, defend against, settle, and realize upon any rights, Claims, causes of action, defenses, or counterclaims that the Debtors or the Reorganized Debtors have, or may have, as of the Effective Date. The Reorganized Debtors may commence, prosecute, defend against, settle, and realize upon any rights, Claims, causes of action (other than Avoidance Actions and Excluded Claims), defenses, and counterclaims in their sole discretion, in accordance with what is in the best interests, and for the benefit, of the Reorganized Debtors.

**(q)     Employee and Retiree Benefits**

On and after the Effective Date, the Reorganized Debtors may honor, in the ordinary course of business, any unrejected contracts, agreements, policies, programs, and plans, in each case to the extent disclosed in the Disclosure Statement or order entered by the Bankruptcy Court approving a pleading seeking payment of, for, among other things, compensation (including equity based and bonus compensation), health care benefits, disability benefits, deferred

compensation benefits, travel benefits, savings, severance benefits, retirement benefits, welfare benefits, workers' compensation insurance, accidental death and dismemberment insurance for the directors, officers and employees of any of the Debtors who served in such capacity at any time, and any other benefit plan; provided, however, that the Debtors' or Reorganized Debtors' performance of any employment agreement will not entitle any person to any benefit or alleged entitlement under any policy, program, or plan that has expired or been terminated before the Effective Date, or restore, reinstate, or revive any such benefit or alleged entitlement under any such policy, program, or plan. Nothing in the Plan shall limit, diminish, or otherwise alter the Reorganized Debtors' defenses, claims, any causes of action, or other rights with respect to any such contracts, agreements, policies, programs, and plans.

**(r)    Workers' Compensation Programs**

As of the Effective Date, the Reorganized Debtors shall continue to honor their post-petition obligations under: (i) all applicable workers' compensation laws in the states in which the Reorganized Debtors operate; and (ii) the Debtors' written contracts, agreements, agreements of indemnity, self-insurer workers' compensation bonds, policies, programs and plans for workers' compensation and workers' compensation insurance in effect for the current policy year. Nothing in the Plan shall limit, diminish or otherwise alter the Debtors' or Reorganized Debtors' defenses, claims, rights of action, or other rights under applicable non-bankruptcy law with respect to any such contracts, agreements, policies, programs and plans; provided, however, that nothing in the Plan shall be deemed to impose any obligations on the Debtors or Reorganized Debtors in addition to what is required under the provisions of applicable law.

**(s)    New Management Agreement**

On the Effective Date, the Reorganized Parent and ACAS shall enter into the New Management Agreement on terms substantially similar to those set forth in the Existing Management Agreement, provided, however, the annual amount of the Management Fee shall be as follows: (i) $250,000 in calendar year 2010, pro rata from the Effective Date through the end of calendar year 2010, (ii) for each year thereafter, (A) $250,000 if EBITDA for the twelve month period ending on the last day of the prior calendar year is less than $9,000,000, (B) $375,000 if EBITDA for the twelve month period ending on the last day of the prior calendar year is greater than or equal $9,000,000, but less than $9,500,000, and (C) $500,000 if EBITDA for the twelve month period ending on the last day of the prior calendar year is greater than or equal to $9,500,000. The payment of Management Fees shall be subject to the fixed charge coverage ratio not falling below 1.10x after giving effect to such payment and that both before and after giving effect to such payment no default or event of default shall exist or result therefrom under the Amended and Restated Credit Agreement ("Loan Compliance"); provided, however, that any amount not paid at that time shall accrue and be paid either upon Loan Compliance, or the payment in full of all obligations due under the Amended and Restated Credit Facility and the New Preferred Stock. All Management Fees shall be paid in cash on a quarterly basis in an amount equal to $1/4^{th}$ of the applicable amounts set forth above. In addition, ACAS shall be paid a bonus in the amount of $500,000 the first time EBITDA exceeds $11,000,000 for the twelve month period ending on the last day of the prior calendar year and a bonus in the amount of $200,000 the first time EBITDA exceeds $12,000,000 for the twelve month period ending on the last day of the prior calendar year.

**(t)     Exemption From Certain Transfer Taxes**

Pursuant to section 1146(a) of the Bankruptcy Code, the issuance, transfer, or exchange of a security, or the making or delivery of an instrument of transfer from the Debtors to the Reorganized Debtors or any other Person or entity pursuant to the Plan may not be taxed under any law imposing a stamp tax or similar tax, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

**(u)     Payment of Compromised Plan Related Fees and Installment Fees**

On the Effective Date, the Debtors shall pay all Plan Related Fees.  The amount payable by the Debtors on account of the Cortec Professional Fees shall be less the sum held in the Cortec Deposit which deposit shall remain with Cortec.  All Installment Fees shall be paid by the Reorganized Debtors in four quarterly installments of $125,000 beginning on June 30, 2011, but only to the extent that, at the time of payment, cash on hand exceeds amounts outstanding under the Amended and Restated Revolving Credit Facility.  To the extent any Installment Fees are not fully paid when due, they shall be paid by the Reorganized Debtors on a quarterly basis until paid in full to the extent of cash on hand in excess of amounts outstanding under the Amended and Restated Revolving Credit Facility; provided, however, that no more than $250,000 in Installment Fees shall be payable in any quarter.

**Section 3.03   Provisions Governing Distributions**

**(a)     Timing and Calculation of Amounts to Be Distributed**

Unless otherwise provided in the Plan, on the Effective Date (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such a Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim against the Debtors shall receive the distributions that the Plan provides for Allowed Claims in the applicable Class.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the relevant provisions set forth in the Plan.  Except as otherwise provided herein, Holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for herein, regardless of whether such distributions are delivered on or at any time after the Effective Date.

Notwithstanding the foregoing, the Debtors or the Reorganized Debtors shall file any and all objections to General Unsecured Claims on or before the Claims Objection Deadline.  Any General Unsecured Claims that are not objected to by the Debtors or the Reorganized Debtors on or before the Claims Objection Deadline shall be Allowed Claims no later than the Claims

Objection Deadline and distributions on such Allowed General Unsecured Claims shall be made as soon as reasonably practical after the Claims Objection Deadline.

**(b)      Disbursing Agent**

Except as otherwise provided herein, all distributions under the Plan shall be made by the Reorganized Debtors as Disbursing Agent or such other Entity designated by the Reorganized Debtors as a Disbursing Agent on the Effective Date.  Any Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.

**(c)      Rights and Powers of Disbursing Agent**

**(i)      Powers of the Disbursing Agent**

The Disbursing Agent shall be empowered to: (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (ii) make all distributions contemplated hereby; (iii) employ professionals to represent it with respect to its responsibilities; and (iv) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

**(ii)      Expenses Incurred On or After the Effective Date**

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses) made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors.

**(d)      Distributions on Account of Claims Allowed After the Effective Date**

**(i)      Payments and Distributions on Disputed Claims**

Distributions made after the Effective Date to Holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

**(ii)      Special Rules for Distributions to Holders of Disputed Claims**

Notwithstanding any provision otherwise in the Plan and except as otherwise agreed to by the relevant parties: (i) no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order; and (ii) any Entity that holds both an Allowed Claim and a Disputed Claim shall not receive any distribution on the Allowed Claim unless and until all objections to the Disputed Claim have been resolved by settlement or Final Order and the Disputed Claims have been Allowed or not Allowed.

**(e)     Delivery of Distributions and Undeliverable or Unclaimed Distributions**

**(i)      Delivery of Distributions in General**

Except as otherwise provided herein, the Disbursing Agent shall make distributions to Holders of Allowed Claims on the Effective Date (i) at the address for each such Holder as indicated on the Debtors' records as of the date of any such distribution; or (ii) at the address set forth on any proof of Claim filed by such Holder; provided, however, that the manner of such distributions with respect to the foregoing subsections (i) and (ii) shall be determined at the discretion of the Disbursing Agent.

**(ii)     Minimum Distributions**

The Disbursing Agent shall not be required to make distributions of less than fifty dollars ($50.00) to the holder of any Claim unless a request therefor is made in writing to the Disbursing Agent.

**(iii)    Undeliverable Distributions and Unclaimed Property**

**(A)     Failure to Claim Undeliverable Distributions**

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then current address of such Holder, at which time such distribution shall be made to such Holder without interest; provided, however, such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six months from the Effective Date. After such date, all unclaimed property or interests in property shall be remitted to the Agent on behalf of, and for distribution to, the Existing Lenders pursuant to Section 3.04(a) of the Plan (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such property or Interest in property shall be discharged and forever barred.

**(B)     Failure to Present Checks**

Checks issued by the Disbursing Agent on account of Allowed Claims shall be null and void if not negotiated within 180 days after the issuance of such check. Requests for reissuance of any check shall be made directly to the Disbursing Agent by the Holder of the relevant Allowed Claim with respect to which such check originally was issued. Any Holder of an Allowed Claim holding an un-negotiated check that does not request reissuance of such un-negotiated check within 180 days after the issuance of such check shall have its Claim for such un-negotiated check discharged and be discharged and forever barred, estopped and enjoined from asserting any such Claim against the Reorganized Debtors or their property. In such cases, any Cash held for payment on account of such Claims shall be remitted to the Agent on behalf of, and for distribution to, the Existing Lenders pursuant to Section 3.04(a) of the Plan, free of any Claims of such Holder with respect thereto. Nothing contained in the Plan shall require the Reorganized Debtors or Disbursing Agent to attempt to locate any Holder of an Allowed Claim.

FP01/ 6384629.6

**(f)     Compliance with Tax Requirements/Allocations**

In connection with the Plan, to the extent applicable, the Reorganized Debtors shall comply with all tax withholding and reporting requirements imposed on them by any governmental unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors and the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate.  The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens and encumbrances.  Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

**(g)     Claims Paid or Payable by Third Parties**

**(i)     Claims Paid by Third Parties**

The Debtors or the Reorganized Debtors, as applicable, may seek to reduce a Claim (or disallow such Claim) to the extent that the Holder of such Claim receives payment on account of such Claim from a party that is not a Debtor or Reorganized Debtor.  To the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, the  Reorganized Debtor shall be entitled to seek recovery of such distribution, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.

**(ii)     Claims Payable by Third Parties**

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of the Debtors' insurers agrees to satisfy in full a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, such Claim may be expunged without a Claims objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

**(h)     Applicability of Insurance Policies**

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the

Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers. All rights of the Debtors or their Estates under or in connection with insurance policies shall vest in the Reorganized Debtors as of the Effective Date.

**Section 3.04   Treatment of Executory Contracts and Unexpired Leases**

**(a)        Assumption/Rejection of Executory Contracts and Unexpired Leases**

On the Effective Date, and to the extent permitted by applicable law, all of the Debtors' executory contracts and unexpired leases will be assumed by the Debtors (other than the Existing Management Agreement which shall be rejected) unless such executory contract or unexpired lease: (a) is identified as part of the Plan Supplement to be filed prior to the Confirmation Hearing as a contract or lease being rejected pursuant to the Plan; (b) is the subject of separate motions to reject, assume, or assume and assign filed pursuant to section 365 of the Bankruptcy Code by the Debtors before the Effective Date; or (c) is the subject of a dispute over the amount or manner of cure pursuant to the next section hereof and for which the Debtors make a motion to reject such contract or lease based upon the existence of such dispute filed at any time. Notwithstanding anything to the contrary herein, nothing in the Plan is intended to have, nor shall have, any effect whatsoever on any insurance policies, insurance coverages, or contracts of insurance issued to, or for the benefit of, the Debtors, the Reorganized Debtors, or the Estates or that cover claims against any other Person.

No later than 20 days prior to the date of the Confirmation Hearing or such other time as the Bankruptcy Court may determine, the Debtors shall file and serve each counter-party to an executory contract or unexpired lease a Notice of Intent to Assume or Reject, identifying the executory contracts and unexpired leases that will be assumed or rejected pursuant to the Plan. Inclusion of a contract, lease or other agreement on any Notice of Intent to Assume or Reject shall constitute adequate and sufficient notice that (i) any Claims arising thereunder or related to a rejection shall be treated as General Unsecured Claims under the Plan, and (ii) the Debtors intend to assume or reject such executory contract or unexpired lease.  The Notice of Intent to Assume or Reject shall include a proposed Assumption Effective Date or Rejection Effective Date, as applicable, and, if applicable, a Proposed Cure Amount and/or a proposed assignment.

The Notice of Intent to Assume or Reject may be amended or modified after it has been filed, provided that any such amendment or modification shall be served on any affected counterparty to an executory contract or unexpired lease.

The Plan shall constitute a motion to reject such executory contracts and unexpired leases set forth in the Notice of Intent to Assume or Reject filed by the Debtors with the Bankruptcy Court prior to the Confirmation Hearing, and the Debtors shall have no liability thereunder except as is specifically provided in the Plan.  Entry of the Confirmation Order by the Clerk of the Bankruptcy Court shall constitute approval of such rejections pursuant to section 365(a) of the Bankruptcy Code and a finding by the Bankruptcy Court that each such rejected agreement, executory contract or unexpired lease is burdensome and that the rejection thereof is in the best interests of the Debtors and their Estates.

The Plan shall constitute a motion to assume all executory contracts and unexpired leases assumed pursuant to this Section 7.01. Entry of the Confirmation Order by the Clerk of the Bankruptcy Court shall constitute approval of such assumptions pursuant to sections 365(a) and (b) of the Bankruptcy Code.

**(b)  Objections to Assumption of Executory Contracts and Unexpired Leases**

**(i)  Objection Procedure Generally**

Any party objecting to any Debtor's proposed assumption of an executory contract or unexpired lease based on a lack of adequate assurance of future performance or on any other ground including the adequacy of the Proposed Cure Amount set forth in the Notice of Intent to Assume or Reject shall file and serve a written objection to the assumption of such contract or lease and serve such objection on the Debtors and the Existing Agent within 15 days from the date of the service of the Notice of Intent to Assume or Reject. Failure to timely file an objection shall constitute consent to the assumption and assignment of such contracts and/or leases, including an acknowledgment that the proposed assumption provides adequate assurance of future performance and that the applicable Proposed Cure Amount set forth in the Notice of Intent to Assume or Reject is proper and sufficient for purposes of section 365 of the Bankruptcy Code.

**(ii)  Objection Based on Grounds Other Than "Proposed Cure" Amount**

If any party timely and properly files an objection to assumption based on the Assumption Effective Date or any ground other than the adequacy of the Proposed Cure Amount set forth in the Notice of Intent to Assume or Reject and the Bankruptcy Court ultimately determines by Final Order that any Debtor cannot assume the executory contract or unexpired lease, then the unexpired lease or executory contract shall automatically thereupon be deemed to have been excluded therefrom and shall be rejected.

**(iii)  Objection Based on "Proposed Cure" Amount**

If any party timely and properly files an objection to assumption based on the adequacy of the Proposed Cure Amount set forth in the Notice of Intent to Assume or Reject and such objection is not resolved between the Debtors and the objecting party, the Bankruptcy Court shall resolve such dispute at the Confirmation Hearing or another hearing date to be determined by the Bankruptcy Court. The resolution of such dispute shall not affect the assumption of the executory contract or lease that is the subject of such dispute but rather shall affect only the "cure" amount the Debtors must pay in order to assume such contract or lease. Notwithstanding the immediately preceding sentence, if the Debtors in their discretion determine that the amount asserted to be the necessary "cure" amount would, if ordered by the Bankruptcy Court, make the assumption of the executory contract or unexpired lease imprudent, then the Debtors may elect to (1) reject the executory contract or unexpired lease, or (2) request an expedited hearing on the resolution of the "cure" dispute, exclude assumption or rejection of the contract or lease from the scope of the Confirmation Order, and retain the right to reject the executory contract or unexpired lease pending the outcome of such dispute.

**(c)  Cure Costs**

At the election of the Debtors, any monetary defaults under each executory contract and unexpired lease to be assumed under this Plan shall be satisfied pursuant to section 365(b)(1) of the Bankruptcy Code: (a) by payment of the Cure amount in Cash on or as soon as practical after the later of (i) the Effective Date or (ii) the date on which such Cure Claim becomes Allowed; or (b) on such other terms as agreed to by the parties to such executory contract or unexpired lease.

**(d)** **Claims Arising from Rejection, Expiration or Termination**

Rejection Claims created by the rejection of executory contracts and unexpired leases must be filed with the Bankruptcy Court and served on the Debtors by the Rejection Bar Date. Any such Rejection Claims for which a proof of claim is not filed by the Rejection Bar Date shall be forever barred from assertion and shall not be enforceable against the Debtors, the Reorganized Debtors, their respective Estates, Affiliates or Assets. Unless otherwise ordered by the Bankruptcy Court, all such Rejection Claims that are timely filed as provided herein shall be treated as General Unsecured Claims under the Plan subject to objection by the Reorganized Debtors and/or Disbursing Agent.

**(e)** **Treatment of Compensation and Benefit Programs**

Except to the extent (i) otherwise provided for in the Plan, (ii) previously assumed or rejected by an order of the Bankruptcy Court entered on or before the Confirmation Date, (iii) the subject of a pending motion to reject filed by the Debtors on or before the Confirmation Date, or (iv) previously terminated, all employee compensation and benefit programs of the Debtors in effect during the pendency of the Chapter 11 Cases, including all health and welfare plans, 401(k) plans, and all benefits subject to sections 1114 and 1129(a)(13) of the Bankruptcy Code, entered into before or after the Petition Date and in effect during the pendency of the Chapter 11 Cases, shall be deemed to be, and shall be treated as though they are, executory contracts that are assumed and assigned pursuant to section 365 of the Bankruptcy Code and the Plan. Nothing contained herein shall be deemed to modify the existing terms of such employee compensation and benefit programs, including, without limitation, the Debtors' and the Reorganized Debtors' rights of termination and amendment thereunder.

**(f)** **Pass-Through**

Any rights or arrangements necessary or useful to the operation of the Debtors' business but not otherwise addressed as a Claim or Interest, including non-exclusive or exclusive patent, trademark, copyright, maskwork or other intellectual property licenses and other executory contracts not assumable under section 365(c) of the Bankruptcy Code, shall, in the absence of any other treatment, be passed through the bankruptcy proceedings for the Debtors and the Debtors' counterparty's benefit, unaltered and unaffected by the bankruptcy filings or Chapter 11 Cases.

**(g)** **Assumed Executory Contracts and Unexpired Leases**

Each executory contract and unexpired lease that is assumed will include (a) all amendments, modifications, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affect such executory contract or unexpired lease, and (b) all executory contracts or unexpired leases and

other rights appurtenant to the property, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, powers, uses, reciprocal easement agreements, vaults, tunnel or bridge agreements or franchises, and any other equity interests in real estate or rights in rem related to such premises, unless any of the foregoing agreements has been rejected pursuant to an order of the Bankruptcy Court or is the subject of a motion to reject filed on or before the Confirmation Date.

Amendments, modifications, supplements, and restatements to prepetition executory contracts and unexpired leases that have been executed by the Debtors during their Chapter 11 Cases shall not be deemed to alter the prepetition nature of the executory contract or unexpired lease, or the validity, priority, or amount of any claims that may arise in connection therewith.

### (h) Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases

Rejection or repudiation of any executory contract or unexpired lease pursuant to the Plan or otherwise shall not constitute a termination of pre-existing obligations owed to the Debtors under such contracts or leases. In particular, notwithstanding any non-bankruptcy law to the contrary, the Reorganized Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased by the contracting Debtors or Reorganized Debtors, as applicable, from counterparties to rejected or repudiated executory contracts or unexpired leases.

### (i) Intercompany Contracts, Assumed Contracts and Leases, and Leases Entered After Petition Date

Intercompany contracts, leases entered into after the Petition Date by any Debtor, and any executory contracts and unexpired leases assumed by any Debtor, may be performed by the applicable Reorganized Debtor in the ordinary course of business.

### (j) Assumption of Indemnification Provisions

The Debtors, and upon the Effective Date, the Reorganized Debtors, shall assume all of the Indemnification Provisions in place on and before the Effective Date for Indemnified Parties for Claims related to or in connection with any actions, omissions or transactions occurring before the Effective Date.

### (k) Reservation of Rights

Neither the exclusion nor inclusion of any contract or lease in the Plan Supplement, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an executory contract or unexpired lease or that any Reorganized Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Reorganized Debtors, as applicable, shall have thirty days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

**Section 3.05    Procedures for Resolving Disputed, Contingent and Unliquidated Claims**

**(a)    Allowance of Claims and Interests**

Except as expressly provided in the Plan or any order entered in the Chapter 11 Cases prior to the Effective Date (including the Confirmation Order), no Claim shall be deemed Allowed unless and until such Claim is deemed Allowed under the Bankruptcy Code, under the Plan, or the Bankruptcy Court enters a Final Order in the Chapter 11 Cases allowing such Claim under section 502 of the Bankruptcy Code. Except as expressly provided in any order entered in the Chapter 11 Cases prior to the Effective Date (including the Confirmation Order), the Reorganized Debtors after Confirmation will have and retain any and all rights and defenses the Debtors had with respect to any Claim as of the Petition Date.

**(b)    Objections to Claims**

The Debtors or Reorganized Debtors, as applicable, shall have the exclusive authority to file, settle, compromise, withdraw, or litigate to judgment any objections to Claims, and shall consult with the Agent in respect of such decisions and actions with respect to Claims equal to or greater than $25,000. From and after the Effective Date, the Reorganized Debtors may settle or compromise any Disputed, Contingent or Unliquidated Claim in an amount less than $25,000 without approval of the Bankruptcy Court. From and after the Effective Date, the Reorganized Debtors may settle or compromise any Disputed, Contingent or Unliquidated Claim in an amount equal to or greater than $25,000 (a) without approval of the Bankruptcy Court if the Agent does not object in writing to a proposed settlement within 10 days of receiving written notice thereof or (b) with approval of the Bankruptcy Court.

**(c)    Estimation of Claims**

Any Debtor or Reorganized Debtor, as applicable, may at any time request that the Bankruptcy Court estimate any Disputed Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether such Debtor or Reorganized Debtor has previously objected to such Claim or whether the Bankruptcy Court has ruled on any objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal related to any such objection. In the event the Bankruptcy Court estimates any Disputed Claim, that estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Debtors or Reorganized Debtors, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim. All of the aforementioned objection, estimation and resolution procedures are cumulative and are not necessarily exclusive of one another. Claims may be estimated and thereafter resolved by any permitted mechanism.

**(d)    No Distributions Pending Allowance**

Notwithstanding any other provision of the Plan, no payments or distributions shall be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed

Claim have been settled or withdrawn or have been determined by Final Order, and the Disputed Claim, or some portion thereof, has become an Allowed Claim.

### (e) Distributions After Allowance

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan. As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Disbursing Agent shall provide to the Holder of such Claim the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim.

### (f) Reserves for Disputed General Unsecured Claims

Notwithstanding all references in the Plan to General Unsecured Claims that are Allowed, in undertaking the calculations concerning Allowed General Unsecured Claims under the Plan, including the determination of the amount of distributions due to the Holders of Allowed General Unsecured Claims, each Disputed General Unsecured Claim shall be treated as if it were an Allowed General Unsecured Claim, as appropriate, except that if the Bankruptcy Court estimates the portion of a Disputed General Unsecured Claim to be Allowed or otherwise determines the amount which would constitute a sufficient reserve for a Disputed General Unsecured Claim (which estimations and determinations may be requested by the Reorganized Debtors), such amount as determined by the Bankruptcy Court shall be used as to such General Unsecured Claim.

The distributions due in respect of Disputed General Unsecured Claims based on the calculations required by the Plan shall be reserved for the Holders of the Disputed General Unsecured Claims and deposited into the Plan Distribution Account. The funds so deposited on behalf of a Creditor holding a particular Disputed General Unsecured Claim is referred to in the Plan as the "Reserve Fund."

After an objection to a Disputed General Unsecured Claim is withdrawn or determined by Final Order, the distributions due on account of any resulting Allowed General Unsecured Claim shall be paid by the Disbursing Agent from the Plan Distribution Account for such Creditor. No interest shall be due to a Disputed General Unsecured Claim holder based on the delay attendant to determining the allowance of such General Unsecured Claim. Should the distribution on account of any Allowed General Unsecured Claim of such Creditor exceed the Reserve Fund, the shortfall may be paid from available sums, if any, for the next distribution, provided that, in no event shall the Creditor have recourse to any payments already made to others or to sums reserved by the Disbursing Agent in connection with the Reserve Fund or for ongoing fees and costs of administering or effectuating the Plan.

### (g) General Unsecured Claims

Notwithstanding the contents of the Schedules, Claims listed therein as undisputed, liquidated and not contingent shall be reduced by the amount, if any, that was paid by the Debtors

in respect of such Claim prior to the Effective Date, including pursuant to orders of the Bankruptcy Court. To the extent such payments are not reflected in the Schedules, such Schedules will be deemed amended and reduced to reflect that such payments were made. Nothing in the Plan shall preclude the Reorganized Debtors or Disbursing Agent from paying Claims that the Debtors were authorized to pay pursuant to any Final Order entered by the Bankruptcy Court prior to the Confirmation Date.

**Section 3.06   Conditions Precedent to Confirmation and Consummation of the Plan**

**(a)      Conditions Precedent To Confirmation**

It is a condition to Confirmation that (a) the Confirmation Order shall approve in all respects all of the provisions, terms and conditions of the Plan, and (b) the proposed form of the Confirmation Order is reasonably satisfactory in form and substance to each of the Plan Document Parties.

**(b)      Conditions Precedent To Consummation**

It is a condition of Consummation that (a) the Confirmation Order shall have been signed by the Bankruptcy Court and duly entered on the docket for these Chapter 11 Cases by the Clerk of the Bankruptcy Court in form and substance reasonably acceptable to Plan Document Parties; (b) the Confirmation Order shall be a Final Order; (c)  the Amended and Restated Credit Documents and the Amended and Restated Credit Documents shall have been executed and delivered by the respective parties thereto and all conditions precedent to the effectiveness of each such document (other than Confirmation of the Plan) shall have been satisfied or waived; (d) Cash in the Plan Distribution Amount shall have been deposited in the Plan Distribution Account; (e) all statutory fees then due to the United States Trustee shall have been paid in full or shall be payable in full under the Plan; (f) the Debtors shall have Cash On Hand (exclusive of the proceeds of the Tax Refund) on the Effective Date in an amount not less than $1 million after giving effect to all payments and distributions required to be made under the Plan on the Effective Date including the payment of the New Facility Fee Amount and Plan Related Fees; (g) the Reorganized Debtors shall have been duly organized and in good standing; (h) the Reorganized Debtors and all parties to the Plan Documents shall have executed the Plan Documents all of which shall be reasonably acceptable to the Plan Document Parties, other than Cortec, each in its sole discretion, provided, however, that (x) the New Stockholders' Agreement shall be in a form reasonably acceptable to the Plan Document Parties and (y) any documentation or matter consistent with a term specifically addressed in the Lender/ACAS Term Sheet and the Amended and Restated Credit Facility Term Sheet shall be deemed acceptable to the Plan Document Parties; and (i) all other material actions, documents, and agreements necessary to implement the Plan shall have been effected or executed.

**(c)      Substantial Consummation**

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

**(d)      Waiver Of Conditions**

Except for Sections 9.02(a), (d), (e) and (f), each of the conditions to Consummation set forth in the Plan may be waived in whole or in part by written consent of the Plan Document Parties, without any notice to other parties in interest or the Bankruptcy Court and without a hearing. The failure to satisfy or waive any condition to the Effective Date may be asserted by the Debtors or the Reorganized Debtors regardless of the circumstances giving rise to the failure of such condition to be satisfied (including any action or inaction by the Debtors or Reorganized Debtors). The failure of the Debtors or the Reorganized Debtors to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each such right shall be deemed an ongoing right that may be asserted at any time.

### Section 3.07   Release, Exculpation and Related Provisions

**(a)        Compromise and Settlement**

Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distribution and other benefits provided under the Plan, including, inter alia, (i) the compromise and resolution of the Lender Secured Claims, (ii) the compromise and resolution of Subordinated Noteholder Claims, (iii) the compromise and resolution of Unpaid Management Fee Claims, (iv) the commitment to provide the Amended and Restated Resolving Credit Facility, (v) the grant of releases provided in the Plan, and (vi) the cancellation of Subsidiary Equity Interests and Equity Interests, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims against and Equity Interests in, the Debtors (the "Global Compromise"). The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Global Compromise, and the Bankruptcy Court's findings shall constitute its determination that such compromises and settlements are in the best interests of the Debtors, the Estates, Creditors and other parties in interest, and are fair, equitable and within the range of reasonableness. As further consideration for the Global Compromise memorialized in the Plan, the Plan Related Fees shall be deemed approved without need for further application or notice, and be paid by the Reorganized Debtors on the Effective Date.

**(b)        Releases by the Debtors**

**To the extent approved by the Bankruptcy Court, pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or the Plan Supplement, for good and valuable consideration, including the service of the Released Parties to facilitate the expeditious reorganization of the Debtors and the implementation of the restructuring contemplated by the Plan, on and after the Effective Date, the Released Parties are deemed released and discharged by the Debtors, the Reorganized Debtors, and the Estates, their successors and assigns, from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims, asserted on behalf of the Debtors, the Reorganized Debtors or the Estates, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtors, the Reorganized Debtors, or the Estates, would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Entity, based on or relating to any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date; provided, however, that the foregoing "Debtor Release" shall not operate to**

waive or release any Causes of Action of any Debtor or Reorganized Debtor: (a) against a Released Party arising from any contractual obligations or Customs Obligations owed to the Debtors or Reorganized Debtors other than the Excluded Claims and Avoidance Actions; (b) expressly set forth in and preserved by the Plan, the Plan Supplement or related documents; (c) arising from claims for gross negligence, willful misconduct or criminal conduct; or (d) against a Released Party who submits a Release Opt-Out.

(c)     Releases by Holders of Claims and Interests

To the extent permitted by applicable law and approved by the Bankruptcy Court, as of the Effective Date, each Holder of a Claim or an Interest, except Holders of any Claims: (a) who vote to reject the Plan and who submit a Release Opt-Out indicating their decision to not participate in the release set forth in the Plan; (b) who do not vote to accept or reject the Plan but who timely submit a Release Opt-Out indicating their decision to not participate in the release set forth in the Plan; or (c) who are in a Class that is deemed to reject the Plan, shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released and discharged the Debtors, the Reorganized Debtors, and the Released Parties from any and all Claims, Interests, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, including any derivative Claims, asserted on behalf of a Debtor, the Reorganized Debtors or an Estate, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date; provided, however, that the foregoing release shall not operate to waive or release any Causes of Action of any Releasing Party: (w) against a Released Party arising from any contractual or other obligations owed to the Releasing Party unrelated to the Debtors or the Chapter 11 Cases; (x) expressly set forth in and preserved by the Plan, the Plan Supplement or related documents; (y) arising from claims for gross negligence, willful misconduct or criminal conduct; or (z) against a Released Party who submits a Release Opt-Out. Notwithstanding anything to the contrary in the foregoing, the release set forth above does not release any Customs Obligations or post-Effective Date obligations of any party under the Plan, or any Plan Document.

(d)     Exculpation

Except as otherwise specifically provided in the Plan or Plan Supplement, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any Exculpated Claim, obligation, Cause of Action, or liability for any Exculpated Claim, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.

(e)     Discharge of Claims and Termination of Interests

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in full and final satisfaction, settlement, release, and discharge, effective as of the Effective Date,

of all Claims, Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (a) a proof of Claim or Interest based upon such Claim, debt, right, or Interest is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (b) a Claim or Interest based upon such Claim, debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (c) the Holder of such a Claim or Interest has accepted the Plan. Except as otherwise provided in the Plan, any default by the Debtors or their Affiliates with respect to any Claim or Interest that existed immediately before or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring, except as otherwise expressly provided in the Plan.

(f)     **Injunction**

**Except as otherwise expressly provided in the Plan, the Plan Supplement or related documents, or for obligations issued pursuant to the Plan, from and after the Effective Date, all Releasing Parties are permanently enjoined, from taking any of the following actions against the Debtors or the Reorganized Debtors: (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any Claims or Interests; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree or order against the Debtors or the Reorganized Debtors on account of or in connection with or with respect to any Claims or Interests; (c) creating, perfecting, or enforcing any encumbrance of any kind against the Debtors or the Reorganized Debtors or the property or estates of the Debtors or the Reorganized Debtors on account of or in connection with or with respect to any Claims or Interests; (d) asserting any right of setoff of any kind against any obligation due from the Debtors or the Reorganized Debtors or against the property or Estates of the Debtors or the Reorganized Debtors on account of or in connection with or with respect to any Claims or Interests unless such Holder has filed a motion requesting the right to perform such setoff on or before the Confirmation Date; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any Claims or Interests released or settled pursuant to the Plan. Nothing in the Plan or Confirmation Order shall preclude any Releasing Party from pursuing an action against one or more of the Debtors in a nominal capacity to recover insurance proceeds so long as the Debtors or Reorganized Debtors, as applicable, and any Releasing Party agree in writing that Releasing Party will: (i) waive all Claims against the Debtors or Reorganized Debtors, the Reorganized Debtors, and the Estates related to such action and (ii) enforce any judgment on account of such Claim solely against applicable insurance proceeds, if any.**

(g)     **Setoffs**

Except as otherwise expressly provided for in the Plan, each Reorganized Debtor pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim or Interest, may set off against any Allowed Claim or Interest and the distributions to be made pursuant to the Plan on account of such Allowed Claim or Interest (before any distribution is made on account of such Allowed Claim or Interest), any Claims, rights, and Causes of Action (other than Avoidance Actions and Excluded Claims) of any nature that such Debtor or Reorganized Debtor, as applicable, may hold against the Holder of such Allowed Claim or Interest, to the extent such Claims, rights, or Causes of Action (other than Avoidance Actions and Excluded Claims) against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); provided, however, that neither the failure to effect such a setoff nor the allowance of any Claim or Interest pursuant to the Plan shall constitute a waiver or release by such Reorganized Debtor of any such Claims, rights, and Causes of Action that such Reorganized Debtor may possess against such Holder. In no event shall any Holder of Claims or Interests be entitled to setoff any Claim or Interest against any Claim, right, or Cause of Action of the Debtor or Reorganized Debtor, as applicable, unless such Holder has filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date and the Bankruptcy Court shall have entered an order authorizing such set off.

**(h)** **Release of Liens**

Except as otherwise provided in the Plan, the Amended and Restated Credit Documents, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date or upon receipt by each Plan Document Party of the consideration to which such Plan Document Party is entitled, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtor and its successors and assigns.

**(i)** **Preservation of Rights of Action by the Debtors and the Reorganized Debtor**

Except as provided in the Plan or in any contract, instrument, release or other agreement entered into or delivered in connection with the Plan, in accordance with section 1123(b) of the Bankruptcy Code and to the fullest extent possible under applicable law, the Reorganized Debtors shall retain and may enforce, and shall have the sole right to enforce, any claims, demands, rights and Causes of Action that the Debtors or Estates may hold against any Entity, as appropriate. The Reorganized Debtors or their successors, as the case may be, may pursue such retained claims, demands, rights or Causes of Action (other than Avoidance Actions and Excluded Claims), as appropriate, in accordance with the best interests of the Reorganized Debtors or their successors, holding such claims, demands, rights or Causes of Action. Further, the Reorganized Debtors, retain their rights to file and pursue, and shall have the sole right to file and pursue any adversary proceedings against any account Debtors related to debit balances or deposits owed to the Debtor.

**Section 3.08    Binding Nature Of The Plan**

THE PLAN SHALL BIND ALL HOLDERS OF CLAIMS AGAINST AND
INTERESTS AND INTERCOMPANY INTERESTS IN THE DEBTORS TO THE MAXIMUM
EXTENT PERMITTED BY APPLICABLE LAW, NOTWITHSTANDING WHETHER OR
NOT SUCH HOLDER (1) WILL RECEIVE OR RETAIN ANY PROPERTY OR INTEREST
IN PROPERTY UNDER THE PLAN, (2) HAS FILED A PROOF OF CLAIM OR INTEREST
IN THE CHAPTER 11 CASES OR (3) FAILED TO VOTE TO ACCEPT OR REJECT THE
PLAN OR VOTED TO REJECT THE PLAN.

**Section 3.09    Retention Of Jurisdiction**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective
Date, the Bankruptcy Court shall, after the Effective Date, retain such jurisdiction over the
Chapter 11 Cases and all Entities with respect to all matters related to the Chapter 11 Cases, the
Debtors and the Plan as legally permissible, including, without limitation, jurisdiction to:

1.    Allow, disallow, determine, liquidate, classify, estimate, or establish the priority,
secured or unsecured status, or amount of any Claim or Interest, including the resolution of any
request for payment of any Administrative Claim and the resolution of any and all objections to
the Secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.    Decide and resolve all matters related to the granting and denying, in whole or in
part, any applications for allowance of compensation or reimbursement of expenses to
Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.    Resolve any matters related to: (a) the assumption, assumption and assignment, or
rejection of any executory contract or unexpired lease to which a Debtor is party or with respect
to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims
arising therefrom, including Cure Claims pursuant to section 365 of the Bankruptcy Code; (b)
any potential contractual obligation under any executory contract or unexpired lease that is
assumed; (c) the Reorganized Debtors amending, modifying, or supplementing, after the
Effective Date, pursuant to the Plan, any executory contracts or unexpired leases to the list of
executory contracts and unexpired leases to be assumed or rejected or otherwise; and (d) any
dispute regarding whether a contract or lease is or was executory or expired;

4.    Ensure that distributions to Holders of Allowed Claims and Interests are
accomplished pursuant to the provisions of the Plan;

5.    Adjudicate, decide, or resolve any motions, adversary proceedings, contested or
litigated matters, and any other matters, and grant or deny any applications involving a Debtor
that may be pending on the Effective Date;

6.    Adjudicate, decide, or resolve any and all matters related to Causes of Action;

7.     Adjudicate, decide, or resolve any and all matters related to sections 1141 and 1145 of the Bankruptcy Code;

8.     Enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

9.     Enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

10.     Resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

11.     Issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

12.     Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, and other provisions contained in the Plan and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

13.     Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to the Plan;

14.     Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

15.     Determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

16.     Enter an order or Final Decree concluding or closing the Chapter 11 Cases;

17.     Adjudicate any and all disputes arising from or relating to distributions under the Plan;

18.     Consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

19.     Determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

20.     Hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

21.     Hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

22.     Hear and determine all disputes involving the existence, nature, or scope of the Debtors' discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

23.     Enforce all orders previously entered by the Bankruptcy Court; and

24.     Hear any other matter not inconsistent with the Bankruptcy Code.

## Section 3.10    Modification, Revocation, Or Withdrawal Of The Plan

### (a)    Modification and Amendments

Effective as of the date hereof and subject to the limitations and rights contained in the Plan and subject to the consent of the Plan Document Parties which consent shall not be unreasonably withheld or delayed: (a) the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan prior to the entry of the Confirmation Order; and (b) after the entry of the Confirmation Order, the Debtors or the Reorganized Debtors, as applicable, may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan.

### (b)    Effect of Confirmation on Modifications

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

### (c)    Revocation or Withdrawal of the Plan

The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date and to file subsequent chapter 11 plans. If the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then: (a) the Plan shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan, assumption or rejection of executory contracts or unexpired leases effected by the Plan and any document or agreement executed pursuant to the Plan shall be deemed null and void except as may be set forth in a separate order entered by the Bankruptcy Court; and (c) nothing contained in the Plan shall: (i) constitute a waiver or release of any Claims by or against, or any Interests in, such Debtor or any other Entity; (ii) prejudice in any manner the rights of the Debtors or any other Entity; or (iii)

constitute an admission, acknowledgement, offer or undertaking of any sort by the Debtors or any other Entity.

## Section 3.11    Miscellaneous Provisions

### (a)    Bar Dates For Certain Claims

#### (i)    Administrative Claims

The Confirmation Order will establish an Administrative Claims Bar Date for filing of all Administrative Claims, (but not including Professional Fee Claims or claims for the expenses of the members of the Committee, or claims that are based on liabilities incurred in the ordinary course of the Debtors' business), which date will be 45 days after the Effective Date.  Holders of asserted Administrative Claims, other than Professional Fee Claims, claims for U.S. Trustee fees under 28 U.S.C. §1930, administrative tax claims and administrative ordinary case liabilities, must submit proofs of Administrative Claim on or before such Administrative Claims Bar Date or forever be barred from doing so.  A notice prepared by the Reorganized Debtors will set forth such date and constitute notice of this Administrative Claims Bar Date.  The Debtors or Reorganized Debtors, as the case may be, and other parties in interest shall have 45 days (or such longer period as may be allowed by order of the Bankruptcy Court) following the Administrative Claims Bar Date to review and object to such Administrative Claims before a hearing for determination of allowance of such Administrative Claims.

#### (ii)    Administrative Ordinary Course Liabilities

Holders of Administrative Claims that are based on liabilities incurred in the ordinary course of the Debtors' businesses (other than Claims of governmental units for taxes (and for interest and/or penalties related to such taxes)), including Customs Obligations,  shall not be required to file any request for payment of such Claims.  Such Administrative Claims, unless objected to by the Debtors or the Reorganized Debtors, shall be assumed and paid by the Debtors or the Reorganized Debtors, in Cash, pursuant to the terms and conditions of the particular transaction giving rise to such Administrative Claim.

#### (iii)    Administrative Tax Claims

All requests for payment of Administrative Claims by a governmental unit for taxes (and for interest and/or penalties related to such taxes) for any tax year or period, all or any portion of which occurs or falls within the period from and including the Petition Date through and including the Effective Date, and for which no bar date has otherwise been previously established, must be filed and served on the Reorganized Debtors and any other party specifically requesting a copy in writing on or before the later of (a) thirty (30) days following the Effective Date; and (b) one hundred and twenty (120) days following the filing of the tax return for such taxes for such tax year or period with the applicable governmental unit.  Any Holder of any such Claim that is required to file a request for payment of such taxes and does not file and properly serve such a claim by the applicable bar date shall be forever barred from asserting any such claim against the Debtors, the Reorganized Debtors or their property, regardless of whether any such Claim is deemed to arise prior to, on, or subsequent to the

Effective Date. Any interested party desiring to object to an Administrative Claim for taxes must file and serve its objection on counsel to the Reorganized Debtors and the relevant taxing authority no later than ninety (90) days after the taxing authority files and serves its application.

(iv)    Professional Fee Claims

All final requests for compensation or reimbursement of Professional Fees pursuant to sections 327, 328, 330, 331, 363, 503(b) or 1103 of the Bankruptcy Code for services rendered to or on behalf of the Debtors or the Committee prior to the Effective Date must be filed and served on the Reorganized Debtors and their counsel no later than 45 days after the Effective Date, unless otherwise ordered by the Bankruptcy Court. Objections to applications of such Professionals or other entities for compensation or reimbursement of expenses must be filed and served on the Reorganized Debtors and their counsel and the requesting Professional or other entity no later than 30 days (or such longer period as may be allowed by order of the Bankruptcy Court) after the date on which the applicable application for compensation or reimbursement was served. The Reorganized Debtors shall be authorized to retain and compensate the Debtors' Professionals for services rendered after the Effective Date without further order of the Bankruptcy Court.

**(b)    Payment Of Statutory Fees**

On or before the Effective Date, the Debtors shall have paid in full, in Cash (including by check or wire transfer), in U.S. dollars, all fees payable pursuant to section 1930 of title 28 of the United States Code.

**(c)    Term Of Injunctions Or Stay**

Unless otherwise provided in the Plan or Confirmation Order, all injunctions or stays provided for in the Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code or otherwise, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or Confirmation Order), shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or Confirmation Order shall remain in full force and effect in accordance with their terms.

**(d)    Dissolution of Committee**

On the Effective Date, the Committee shall dissolve and the members of the Committee shall be released and discharged from all authority, duties, responsibilities and obligations related to and arising from and in connection with the Chapter 11 Cases.

**(e)    No Admissions**

Notwithstanding anything in the Plan to the contrary, nothing in the Plan shall be deemed as an admission by the Debtors with respect to any matter set forth in the Plan, including liability on any Claim.

**(f)    Nonseverability of Plan Provisions**

If, before Confirmation of the Plan, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted; provided, further, that the Debtors may seek an expedited hearing before the Bankruptcy Court to address any objection to any such alteration or interpretation of the foregoing. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (a) valid and enforceable pursuant to its terms; (b) integral to the Plan and may not be deleted or modified without the Debtors' consent; and (c) nonseverable and mutually dependent.

**(g)  Return of Security Deposits**

Unless the Debtors have agreed otherwise in a written agreement or stipulation approved by the Bankruptcy Court, all security deposits provided by the Debtors to any Person or Entity at any time after the Petition Date shall be returned to the Reorganized Debtors within twenty (20) days after the Effective Date, without deduction or offset of any kind.

**(h)  Entire Agreement**

Except as otherwise indicated, the Plan and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

**(i)  Exhibits**

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or the Bankruptcy Court's web site at www.deb.uscourts.gov. To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Plan shall control.

**(j)  Votes Solicited in Good Faith**

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code and any applicable non-bankruptcy law, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of

Securities offered and sold under the Plan, and, therefore, will have no liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan.

### (k) Closing of Chapter 11 Cases

The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

### (l) Conflicts

Except as set forth in the Plan, to the extent that any provision of this Disclosure Statement, the Plan Supplement, or any other order (other than the Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), conflict with or are in any way inconsistent with any provision of the Plan, the Plan shall govern and control.

### (m) Filing of Additional Documents

On or before the Effective Date, the Debtors may file with the Bankruptcy Court all agreements and other documents that may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

### (n) Governing Law

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules), the laws of the State of Delaware, without giving effect to the principles of conflicts of law thereof, shall govern the construction and implementation of the Plan and any agreements, documents, and instruments executed in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control) as well as corporate governance matters with respect to the Debtors; provided, however, that corporate governance matters relating to the Debtors or Reorganized Debtors, as applicable, not organized under Delaware law shall be governed by the laws of the state of organization of such Debtor or Reorganized Debtor.

## IV.
## THE SOLICITATION; VOTING PROCEDURES

The following briefly summarizes procedures to accept and confirm the Plan. Holders of Claims and Equity Interests are encouraged to review the relevant provisions of the Bankruptcy Code and/or to consult their own attorneys.

### Section 4.01 Solicitation Package

The Solicitation Agent will facilitate the solicitation process. The following materials constitute the solicitation package (the "Solicitation Package"):

- notice of the Confirmation Hearing;

- appropriate Ballots and a pre-addressed, postage pre-paid return envelope, which will be provided <u>only</u> to the Holders of Class 2A, 2B, 3A, 3B, 5 and 6 Claims, together with voting instructions;

- the Disclosure Statement and the Plan; and

- the Disclosure Statement Order, which, among other things: (a) approves the Disclosure Statement as containing "adequate information" under section 1125 of the Bankruptcy Code; (b) fixes the voting record date ("Voting Record Date"); (c) approves solicitation and voting procedures with respect to the Plan; (d) approved the form of Solicitation Package and notices; and (e) establishes deadlines for voting on the Plan and objecting to Confirmation of the Plan.

The Solicitation Package is being distributed to Holders of Class 2A, 2B, 3A, 3B, 5 and 6 Claims as of the Voting Record Date. Notices of non-voting status will be distributed to Holders of all other Claims and Equity Interests.

The Solicitation Package (except for Ballots) may also be obtained by accessing the Solicitation Agent's website (http://www.gardencitygroup.com) or by requesting a copy by writing to Jones Stephens, c/o Drinker Biddle & Reath LLP, 1100 N. Market Street, Suite 1000, Wilmington, DE 19801-1254 (Attn: Howard A. Cohen).

## Section 4.02   Voting Instructions

Only the Holders as of the Voting Record Date of Class 2A, 2B, 3A, 3B, 5 and 6 Claims are entitled to vote on the Plan, and they may do so by completing a Ballot and returning it to the Solicitation Agent in the self-addressed postage-paid envelope provided by the Voting Deadline. Voting instructions are attached to each Ballot.

**The Voting Deadline is 4:00 p.m., prevailing Eastern Time, on December 15, 2010.**

**HOLDERS MUST CAST THEIR BALLOTS IN ACCORDANCE WITH THE INSTRUCTIONS ON THE BALLOT AND THE SOLICITATION PROCEDURES DESCRIBED HEREIN. ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE SHALL NOT BE COUNTED. ALL BALLOTS ARE ACCOMPANIED BY SELF-ADDRESSED, POSTAGE PRE-PAID RETURN ENVELOPES.**

**THE SOLICITATION AGENT SHALL NOT COUNT ANY BALLOT WHICH DOES NOT CLEARLY INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN OR WHICH INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN.**

**DO NOT RETURN BALLOTS TO THE BANKRUPTCY COURT.**

## Section 4.03     Voting Tabulation

To ensure that a vote is counted, those creditors entitled to vote should: (a) complete a Ballot; (b) clearly indicate the creditor's decision to accept or reject the Plan in the boxes provided in the Ballot; and (c) sign and timely return the Ballot to the address set forth on the enclosed prepaid envelope by the Voting Deadline.

The Ballot may not be used for any purpose other than to vote to accept or reject the Plan. The Ballot does not constitute, and shall not be deemed to be, a Proof of Claim or an assertion or admission of a Claim.

Accordingly, at the time the Ballot is transmitted, claimants should not surrender certificates, instruments, or other documents representing or evidencing their Claims.

Ballots received after the Voting Deadline may not be counted. The method of delivery of the Ballots to be sent to the Solicitation Agent is at the election and risk of each Holder of a Claim. A Ballot will be deemed delivered only when the Solicitation Agent actually receives the original executed Ballot. In all cases, sufficient time should be allowed to assure timely delivery. Delivery of a Ballot by facsimile, e-mail or any other electronic means will not be accepted. No Ballot should be sent to any of the Debtors, the Debtors' agents (other than the Solicitation Agent), the Debtors' financial or legal advisors, the Committee, the Committee's agents, or the Committee's financial or legal advisors.

The Debtors reserve the right to amend from time to time the terms of the Plan (subject to compliance with the requirements of section 1127 of the Bankruptcy Code and the terms of the Plan regarding modifications). The Bankruptcy Code requires the Debtors to disseminate additional solicitation materials if the Debtors make material changes to the terms of the Plan or if the Debtors waive a material condition to Confirmation of the Plan. In that event, the Voting Deadline will be extended or re-opened to the extent directed by the Bankruptcy Court.

If multiple Ballots are received from the same Holder with respect to the same Allowed Claim prior to the Voting Deadline, the last Ballot timely received will be deemed to reflect that voter's intent and will supersede and revoke any prior Ballot(s). Holders must vote all of their Claims either to accept or reject the Plan and may not split their vote. Accordingly, a Ballot that partially rejects and partially accepts the Plan will not be counted.

A person signing a Ballot in its capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of corporations, or otherwise acting in a fiduciary or representative capacity should indicate such capacity when signing and, unless otherwise determined by the Debtors must submit proper evidence to so act on behalf of a beneficial holder.

In the event a party-in-interest seeks a designation of lack of good faith under section 1126(e) of the Bankruptcy Code with respect to a Ballot, the Bankruptcy Court will determine whether the vote to accept or reject the Plan cast with respect to that Claim will be counted for purposes of determining whether the Plan has been accepted or rejected.

The Debtors will file with the Bankruptcy Court a voting report (the "Voting Report") on or before December 17, 2010. The Voting Report shall, among other things, delineate every Ballot that does not conform to the Voting Instructions or that contains any form of irregularity (each an "Irregular Ballot") including, but not limited to, those Ballots that are late or illegible,

unidentifiable, lacking signatures or lacking necessary information, received via facsimile or electronic mail or damaged. Moreover, none of the Debtors or any other person or entity will be under any duty to provide notification of defects or irregularities with respect to delivered Ballots other than as provided in the Voting Report, nor will any of them incur any liability for failure to provide such notification. The Voting Report also shall indicate the Debtors' intentions with regard to such Irregular Ballots.

# V.
# VALUATION ANALYSIS AND FINANCIAL PROJECTIONS

## Section 5.01   Introduction

As a condition to confirmation, section 1129(a)(ii) of the Bankruptcy Code requires that the Debtors prove that the Plan is not likely to be followed by the liquidation or need for further financial reorganization of the Debtors. To satisfy this so-called "feasibility" requirement, the Debtors, in consultation with AlixPartners LLP, developed a set of financial projections summarized in <u>Exhibit B</u> hereto (the "Projections") which demonstrate the Reorganized Debtors' ability to meet their obligations under the Plan to maintain sufficient liquidity and capital resources to conduct their businesses.

In addition, section 1129(a)(7) of the Bankruptcy Code requires that holders of claims and interests receive a recovery under a plan no less than the recovery they would have received under a liquidation of the Debtors' estates. As described in more detail in the liquidation analysis set forth in <u>Exhibit C</u> hereto (the "Liquidation Analysis"), the recovery each Class of creditors would receive under the Debtors' Plan is not less than the recovery to each Class of creditors if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code. Accordingly, the Plan satisfies the "best interests of creditors" test.

## Section 5.02   Financial Projections

The Debtors prepared the Projections summarized in <u>Exhibit B</u> for purposes of demonstrating the feasibility of the Plan (<u>see</u> 11 U.S.C. § 1129(a)(11)), that the Plan is in the best interests of all Holders of Claims (<u>see</u> 11 U.S.C. § 1129(a)(7)) and that the new debt obligations to be incurred upon emergence from these Chapter 11 Cases are necessary for the Debtors to continue as a viable going concern. The Projections are based upon, among other things, the anticipated future financial condition and results of operations of the Reorganized Debtors. The Projections reflect the Debtors' estimate of their expected consolidated financial position and results of operations of the Reorganized Debtors (collectively, the "Company").

The Debtors prepared the Projections in good faith, based upon estimates and assumptions made by the Debtors' management. The estimates and assumptions in the Projections, while considered reasonable by management, may not be realized, and are inherently subject to significant uncertainties and contingencies beyond the Debtors' control. They also are based on outside factors such as industry performance, general business, economic, competitive, regulatory, market and financial conditions, retention or loss of customers and vendors, foreign currency exchange rates, and commodity prices all of which are difficult to predict. Because future events and circumstances may well differ from those assumed and

unanticipated events or circumstances may occur, the Debtors expect that the actual and projected results will differ and the actual results may be materially greater or less than those contained in the Projections. No representations can be made as to the accuracy of the Projections or the Reorganized Debtors' ability to achieve the projected results. Some assumptions inevitably will not materialize. Actual operating results and values may vary significantly from these Projections. Furthermore, events and circumstances occurring subsequent to the date of which these Projections were prepared may differ from any assumed facts and circumstances. Moreover, unanticipated events and circumstances may come to pass, and may affect financial results in a materially adverse or materially beneficial manner. Therefore, the Projections may not be relied upon as a guaranty or other assurance of the actual results that will occur. The inclusion of the Projections herein should not be regarded as an indication that the Debtors considered or consider the Projections to reliably predict future performance. The Projections are subjective in many respects, and thus are susceptible to interpretations and periodic revisions based on actual experience and recent developments. The Projections were not prepared with a view toward general use, but rather for the limited purpose of providing information in conjunction with the Plan. Also, they have been presented in lieu of pro forma historical financial information. The Projections should be read in conjunction with Article VII "Certain Risk Factors Affecting the Debtors" and the assumptions and qualifications set forth herein.

Although the forecasts represent the best estimates of the Debtors, for which the Debtors believe they have a reasonable basis as of the date hereof, of the results of operations and financial position of the Company after giving effect to the reorganization contemplated under the Plan, they are only estimates and actual results may vary considerably from forecasts. Consequently, the inclusion of the forecast information herein should not be regarded as a representation by the Debtors, the Debtors' advisors or any other person that the forecast results will be achieved. Holders of Claims must make their own determinations as to the reasonableness of such assumptions and the reliability of the Projections in making their determinations of whether to accept or reject the Plan, to the extent such Claims are allowed to vote.

**THE PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARD COMPLIANCE WITH THE GUIDELINES ESTABLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS (THE "AICPA"), THE FINANCIAL ACCOUNTING STANDARDS BOARD (THE "FASB"), OR THE RULES AND REGULATIONS OF THE SEC REGARDING PROJECTIONS. FURTHERMORE, THE DEBTORS' INDEPENDENT AUDITOR HAS NEITHER COMPILED NOR EXAMINED THE ACCOMPANYING PROSPECTIVE FINANCIAL INFORMATION TO DETERMINE THE REASONABLENESS THEREOF AND, ACCORDINGLY, HAS NOT EXPRESSED AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT THERETO.**

**THE DEBTORS DO NOT, AS A MATTER OF COURSE, PUBLISH PROJECTIONS OF THEIR ANTICIPATED FINANCIAL POSITION, RESULTS OF OPERATIONS OR CASH FLOWS. ACCORDINGLY, NEITHER THE DEBTORS NOR THE REORGANIZED DEBTORS INTEND TO, AND EACH DISCLAIMS ANY OBLIGATION TO: (A) FURNISH UPDATED PROJECTIONS TO HOLDERS OF**

**ALLOWED CLAIMS OR EQUITY INTERESTS PRIOR TO THE EFFECTIVE DATE OR TO HOLDERS OF NEW STOCK OR TO ANY OTHER PARTY AFTER THE EFFECTIVE DATE; (B) INCLUDE ANY SUCH UPDATED INFORMATION IN ANY DOCUMENTS THAT MAY BE REQUIRED TO BE FILED WITH THE SEC; OR (C) OTHERWISE MAKE SUCH UPDATED INFORMATION PUBLICLY AVAILABLE.**

## VI.
## CONFIRMATION PROCEDURES

### Section 6.01   The Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of the Plan (the "Confirmation Hearing").  Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of the Plan.

The Bankruptcy Court has scheduled the Confirmation Hearing for December 21, 2010, at 10:00 a.m. prevailing Eastern Time, before the Honorable Christopher S. Sontchi, United States Bankruptcy Judge, in the United States Bankruptcy Court for the District of Delaware, located at Marine Midland Building, 824 North Market Street, 5th Floor, Wilmington, Delaware 19801.  The Confirmation Hearing may be adjourned from time to time without further notice.

Objections to confirmation of the Plan must be filed and served on the Debtors and the other parties set forth in the Disclosure Statement Order, and certain other parties, by no later than December 15, 2010, at 4:00 p.m. prevailing Eastern Time, in accordance with the Disclosure Statement Order.  **THE BANKRUPTCY COURT MAY NOT CONSIDER OBJECTIONS TO CONFIRMATION OF THE PLAN IF ANY SUCH OBJECTIONS HAVE NOT BEEN NOT TIMELY SERVED AND FILED IN COMPLIANCE WITH THE DISCLOSURE STATEMENT ORDER.**

The Confirmation Hearing Notice will contain, among other things, the Plan Objection Deadline, the Voting Deadline, and Confirmation Hearing Date.

### Section 6.02   Statutory Requirements for Confirmation of the Plan

At the Confirmation Hearing, the Bankruptcy Court shall determine whether the requirements of section 1129 of the Bankruptcy Code have been satisfied.  If so, the Bankruptcy Court shall enter the Confirmation Order.

The Debtors believe that the Plan satisfies or will satisfy the applicable requirements, as follows:

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtors, as Plan proponents, will have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the case, has been disclosed to the Bankruptcy Court, and any such payment: (a) made before the Confirmation of the Plan is reasonable; or (b) subject to the approval of the Bankruptcy Court as reasonable if it is to be fixed after the Confirmation of the Plan.

- Either each Holder of an impaired claim or equity interest has accepted the Plan, or will receive or retain under the Plan on account of that claim or equity interest, property of a value, as of the Effective Date of the Plan, that is not less than the amount that the holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code.

- Each class of claims that is entitled to vote on the Plan has either accepted the Plan or is not Impaired under the Plan, or the Plan can be confirmed without the approval of each voting class pursuant to section 1129(b) of the Bankruptcy Code.

- Except to the extent that the holder of a particular claim will agree to a different treatment of its claim, the Plan provides that Administrative Claims, Priority Tax Claims, Priority Claims and Other Secured Claims will be paid in full, in cash, on the Effective Date, or as soon thereafter as practicable.

- At least one class of impaired claims will accept the Plan, determined without including any acceptance of the Plan by any insider holding a claim of that class.

- Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any successors thereto under the Plan unless such a liquidation or reorganization is proposed in the Plan.

- All fees of the type described in 28 U.S.C. § 1930, including the fees of the United States Trustee, will be paid as of the Effective Date.

The Debtors believe that: (a) the Plan satisfies or will satisfy all of the statutory requirements of chapter 11 of the Bankruptcy Code; (b) it has complied or will have complied with all of the requirements of chapter 11; and (c) the Plan has been proposed in good faith.

(a)     **Best Interests of Creditors Test/Liquidation Analysis**

Before the Plan may be confirmed, the Bankruptcy Court must find (with certain exceptions) that the Plan provides, with respect to each Class, that each Holder of a Claim or Equity Interest in such Class either: (a) has accepted the Plan; or (b) will receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the amount that such person would receive or retain if Debtors liquidated under chapter 7 of the Bankruptcy Code.  In chapter 7 liquidation cases, unsecured creditors and interest holders of a debtor are paid from available assets generally in the following order, with no junior Class receiving any payments until all amounts due to senior Classes have been paid fully or any such payment is provided for:

- Secured creditors (to the extent of the value of their collateral);

- Administrative and priority unsecured creditors;

- Non-priority unsecured creditors;

- Debt expressly subordinated by its terms or by order of the Bankruptcy Court; and

- Equity Interest holders.

As described in more detail in the Liquidation Analysis attached as <u>Exhibit C</u> hereto, the Debtors believe that the value of any distributions in a chapter 7 case would be less than the value of distributions under the Plan because, among other reasons, distributions in a chapter 7 case may not occur for a longer period of time, thereby reducing the present value of such distributions. In this regard, the distribution of the proceeds of a liquidation would be delayed until a chapter 7 trustee and its professionals become knowledgeable about the Chapter 11 Cases and the Claims against the Debtors. In addition, proceeds received in a chapter 7 liquidation are likely to be significantly discounted due to the distressed nature of the sale, and the Debtors would have to pay the fees and expenses of a chapter 7 trustee in addition to the Professionals' pre-conversion fees and expenses (thereby further reducing cash available for distribution).

**(b)     Feasibility**

The Bankruptcy Code requires a bankruptcy court to find, as a condition to confirmation, that confirmation is not likely to be followed by a debtor's liquidation or the need for further financial reorganization, unless that liquidation or reorganization is contemplated by the Plan. For purposes of showing that the Plan meets this feasibility standard, the Debtors analyzed the Reorganized Debtors' ability to meet their obligations under the Plan and to retain sufficient liquidity and capital resources to conduct their businesses. As described in more detail in the Financial Projections set forth in <u>Exhibit B</u> hereto, the Reorganized Debtors should have sufficient cash flow to pay and service their debt obligations and to fund their operations. Accordingly, the Debtors believe that the Plan complies with the financial feasibility standard of section 1129(a)(11) of the Bankruptcy Code.

**(c)     Acceptance by Impaired Classes**

The Bankruptcy Code requires, as a condition to confirmation that, except as described in the following section, each class of Claims or Equity Interests that is impaired under the Plan accept the Plan. A class that is not "impaired" under a plan of reorganization is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required. A class is "Impaired" unless the plan: (a) leaves unaltered the legal, equitable and contractual rights to which the Claim or Equity Interest entitles the Holder of that Claim or Equity Interest; (b) cures any default and reinstates the original terms of the obligation; or (c) provides that, on the consummation date, the holder of the Claim or Equity Interest receives cash equal to the Allowed amount of that Claim or, with respect to any interest, any fixed liquidation preference to which the Equity Interest Holder is entitled or any fixed price at which the Debtors may redeem the security.

**(d) Confirmation Without Acceptance by All Impaired Classes**

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan, even if an impaired class entitled to vote on the plan has not accepted it, provided that the plan has been accepted by at least one impaired Class. Holders of Holders of Subsidiary Equity Interests in Class 7 and Equity Interests in Class 8 are deemed to reject the Plan and, therefore, the Debtors intend to confirm the plan pursuant to section 1129(b) of the Bankruptcy Code. Section 1129(b) of the Bankruptcy Code states that, notwithstanding an impaired class's failure to accept a plan of reorganization, the plan shall be confirmed, at the plan proponent's request, in a procedure commonly known as "cram down," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of Claims or Equity Interests that is impaired under, and has not accepted, the plan.

The condition that a plan be "fair and equitable" with respect to a non-accepting class of unsecured claims includes the following requirement that either: (a) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (b) the holder of any claim or equity interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or equity interest any property.

The Debtors reserve the right to alter, amend, modify, revoke or withdraw the Plan or any Exhibit or Schedule, including to amend or modify it to satisfy section 1129(b) of the Bankruptcy Code, if necessary.

## Section 6.03   Identity of Persons to Contact for More Information

Any interested party desiring further information about the Plan should contact the counsel to the Debtors by writing to:

> Michael P. Pompeo, Esq.
> Drinker Biddle & Reath LLP
> 500 Campus Drive
> Florham Park, New Jersey 07932

### VII.
### CERTAIN RISK FACTORS AFFECTING THE DEBTORS

**PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN, ALL IMPAIRED HOLDERS OF CLAIMS SHOULD READ AND CAREFULLY CONSIDER THE FACTORS SET FORTH BELOW, AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT. THESE FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.**

## Section 7.01   General

FP01/ 6384629.6

The following provides a non-exhaustive summary of various important considerations and risk factors associated with the Plan. In considering whether to vote for or against the Plan, Holders of Claims or Interests should read and carefully consider the factors set forth below, as well as all other information set forth or otherwise referenced in this Disclosure Statement.

**Section 7.02    Certain Bankruptcy Law Considerations**

(a)    **Parties-in-Interest May Object To the Plan and Confirmation**

Section 1129 of the Bankruptcy Code provides certain requirements for a chapter 11 plan to be confirmed. Parties-in-interest may object to confirmation of a plan based on an alleged failure to fulfill these requirements or other reasons. The Debtors believe that the Plan complies with the requirements of the Bankruptcy Code.

(b)    **Parties-in-Interest May Object To the Debtors' Classification of Claims and Equity Interests**

Section 1122 of the Bankruptcy Code provides that a plan of reorganization may place a class or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class. The Debtors believe that the classification of Claims and Equity Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because each classes of Claims and Equity Interests encompass Claims or Interests that are substantially similar to the other Claims or Equity Interests in each such class.

(c)    **Undue Delay In Confirmation May Disrupt the Debtors' Operations and Have Potential Adverse Effects**

The Debtors cannot accurately predict or quantify the impact on their business operations of prolonging the Chapter 11 Cases. A lengthy time in bankruptcy could adversely affect the Debtors' relationships with their customers, vendors and employees, which, in turn, could adversely affect the Debtors' competitive position, financial condition, and results of operations.

Furthermore, prolonging the Chapter 11 Cases could adversely affect the Debtors' ability to attract new business and retain existing business. So long as the Chapter 11 Cases continue, the Debtors' senior management will be required to spend a significant amount of time and effort dealing with the Debtors' reorganization instead of focusing exclusively on developing future business opportunities for the Debtors.

(d)    **The Debtors May Not Be Able To Obtain Confirmation of the Plan**

The Debtors cannot ensure they will receive the requisite acceptances to confirm the Plan. But, even if the Debtors do receive the requisite acceptances, there can be no assurance that the Bankruptcy Court will confirm the Plan. The Bankruptcy Court could still decline to confirm the Plan if it were to determine that any of the statutory requirements for confirmation had not been met, including a determination that the terms of the Plan are not fair and equitable to non-accepting Classes. Therefore, there can be no assurance that modifications of the Plan will not be required for Confirmation or that such modifications would not necessitate the resolicitation of votes.

FP01/ 6384629.6

### (e) Risks Associated with Resolicitation

If the Debtors resolicit acceptances of the Plan from parties entitled to vote thereon, Confirmation of the Plan could be delayed and possibly jeopardized. A prolonged chapter 11 would entail the risks summarized above.

### (f) Risk of Non-Occurrence of the Effective Date

Although the Debtors believe that the Effective Date may occur in less than ten (10) Business Days following the Confirmation Date, there can be no assurance as to such timing.

### (g) Risk of Post-Effective Date

At the Confirmation Hearing, the Court will be required to make a judicial determination that the Plan is feasible, but that determination does not serve as any guarantee that there will not be any post-Effective Date defaults. The Debtors believe that the cash flow generated from operations and post-Effective Date borrowing will be sufficient to meet the Reorganized Debtors' operating requirements, their obligations under the Amended and Restated Credit Documents, and other post-Effective Date obligations under the Plan.

## Section 7.03 Financial Information; Disclaimer

### (a) Information Presented Is Based On The Debtors' Books And Records, And No Audit Was Performed

While the Debtors' management has reviewed the financial information provided in this Disclosure Statement and the Debtors have endeavored to present information fairly in this Disclosure Statement, because of the complexity of Debtors' financial matters, the Debtors' books and records upon which this Disclosure Statement is based might be incomplete or inaccurate. The financial information contained herein, or incorporated by reference into, this Disclosure Statement, unless otherwise expressly indicated, is unaudited.

### (b) Financial Projections And Other Forward Looking Statements Are Not Assured, And Actual Results May Vary

As described above, there are certain risks associated with the Debtors' financial projections and estimates.

### (c) The Projected Value of Estate Assets Might Not Be Realized

In the Liquidation Analysis, the Debtors project the value of the Debtors' assets that will be available for payment of expenses and distributions to Holders of Allowed Claims in cases under chapter 7 of the Bankruptcy Code. Assumptions to the Liquidation Analysis contained in <u>Exhibit B</u> hereto as described in the notes should be read carefully.

**Section 7.04    Risk Factors Associated with the Debtors' Business**

**(a)        The Debtors' Business is Affected by Macro Economic Factors**

The Debtors' business is vulnerable to the U.S. economy and the varying economic and business cycles of their customers.

**(b)        Reliance on Key Personnel**

The Debtors' success and future prospects depend on the continued contributions of their senior management.  The Debtors current financial position makes it difficult for it to retain key employees.  There can be no assurances that the Reorganized Debtors will be able to find qualified replacements for these individuals or other members of senior management if their services were no longer available.  The loss of services of one or more members of the senior management team could have a material adverse effect on the Debtors' business, financial condition and results of operations.

**(c)        Market Demand**

The Debtors' business plan is based on certain assumptions regarding the plumbing industry, including continued demand for the Debtors' products.  There can be no assurances that the popularity of the Debtors' products will continue to grow or be sustained.

**(d)        Competition**

Like the Debtors, the Reorganized Debtors will face intense competition, which could harm their financial condition and results of operations.  The plumbing industry has relatively few barriers to entry.  The Debtors compete with both national and regional retailers that sell similar products as the Debtors, and may have other resources greater than the Debtors.  In addition many of the Debtors' competitors may be able to take advantage of trade and quantity discounts with respect to goods they obtain.  The Debtors must compete based on product quality, variety and price, as well as location, service, and convenience.  The Reorganized Debtors' ability to respond to competition in its markets thus represents an additional risk factor.

**(e)        Laws and Regulations**

The Debtors' operations are subject to a number of complex and stringent environmental, labor, employment, and other laws and regulations.  These laws and regulations generally require the Debtors to maintain a wide variety of certificates, permits, licenses and other approvals.  The Debtors' failure to maintain required certificates, permits or licenses, or to comply with applicable laws, ordinances or regulations, could result in substantial fines or possible revocation of the Debtors' authority to conduct operations, which in turn could restrict the Debtors' ability to conduct business effectively and thereby have an adverse impact on the Debtors' financial condition.  The Debtors cannot provide assurance that existing laws or regulations will not be revised or that new more restrictive laws or regulations will not be adopted or become applicable to the Debtors' operations.  The Debtors also cannot provide assurance that it will be able to recover from its customers any or all increased costs of compliance or that the Debtors' business

and financial condition will not be materially and adversely affected by these or future changes in applicable laws and regulations.

**(f)** **The Reorganized Debtors May Not be Able to Meet Post-Reorganization Debt Obligations and Finance All Operating Expenses, Working Capital Needs and Capital Expenditures**

To the extent the Reorganized Debtors are unable to meet their projected financial results or achieve projected revenues and cash flows, the Reorganized Debtors may be unable to service their debt obligations as they come due or to meet the Reorganized Debtors' operational needs. Such a failure may preclude the Reorganized Debtors from taking advantage of future opportunities, growing its business or responding to competitive pressures.

**(g)** **Access to Financing and Trade Terms**

The Debtors' operations depend on the availability and cost of working capital financing and trade terms provided by vendors and may be adversely affected by any shortage or increased cost of such financing and trade vendor support. The Debtors believe that substantially all of their needs for funds necessary to consummate the Plan and for post-Effective Date working capital financing will be met by Cash On Hand, projected operating cash flow, the Exit Facility, the Tax Refund, and trade terms supplied by vendors. However, if the Reorganized Debtors require working capital and trade financing greater than that provided by such sources, they may be required either to: (a) obtain other sources of financing; or (b) curtail their operations.

No assurance can be given, however, that any additional financing will be available, if at all, on terms that are favorable or acceptable to the Reorganized Debtors. The Debtors believe that it is important to their going forward business plan that their performance meet projected results in order to ensure continued support from vendors and customers.

**Section 7.05** **Factors Affecting the Value of the Securities to be Issued under the Plan**

**(a)** **The New Plan Securities May Be Illiquid**

The liquidity of the New Plan Securities of Parent will depend, among other things, on the number of holders of the New Plan Securities and the Reorganized Debtors' financial performance, neither of which can be predicted with certainty. Additionally, there are substantial liquidity constraints on the New Plan Securities. Among other things, the Reorganized Debtors will initially be a private company. In addition, the New Plan Securities will be subject to certain restrictions on transfer to limit the number of holders thereof to ensure that Reorganized Parent is not required to register the New Plan Securities under the Securities Act or Exchange Act.

**(b)** **Exemption from Registration**

The Debtors intend to pursue an exemption from the registration requirements of the Securities Act and the Exchange Act and any other applicable law requiring registration prior to the offering, issuance, distribution or sale of securities. Holders of New Plan Securities issued pursuant to the Amended Plan who are deemed to be "underwriters" as defined in section

1145(b) of the Bankruptcy Code, including holders who are deemed to be "affiliates" or "control persons" within the meaning of the Securities Act, may be unable freely to transfer or to sell their New Plan Securities except pursuant to (a) "ordinary trading transactions" by a holder that is not an "issuer" within the meaning of section 1145(b), (b) an effective registration of such securities under the Securities Act and under equivalent state securities or "blue sky" laws, or (c) pursuant to the provisions of Rule 144 under the Securities Act or another available exemption from the registration requirements of the Securities Act. The Reorganized Debtors are under no obligation to register such New Plan Securities under the Securities Act. If the issuance of any of the new stock does not qualify for the exemption from securities laws provided under section 1145 of the Bankruptcy Code, Reorganized Parent will seek to issue the new stock in a manner that is exempt under the applicable securities laws, whether as a private placement under Rule 506 under the Securities Act in which securities are issued only to "accredited investors," as such term is defined in Rule 501 under the Securities Act, or otherwise. If an exemption were unavailable and the Debtors were required to register the new stock, the associated cost and delay could have an adverse impact on the value of the new stock. Recipients of New Plan Securities should consult with their own counsel with respect to any registration requirements related to New Plan Securities.

(c)      **A Small Number Of Holders May Control The Reorganized Debtors**

Confirmation and consummation of the Plan may result in a small number of holders owning a significant percentage of the new stock. Those holders may therefore exercise a controlling influence over the businesses and affairs of the Reorganized Debtors, have the power to elect directors, approve significant mergers, or the sale of all or substantially all of the assets of the Reorganized Debtors.

(d)      **The Debtors Do not Expect to Pay Any Dividends on the New Common Stock for the Foreseeable Future**

The Debtors do not expect Reorganized Parent to declare dividends in the foreseeable future with respect to the New Common Stock, which may adversely affect the market for and value of such stock.

(e)      **Certain Tax Implications of the Debtors' Bankruptcy and Reorganization May Increase the Tax Liability of the Reorganized Debtors**

Holders of Claims should carefully review IX of this Disclosure Statement, "CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN – Certain U.S. Federal Income Tax Consequences to the Reorganized Debtors," to determine how the tax implications of the Plan and these Chapter 11 Cases may adversely affect the Reorganized Debtors.

**Section 7.06    Factors Affecting the Reorganized Debtors**

(a)      **The Debtors Have No Duty To Update**

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after

that date does not imply that there has been no change in the information set forth herein since that date.

**(b)      No Representations Outside The Disclosure Statement Are Authorized**

No representations concerning or related to the Debtors, the Chapter 11 Cases or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement should not be relied upon by you in arriving at your decision.  You should promptly report unauthorized representations or inducements to Debtors' counsel, Committee counsel, or the Office of the United States Trustee.

**(c)      All Information Was Provided by Debtors and Was Relied Upon By Professionals**

Counsel for and other professionals retained by the Debtors have relied upon information provided by the Debtors in connection with preparation of this Disclosure Statement.  Counsel for and other professionals retained by the Debtors have not verified independently the information contained herein.

(d)      This Disclosure Statement Was Not Approved By The SEC

Although a copy of this Disclosure Statement was served on the SEC, and the SEC was given an opportunity to object to the adequacy of this Disclosure Statement prior to approval by the Bankruptcy Court, neither the SEC nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement, or the exhibits or the statements contained herein, and any representation to the contrary is unlawful.

(e)      No Legal Or Tax Advice Is Provided To You By This Disclosure Statement

The contents of this Disclosure Statement should not be construed as legal, business or tax advice.  Each creditor or holder of Equity Interest should consult his, her or its own legal counsel and accountant as to legal, tax and other matters concerning his, her, or its Claim or equity interest.  This Disclosure Statement is not legal advice to you.  This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

(f)      Environmental Liability Factors

The Debtors are not aware of any environmental condition at any of its properties that it considers material.  However, it is also possible that future environmental laws and regulations, or new interpretations of existing environmental laws, will impose material environmental liabilities on the Debtors, or that current environmental conditions of properties that the Debtors own or operate will be adversely affected by hazardous substances associated with other nearby properties or the actions of unrelated third parties.  The costs to defend any future environmental claims, perform any future environmental remediation, satisfy any environmental liabilities, or

respond to changed environmental conditions could have a material adverse effect on the Debtors' financial condition and operating results.

(h)     Pending Litigation or Demands Asserting Prepetition Liability

From time to time, the Debtors are subject to claims or litigation incidental to their business. As of the date of this Disclosure Statement, there were no pending demands or litigation asserting prepetition liability which the Debtors believe may have a material adverse effect on the operations or financial position of the Debtors or the Reorganized Debtors. The Debtors are currently involved in various legal proceedings arising in the ordinary course of business operations, including personal injury claims, employment matters and contractual disputes. These actions are subject to the automatic stay as set forth in section 362 of the Bankruptcy Code. To the extent claims arise, and are ultimately allowed, they will be Class 5 General Unsecured Claims.

**THESE DISCLOSURE STATEMENT FACTORS CONTAIN FORWARD-LOOKING STATEMENTS. AS A GENERAL MATTER, FORWARD-LOOKING STATEMENTS ARE THOSE FOCUSED UPON FUTURE OR ANTICIPATED EVENTS OR TRENDS AND EXPECTATIONS AND BELIEFS RELATING TO MATTERS THAT ARE NOT HISTORICAL IN NATURE. THE WORDS "BELIEVE," "EXPECT," "PLAN," "INTEND," "ESTIMATE" OR "ANTICIPATE" AND SIMILAR EXPRESSIONS, AS WELL AS FUTURE OR CONDITIONAL VERBS SUCH AS "WILL," "SHOULD," "WOULD" AND "COULD," OFTEN IDENTIFY FORWARD-LOOKING STATEMENTS. THERE IS A REASONABLE BASIS FOR THE EXPECTATIONS AND BELIEFS, BUT THEY ARE INHERENTLY UNCERTAIN, AND THE EXPECTATIONS MAY NOT BE REALIZED AND THE BELIEFS MAY NOT PROVE CORRECT. WE UNDERTAKE NO OBLIGATION TO PUBLICLY UPDATE OR REVISE ANY FORWARD-LOOKING STATEMENT, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS OR OTHERWISE. THE ACTUAL RESULTS AND FUTURE FINANCIAL CONDITION MAY DIFFER MATERIALLY FROM THOSE DESCRIBED OR IMPLIED BY ANY SUCH FORWARD-LOOKING STATEMENTS AS A RESULT OF MANY FACTORS THAT MAY BE OUTSIDE THE COMPANY'S CONTROL. SUCH FACTORS INCLUDE, WITHOUT LIMITATION: GENERAL ECONOMIC CONDITIONS; CHANGES IN THE PLUMBING SUPPLY BUSINESS ENVIRONMENT; FEDERAL REGULATION OF THE PLUMBING INDUSTRY; COMPETITION FROM EXISTING AND POTENTIAL COMPETITORS; ABILITY TO COMPLETE THE REORGANIZATION IN A TIMELY MANNER; RISING RAW MATERIAL PRICES; INCREASES IN THE COSTS OF BORROWINGS AND UNAVAILABILITY OF ADDITIONAL DEBT OR EQUITY CAPITAL; IMPACT OF OUR SUBSTANTIAL INDEBTEDNESS ON OUR OPERATING INCOME AND OUR ABILITY TO GROW; THE COST OF LABOR; LABOR DISPUTES; INCREASED INSURANCE COSTS; AND OTHER COSTS AND EXPENSES. THIS LIST OF FACTORS IS NOT INTENDED TO BE EXHAUSTIVE.**

**VIII.**
**ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN**

FP01/ 6384629.6

If the Plan is not confirmed and consummated, the alternatives to the Plan may include: (a) confirmation and consummation of the Committee's Plan, (b) liquidation of the Debtors under chapter 7 of the Bankruptcy Code; and (c) an alternative plan of reorganization.

## Section 8.01   Liquidation Under Chapter 7

If no plan can be confirmed, the Debtors' Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed (or elected) to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code.  A discussion of the effects that a chapter 7 liquidation would have on the recoveries of holders of Claims and Equity Interests and the Debtors' liquidation analysis is set forth in Section 6.02(a) above, entitled "Best Interests of Creditor's Test/Liquidation Analysis."  The Debtors believe that liquidation under chapter: 7 would result in smaller distributions to creditors than those provided for in the Plan because of: (a) the likelihood that the assets of the Debtors would have to be sold or otherwise disposed of in a less orderly fashion over a shorter period of time; (b) additional administrative expenses involved in the appointment of a trustee; and (c) additional expenses and claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of leases and other executory contracts in connection with a cessation of the Debtors' operations.

## Section 8.02   Alternative Plan of Reorganization

If the Plan is not confirmed, the Debtors or any other party-in-interest, could attempt to formulate a different plan.  Such a plan might involve either a reorganization and continuation of the Debtors' business or an orderly liquidation of their assets.  With respect to an alternative plan, the Debtors have explored various alternatives in connection with the formulation and development of the Plan.  The Debtors believe that the Plan as described herein, enables Creditors to realize the most value under the circumstances.

## IX.
## CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Debtors and the Reorganized Debtors and certain Holders of Claims and Equity Interests.  The following summary does not address the federal income tax consequences to Holders whose Claims are unimpaired or otherwise entitled to payment in full under the Plan (i.e., Administrative Claims, Priority Tax Claims, Priority Claims, and Other Secured Claims).

The following summary is provided for informational purposes only and is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), existing and proposed Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial decisions, and published administrative rules and pronouncements of the Internal Revenue Service ("IRS"), all as in effect on the date hereof.  Changes in such rules or new interpretations thereof may have retroactive effect and could significantly affect the federal income tax consequences described below.  In addition, a substantial amount of time may elapse between the date of this Disclosure

Statement and the receipt of a final distribution under the Plan. Events occurring after the date of this Disclosure Statement, such as additional tax legislation, court decisions, or administrative changes, could affect the federal income tax consequences of the Plan and the transactions contemplated thereunder.

The federal income tax consequences of the Plan are complex and are subject to significant uncertainties. The Debtors have not requested and will not request a ruling from the IRS or an opinion of counsel with respect to any of the tax aspects of the Plan. Thus, no assurance can be given as to the interpretation that the IRS or a court of law will adopt.

In addition, this summary does not address foreign, state, or local tax consequences of the Plan, nor does it purport to address the federal income tax consequences of the Plan to special classes of taxpayers (such as Persons who are related to the Debtors within the meaning of the Tax Code, foreign taxpayers, broker-dealers, banks, governmental authorities or agencies, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, real estate investment trusts, tax-exempt organizations, grantor trusts, Persons holding Claims or Equity Interests as part of a "hedging," "integrated," or "constructive" sale or straddle transaction, pass-through entities or investors in pass-through entities, Persons that have a "functional currency" other than the U.S. dollar, Holders of Claims or Equity Interests who are themselves in bankruptcy, Holders of Claims that acquired their Claims on a secondary market, and Holders of Claims issued with original issue discount). Furthermore, this discussion assumes that Holders of Claims hold only Claims in a single Class. Holders of Claims should consult their own tax advisors as to the effect such ownership may have on the federal income tax consequences described below.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR EQUITY INTEREST. ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL, AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.**

**<u>IRS CIRCULAR 230 DISCLOSURE</u>: TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE IRS, HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE HEREBY NOTIFIED THAT ANY TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING TAX-RELATED PENALTIES UNDER THE TAX CODE. TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT WRITTEN TO SUPPORT THE MARKETING OR PROMOTION (WITHIN THE MEANING OF CIRCULAR 230) BY THE DEBTORS OF THE TRANSACTIONS OR MATTERS ADDRESSED BY THE DISCLOSURE STATEMENT. EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

**Section 9.01    Certain U.S. Federal Income Tax Consequences to the Reorganized Debtors**

(a)    Cancellation of Debt and Reduction of Tax Attributes

In general, a debtor will realize and recognize cancellation of debt ("COD") income upon the satisfaction of its outstanding indebtedness for consideration in an amount less than the remaining balance of the indebtedness, subject to certain statutory or judicial exceptions that can apply to limit the amount of COD income recognized.  The amount of COD income generally will equal the amount by which the indebtedness discharged exceeds any consideration given in exchange therefore, including the amount of cash, the fair market value of any stock, and the issue price of any debt.

Indebtedness of a debtor that is discharged in a title 11 bankruptcy case is generally excluded from the debtor's gross income.  However, the debtor must reduce certain of its tax attributes by the amount of any excluded COD income after the determination of the federal income tax for the year of the discharge.  The debtor's tax attributes must be reduced in the following order:  (a) net operating loss ("NOL") carryforwards, (b) most tax credits and capital loss carryforwards, (c) tax basis in property, and (d) foreign tax credits.  Unless a debtor elects to reduce the basis for depreciable property prior to reducing NOLs, any excluded COD income in excess of the debtor's NOLs, tax credits and capital loss carryforwards is applied to reduce the basis of the debtor's assets held by the debtor at the beginning of the tax year after the tax year of the discharge.  The debtor's basis in its assets immediately after the discharge cannot be reduced to an amount less than its aggregate debt immediately after discharge.  The amount of any excluded COD income that exceeds this limitation is, subject to other sections of the Tax Code and the Regulations promulgated thereunder (e.g., the consolidated return provisions) permanently excluded from the debtor's income without further current or future tax consequences to the debtor.

As a result of implementation of the Plan, the Debtors expect to realize substantial COD income.  The extent of such COD income and resulting tax attribute reduction will depend significantly on the amount of Cash distributed, the issue price of the Amended and Restated Term Loan Facility and the fair market value of the New Preferred Stock and the New Common Stock.  These values cannot be known with certainty until after the Effective Date.  The Debtors expect that they will not have any consolidated NOL carryforwards, tax credits or capital loss carryforwards for federal income tax purposes.  Accordingly, the Debtors anticipate that there will be a significant reduction in the basis of their assets.  The exact amount of such reduction cannot be predicted. Generally, to the extent there is any excess COD income over the amount of available tax attributes, such amount should not subject to federal income tax and should not have any other income tax impact.

**(b)    Limitation on NOLs and Other Tax Attributes Post-Effective Date**

The issuance of the New Common Stock in the exchange will result in an "ownership change" of the Debtors.  An ownership change, generally, is a 50 percentage point increase in the percentage ownership of the loss corporation by shareholders that own five percent (5%) or more of the stock of the corporation.  In the event of an ownership change, the use of certain of a debtor's remaining tax attributes, such as NOLs, available after the ownership change may be

significantly limited or eliminated. Under section 382 of the Tax Code, if a corporation undergoes an ownership change, the amount of its pre-change NOL carryforwards and "built-in" losses (i.e., economically accrued but unrecognized losses), that may be utilized to offset future taxable income will, in general, be subject to an annual limitation.

Although the Debtors anticipate they will experience and ownership change, the Debtors do not expect to have NOL carryforwards and do not believe they have a net unrealized built-in loss in their assets. Accordingly, the Debtors will not have NOL carryforwards or net unrealized built-in losses the use of which would be subject to an annual limitation resulting from the change in control.

**Section 9.02    Certain U.S. Federal Income Tax Consequences to Holders of Certain Claims and Equity Interests**

**(a)        Distributions in Discharge of Accrued Interest**

The Plan provides that all distributions in respect of Allowed Claims will be allocated first to the principal amount of such Claim, as determined for federal income tax purposes, and thereafter, to the remaining portion of such Claim, if any. However, there is no assurance that such allocation will be respected by the IRS or a court of law for federal income tax purposes. Each Holder should consult its own tax advisor regarding the allocation of consideration and the deductibility of unpaid interest for tax purposes.

A Holder generally will recognize a loss to the extent any accrued interest previously included in its gross income and is not paid in full. A Holder that receives unpaid interest not previously included in its gross income generally will be required to include the amount in income.

The following discussion assumes that no portion of any consideration is paid for accrued interest.

**(b)        Tax Consequences to Holders of Lender Secured Claims (Class 2)**

Pursuant to the Plan, Holders of Lender Secured Claims will receive their Pro Rata Share of (a) Cash in the amount of Net Available Cash; (b) participation in the Amended and Restated Term Loan Facility; (c) the New Preferred Stock (d) the Lender Common Stock and (e) Cash remaining in the Plan Distribution Account. The federal income tax consequences of the Plan to such Holders of Lender Secured Claims will depend, in part, on whether the Lender Secured Claims constitute "securities" for federal income tax purposes.

Whether a debt instrument constitutes a "security" is determined based on all the facts and circumstances, but most authorities have held that the length of the term of a debt instrument at initial issuance is an important factor in determining whether such instrument is a security for federal income tax purposes. These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security. There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the security for payment, the creditworthiness of the obligor, the subordination (or lack thereof) with respect to other creditors,

the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable or contingent and whether such payments are made on a current basis or are accrued.

Assuming the Lender Secured Claims do not constitute "securities," each Holder of Lender Secured Claims should be treated as exchanging its Lender Secured Claims for the Cash, the Amended and Restated Term Loan Facility, the New Preferred Stock and the New Common Stock in a fully taxable exchange. Such Holder should recognize gain or loss equal to the difference between (1) the Cash, the issue price (as of the Effective Date) of the Amended and Restated Term Loan Facility and the fair market value (as of the Effective Date) of the New Common Stock and the New Preferred Stock, and (2) the Holder's tax basis in its Lender Secured Claims. The character of gain or loss recognized by such a Holder as capital or ordinary will be determined by a number of factors, including the tax status of the Holder and whether the Lender Secured Claims constitute capital assets in the hands of the Holder. Generally, a Holder will have a basis in the Amended and Restated Term Loan Facility equal to its issue price and a fair market value basis in the New Preferred Stock and the New Common Stock. A Holder's holding period for the property will begin on the day after the Effective Date.

If a Holder's Lender Secured Claims were treated as securities, the exchange of such Lender Secured Claims for the Cash, the Amended and Restated Term Loan Facility, the New Preferred Stock and the New Common Stock may be treated as a recapitalization under the Tax Code. In general, this means that any loss realized by a Holder will not be recognized with respect to the exchange.

(c)      **Tax Consequences to Holders of Subordinated Noteholder Claims (Class 3)**

Pursuant to the Plan, Holders of Subordinated Noteholder Claims will receive their Pro Rata Share of the Subordinated Noteholder Common Stock. The federal income tax consequences of the Plan to such Holders of Subordinated Noteholder Claims will depend, in part, on whether the Subordinated Noteholder Claims surrendered constitute "securities" for federal income tax purposes (see discussion above).

Assuming a Holder's Subordinated Noteholder Claims are not treated as "securities" for federal income tax purposes, each Holder should be treated as exchanging its Subordinated Noteholder Claims for the Subordinated Noteholder Common Stock in a fully taxable exchange. The Holder should recognize gain or loss equal to the difference between (1) the fair market value (as of the Effective Date) of the Subordinated Noteholder Common Stock and (2) the Holder's tax basis in its Subordinated Noteholder Claims. The character of gain or loss recognized by such a Holder as capital or ordinary will be determined by a number of factors, including the tax status of the Holder and whether the Subordinated Noteholder Claims constitute capital assets in the hands of the Holder. Generally, a Holder will have a fair market value basis in the Subordinated Noteholder Common Stock. A Holder's holding period for the Subordinated Noteholder Common Stock will begin on the day after the Effective Date.

If a Holder's Subordinated Noteholder Claims were treated as securities, the exchange of such Subordinated Noteholder Claims for the Subordinated Noteholder Common Stock may be treated as a recapitalization under the Tax Code. In general, this means that a Holder will not

recognize loss with respect to the exchange for the Subordinated Noteholder Common Stock, subject to certain exceptions.

### (d) Tax Consequences to Holders of Allowed General Unsecured Claims against JSC (Class 5)

Pursuant to the Plan, Holders of Allowed General Unsecured Claims against JSC will be paid in full in Cash; provided, however, that in the event that the total amount of Allowed General Unsecured Claims against JSC exceeds a $1,500,000.00 cap, each Holder of Allowed General Unsecured Claims against JSC shall receive its Pro Rata Share of $1,500,000.00 in Cash.  A Holder of Allowed General Unsecured Claims against JSC generally will recognize gain or loss for federal income tax purposes in an amount equal to the difference, if any, between (a) the amount of Cash received and (b) such Holder's adjusted tax basis in its Allowed General Unsecured Claims against JSC.  The character of gain or loss recognized by such a Holder as capital or ordinary will be determined by a number of factors, including the tax status of the Holder and whether the Allowed General Unsecured Claims against JSC constitute capital assets in the hands of the Holder.

### (e) Tax Consequences to Holders of Unpaid Management Fee Claims (Class 6)

Pursuant to the Plan, Holders of Unpaid Management Fee Claims will receive their Pro Rata Share of the Cortec Common Stock.  The federal income tax consequences of the Plan to such Holders of Unpaid Management Fee Claims will depend, in part, on whether the Unpaid Management Fee Claims surrendered constitute "securities" for federal income tax purposes (see discussion above).

Assuming a Holder's Unpaid Management Fee Claims are not treated as "securities" for federal income tax purposes, each Holder should be treated as exchanging its Unpaid Management Fee Claims for the Cortec Common Stock in a fully taxable exchange.  The Holder should recognize gain or loss equal to the difference between (1) the fair market value (as of the Effective Date) of the Cortec Common Stock and (2) the Holder's tax basis in its Unpaid Management Fee Claims.  The character of gain or loss recognized by such a Holder as capital or ordinary will be determined by a number of factors, including the tax status of the Holder and whether the Unpaid Management Fee Claims constitute capital assets in the hands of the Holder.  Generally, a Holder will have a fair market value basis in the Cortec Common Stock.  A Holder's holding period for the Cortec Common Stock will begin on the day after the Effective Date.

If a Holder's Unpaid Management Fee Claims were treated as securities, the exchange of such Unpaid Management Fee Claims for the Cortec Common Stock may be treated as a recapitalization under the Tax Code.  In general, this means that a Holder will not recognize loss with respect to the exchange for the Cortec Common Stock, subject to certain exceptions.

### (f) Tax Consequences to Holders of Subsidiary Equity Interests (Class 7) and Holders of Equity Interests (Class 8)

Pursuant to the Plan, Holders of Subsidiary Equity Interests and Holders of Equity Interests will not retain or receive any Cash or property.  All such Subsidiary Equity Interests

and Equity Interests shall be deemed cancelled, discharged and extinguished on the Effective Date.  A Holder of Subsidiary Equity Interests or Equity Interests generally may realize a loss, subject to certain limitations, equal to the Holder's adjusted tax basis in its Subsidiary Equity Interests or Equity Interests at the time of the bankruptcy filing.  The character of the loss recognized by such a Holder as capital or ordinary will be determined by a number of factors, including the tax status of the Holder and whether the Subsidiary Equity Interests or the Equity Interests constitute capital assets in the hands of the Holder.

(g)     Tax Treatment of Disputed Claims Reserve

Distributions from the Reserve Fund established in connection with the Plan may be distributed to Holders of Disputed General Unsecured Claims.  Due to the uncertainty of the tax treatment as discussed below, each Holder entitled to such distributions should consult its own tax advisor regarding the potential tax consequences of such distributions.

Section 468B(g) of the Tax Code provides that escrow amounts, settlement funds or similar funds are subject to current taxation.  Although certain final Treasury Regulations have been issued under Section 468B(g) of the Tax Code relating to qualified settlement funds and disputed ownership funds, such regulations specifically reserve the tax treatment of funds established to resolve claims of a debtor's general trade creditors or debtholders that relate to a title 11 or similar case.

(h)     Information Reporting and Withholding

All distributions to Holders of Allowed Claims under the Plan are subject to any applicable withholding obligations (including employment tax withholding).  Under federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then-applicable rate (currently 28%).  Backup withholding generally applies if the Holder:  (i) fails to furnish its social security number or other taxpayer identification number ("TIN"); (ii) furnishes an incorrect TIN; (iii) fails to properly report interest or dividends; or (iv) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is correct and that such Holder is a United States person that is not subject to backup withholding.

In addition, Treasury Regulations generally require disclosure by a taxpayer on its federal income tax return of certain types of transactions in which the taxpayer participated, including, among others, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds.  Holders are urged to consult their own tax advisors regarding whether the transactions contemplated by the Plan would be subject to these Treasury Regulations and require disclosure on the Holders' federal income tax returns.

**THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX.  THE FOREGOING SUMMARY HAS BEEN PROVIDED FOR INFORMATIONAL PURPOSES ONLY AND DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION.  ALL HOLDERS OF CLAIMS OR EQUITY INTERESTS**

**SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTION CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR FOREIGN TAX LAWS AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

FP01/ 6384629.6

# X.
## CONCLUSION AND RECOMMENDATION

The Debtors believe that the Plan is in the best interests of all holders of Claims, and urge those holders of Claims entitled to vote to accept the Plan and to evidence such acceptance by returning their Ballots so they will be **RECEIVED** by the Solicitation Agent no later than December 15, 2010.  If the Plan is not confirmed, or if holders in those Classes do not vote to accept the Plan, the holders in those Classes may not receive a distribution.


Dated:  November 12, 2010
        Wilmington, Delaware

PLUMBING HOLDING CORPORATION


By:     */s/ Edward J. Moulin*
        Name: Edward J. Moulin
        Title:   Chief Financial Officer

JONES STEPHENS CORP.


By:     */s/ Edward J. Moulin*
        Name: Edward J. Moulin
        Title:   Chief Financial Officer

FP01/ 6384629.6