# EXHIBIT D

## Lender/ACAS Term Sheet

**THIS TERM SHEET IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR
SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN.
SUCH OFFER OR SOLICITATION WILL BE MADE IN COMPLIANCE WITH ALL
APPLICABLE SECURITIES LAWS AND/OR PROVISIONS
OF THE BANKRUPTCY CODE**

### JONES STEPHENS CORP.
### and
### PLUMBING HOLDINGS CORPORATION

**Summary of Principal Terms and Conditions For the Debtors' Second
Amended Joint Plan Of Reorganization Under Chapter 11 Of The Bankruptcy Code**

The terms and conditions set forth in this term sheet (the "Lender/ACAS Term Sheet")
are meant to be part of a comprehensive compromise, each element of which is consideration for
the other elements and an integral aspect of the proposed modifications to the Debtors' First
Amended Joint Plan Of Reorganization Under Chapter 11 Of The Bankruptcy Code (the "First
Amended Plan"). This Lender/ACAS Term Sheet is in the nature of a settlement proposal in
furtherance of settlement discussions and is entitled to protection from any use or disclosure to
any party or person pursuant to Federal Rule of Evidence 408 and any other rule of similar
import.

It is contemplated that the modifications described herein will be implemented through
confirmation of an amended plan (the "Plan") to be filed by Plumbing Holdings Corporation and
Jones Stephens Corp. (collectively, the "Debtors"), which Plan has the support of the Debtors,
American Capital, Ltd. ("American Capital") (as successor by merger to American Capital
Financial Services, Inc.), on its own behalf and as administrative agent for subordinated
noteholders pursuant to certain Note Purchase Agreement dated as of September 7, 2006, as
amended ("ACAS"), Cortec Group Fund IV, L.P., each of its general partners, Cortec Co-
Investment Fund (IV) L.L.C, Cortec Management IV, LLC, and Cortec Group Management
Services, LLC and CoGr, Inc. (collectively, "Cortec"), the Existing Agent (as defined below) and
the Necessary Lenders (as defined below). The Debtors, ACAS, Cortec, the Existing Agent, the
Necessary Lenders, Bank of Ireland ("BOI") in its capacity as revolving lender and Ares Capital
Corporation ("Ares") in its capacity as Agent (as defined below) are collectively referred to
herein as the "Parties" and each a "Party". This Lender/ACAS Term Sheet does not constitute
an offer of securities or a solicitation of the acceptance or rejection of a chapter 11 plan for the
Debtors. Nothing in this Lender/ACAS Term Sheet shall constitute or be deemed or construed,
as a waiver, release, forbearance, acquittal, compromise or abridgment of any right or remedy of
any Party, all of which are hereby reserved. The transactions described in this Lender/ACAS
Term Sheet are subject in all respects to, among other things, definitive documentation, including
the Plan, appropriate disclosure materials and related documents all of which shall be in form
and substance reasonably acceptable to the Debtors, ACAS, Cortec, the Existing Agent, the
Necessary Lenders, BOI in its capacity as revolving lender and Ares in its capacity as Agent. All

capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the First Amended Plan.

| | |
|---|---|
| **Company:** | Jones Stephens Corp. ("JSC") and as reorganized pursuant to the Plan, the "Reorganized JSC", and Plumbing Holdings Corporation ("Parent"), the parent of JSC and as reorganized pursuant to the Plan, the "Reorganized Parent" (together with JSC, the "Company" or "Debtors"), and as collectively reorganized pursuant to the Plan, the "Reorganized Company". |
| **Existing Lenders:** | The entities (the "Existing Lenders") that hold claims against the Debtors under that certain Credit Agreement dated as of September 7, 2006 (as amended from time to time, the "Existing Credit Agreement") among JSC, Parent, CIT Lending Services Corporation, as agent (the "Existing Agent"), and the Existing Lenders. The claims held by the Existing Lenders (inclusive of accrued and unpaid principal and interest, fees, expenses and other obligations and charges) shall be collectively referred to herein as the "Lender Claims." All Lender Claims shall be Allowed in full in the Chapter 11 Cases (as defined below), without setoff, subordination, or recharacterization. |
| **Subordinated Noteholders:** | The entities (the "Subordinated Noteholders") that hold claims against certain of the Debtors under that certain Note Purchase Agreement dated as of September 7, 2006 (as amended from time to time, the "Subordinated Note Purchase Agreement") among JSC, the Parent, ACAS, as agent (the "Subordinated Agent"), and the Subordinated Noteholders. The claims held by the Subordinated Noteholders (inclusive of accrued and unpaid principal and interest, fees, expenses and other obligations and charges) shall be collectively referred to herein as the "Subordinated Noteholder Claims." |
| **Unsecured Claimants against JSC:** | Holders of all unsecured claims (the "JSC Unsecured Claimants") against JSC other than Subordinated Noteholder Claims and Lender Claims (the "JSC Unsecured Claims"), including, without limitation, claims arising out of the rejection of executory contracts or unexpired leases by JSC. |
| **Management Fee Claims Against Parent:** | Cortec holds claims against Parent relating to and arising out of that certain Amended and Restated Management Advisory Agreement by and between Parent and Cortec Management IV, LLC dated as of |

| | December, 2008 and effective as of September 7, 2006 (the "Management Agreement"). The claims held by Cortec (inclusive of accrued and unpaid fees, expenses and other obligations and rejection damages) shall be collectively referred to herein as the "Management Fee Claims." |
|---|---|
| **Existing Interest Holders:** | Holders of all equity interests in Parent ("Existing Interest Holders"). |
| **Restructuring Transaction:** | Subject to the terms hereof, the Debtors shall restructure their capital structure (the "Restructuring") through the Plan, the material terms and conditions of which are set forth herein and which shall otherwise be in form and substance Reasonably Acceptable (as defined below) to the Existing Agent and those Existing Lenders that (i) comprise more than 50% in number of the Existing Lenders; and (ii) hold more than 66 2/3% in amount of the Lender Claims (collectively, the "Necessary Lenders"). |
| | To effectuate the Restructuring, on the effective date of the Plan (the "Effective Date"), the Existing Credit Agreement shall be amended and restated on the terms set forth in Annex A hereto (the "Amended and Restated Credit Facility Term Sheet"). |
| | The Plan, together with all plan-related documents, agreements, supplements and instruments shall be consistent with this Lender/ACAS Term Sheet and Reasonably Acceptable to the Existing Agent, the Necessary Lenders, BOI in its capacity as revolving lender, Ares in its capacity as Agent (as defined in the Amended and Restated Credit Facility Term Sheet), ACAS and the Debtors.  For purposes of this Lender/ACAS Term Sheet, "Reasonably Acceptable" shall mean acceptable to a Debtor, ACAS, the Existing Agent, a Necessary Lender, BOI, or Ares (as applicable) in such entity's reasonable discretion, provided, that, any documentation or matter consistent with this Lender/ACAS Term Sheet shall be deemed Reasonably Acceptable. |

## I.     USE OF CASH COLLATERAL

| | |
|---|---|
| **Use of Cash Collateral:** | Until the Cash Collateral Termination Date (as defined below), the Existing Agent shall permit the Debtors' use of cash collateral in which the Existing Agent has liens and security interests, including without |

| | |
|---|---|
| | limitation all cash, negotiable instruments, documents of title, securities, deposit accounts, all proceeds of accounts receivable and inventory, and all other cash equivalents and cash collateral as such term is defined in section 363(a) of the Bankruptcy Code (collectively, the "<u>Cash Collateral</u>") for working capital, letters of credit, other general corporate purposes of the Debtors, including payment of costs of administration of the Chapter 11 Cases, and for payment of such prepetition claims and obligations as approved by the Bankruptcy Court, in each case in a manner consistent with the terms and conditions contained herein, the Budget (as defined below) and the final order dated January 26, 2010 authorizing the use of Cash Collateral, as amended, modified or extended (the "<u>Cash Collateral Order</u>").  Any amendments, modifications or extensions to the Cash Collateral Order shall be in form and substance Reasonably Acceptable to the Existing Agent, the Necessary Lenders, and the Debtors. |
| **Budget:** | The use of Cash Collateral shall be in accordance with the budget (the "<u>Budget</u>") depicting on a weekly basis cash revenue, receipts, expenses and disbursements and other information from present to the Cash Collateral Termination Date, which Budget shall be in form and substance Reasonably Acceptable to the Existing Agent and the Necessary Lenders.  The Budget shall be updated from time to time (provided that such updated Budget shall be in form and substance Reasonably Acceptable to the Debtors, the Existing Agent and the Necessary Lenders), but in any event not less than on a monthly basis. |
| **Cash Collateral Termination Date:** | The term "<u>Cash Collateral Termination Date</u>" means that date which is the earliest of (a) the date a sale of all or substantially all of the Debtors' assets is consummated under section 363 of the Bankruptcy Code; (b) the Effective Date of the Plan; and (c) January 31, 2011. |

## II.    TREATMENT OF CLAIMS AND INTERESTS UNDER PLAN

| | |
|---|---|
| **Lender Claims:** | On the Effective Date, in full and final satisfaction of the Lender Claims, each Existing Lender shall receive its Pro Rata Share (according to the respective amount of the Lender Claims held by each Existing Lender) of |

(a) cash in the amount of Net Available Cash (as defined below); (b) participation in an approximate $32.5 million Amended and Restated Term Loan Facility (the "Amended and Restated Term Loan Facility"), on the terms set forth in Annex A hereto (the "Amended and  Restated Credit Facility Term Sheet"); (c) $17.5 million in New Preferred Stock (the "New Preferred Stock") on the terms set forth in Annex B hereto (the "New Preferred Stock Term Sheet"); and (d) 50.25% common stock issued by the Reorganized Parent (the "Lender Common Stock") fully diluted after giving effect to options granted under the Management Incentive Plan (defined below).

In addition, after the Effective Date all remaining Cash in the Plan Distribution Account (as defined below) shall be distributed to the Existing Lenders on the terms and conditions as set forth below.

One or more of the Existing Lenders may choose to hold the New Preferred Stock and Lender Common Stock through a newly-formed limited liability company or other pass-through entity subject to the terms and provisions of this Lender/ACAS Term Sheet and provided that the limited liability company or other applicable agreement will subject the holders to effectively the same restrictions and rights as is contemplated by the New Stockholders' Agreement for the benefit of the New Equity Holders.

The Debtors shall pay the full amount of the Lender Professional Fees (as defined and as set forth below).

The term "Net Available Cash" means the sum of Cash On Hand (as defined below) less (i) One Million Dollars ($1,000,000), (ii) the Tax Refund (as defined below) to the extent received prior to the Effective Date, (iii) the Plan Distribution Amount (as defined below), (iv) the New Facility Fee Amount, and (v) an amount equal to the Plan Related Fees (as defined below).

The term "Cash On Hand" means all of the Debtors' Cash on hand as of the Effective Date.

The term "Tax Refund" means that certain federal

| | loss-carry back tax refund anticipated to be received from the Internal Revenue Service from applying the Debtors' 2009 excess tax losses to the fiscal year ending December 31, 2005. |
|---|---|
| | The term "New Facility Fee Amount" means an amount equal to any fees payable on the Effective Date under the Amended and Restated Credit Documents. |
| **Administrative Claims:** | On or as soon as practicable after the later of: (x) the Effective Date of the Plan, or (y) the date on which such claim is Allowed, each holder of an allowed administrative claim shall receive cash equal to the full amount of its claim, unless otherwise agreed to by such holder or permitted by the Bankruptcy Code. |
| **Priority Tax Claims:** | On or as soon as practicable after the Effective Date, each holder of an allowed priority tax claim shall receive cash equal to the full amount of its claim or otherwise be left unimpaired, unless otherwise agreed to by such holder or permitted by the Bankruptcy Code. |
| **Other Secured Claims:** | To the extent there are any Allowed Other Secured Claims against the Debtors' property, at the option of the Reorganized Company and with the consent of the Existing Agent or the Agent, as applicable, which consent shall not be unreasonably withheld, either (i) the legal, equitable and contractual rights to which such claim entitles the holder thereof shall be left unaltered; (ii) the Other Secured Claim shall be left unimpaired in the manner described in section 1124(2) of the Bankruptcy Code; or (iii) the holder of such claim shall receive or retain the collateral securing such Other Secured Claim. |
| **Priority Claims:** | All allowed priority claims shall, at the option of the Reorganized Company and with the consent of the Existing Agent which consent shall not be unreasonably withheld, be paid: (i) in cash in full on the later of (x) the Effective Date and (y) the date such claim becomes due and payable in the ordinary course of business; (ii) in cash on such other terms and conditions as may be agreed between the holder of each such claim and the Reorganized Company, or (iii) in deferred cash payments, to the extent permissible under the Bankruptcy Code. |
| **Subordinated Noteholder Claims:** | The Subordinated Noteholder Claims shall be deemed Allowed under the Plan. On the Effective Date, |

| | |
|---|---|
| | ACAS, on behalf of, and for distribution to, each Holder of an Allowed Subordinated Noteholder Claim, shall receive, in full and final satisfaction of such Subordinated Noteholder Claim, 34.25% of the common stock issued by the Reorganized Parent (the "Subordinated Noteholder Common Stock"), fully diluted after giving effect to options granted under the Management Incentive Plan (as defined below).<br><br>The Debtors shall pay $1,000,000 of the documented professional fees and expenses incurred by the Subordinated Agent in connection with the Chapter 11 Cases as follows: $500,000 on the Effective Date (the "ACAS Effective Date Fees") and $500,000 in four quarterly installments of $125,000 beginning on June 30, 2011 (the "Installment Fees"), but only to the extent that, at the time of payment, cash on hand exceeds amounts outstanding under the revolving loan. To the extent any Installment Fees are not fully paid when due, they will be paid on a quarterly basis until paid in full to the extent of cash on hand in excess of amounts outstanding under the revolving loan; *provided* that no more than $250,000 can be paid in any quarter. |
| **Unsecured Claims against JSC:** | On or as soon as reasonably practicable after the later of (a) the Effective Date, or (b) the date on which such JSC Unsecured Claim becomes Allowed, each Holder of an Allowed JSC Unsecured Claim shall receive, in full and final satisfaction of such JSC Unsecured Claim, the amount of such unpaid Allowed JSC Unsecured Claim in Cash; provided, however, that in the event that the total amount of all Allowed JSC Unsecured Claims exceeds $1,500,000, each Holder of an Allowed JSC Unsecured Claim shall receive its Pro Rata Share of $1,500,000 in Cash. |
| **Management Fee Claims against Parent:** | The Management Fee Claims shall be deemed Allowed under the Plan. On the Effective Date, Cortec shall receive, in full and final satisfaction of such Management Fee Claims, 3% of the common stock issued by the Reorganized Parent (the "Cortec Common Stock"), fully diluted after giving effect to options granted under the Management Incentive Plan (as defined below).<br><br>On the Effective Date, the Debtors shall pay the Cortec |

| | Professional Fees (as defined and set forth below). |
|---|---|
| **Intercompany Claims:** | There shall be no distribution on account of intercompany claims.  Notwithstanding the foregoing, the Reorganized Company may reinstate or compromise, as the case may be, intercompany claims between and among the Debtors. |
| **Existing Interest Holders:** | The holders of all existing Company equity interests and the holders of any existing options, warrants or right to acquire any equity securities of the Company shall not receive any distributions or retain any property on account of their equity interests in the Company and all such capital stock, membership interests, options, warrants and rights shall be extinguished. |

## III.    IMPLEMENTATION OF PLAN AND OTHER PLAN TERMS

| | |
|---|---|
| **New Management Agreement:** | The Management Agreement shall be rejected under the Plan.  On the Effective Date, the Reorganized Parent and ACAS shall enter into a management agreement on terms substantially similar to those set forth in the Management Agreement, provided, however, the annual amount of the management fee (the "Post Effective Management Fee") shall be as follows: (i) $250,000 in calendar year 2010, pro rata from the Effective Date through the end of calendar year 2010, (ii) for each year thereafter, (A) $250,000 if EBITDA for the twelve month period ending on the last day of the prior calendar year is less than $9,000,000, (B) $375,000 if EBITDA for the twelve month period ending on the last day of the prior calendar year is greater than or equal $9,000,000, but less than $9,500,000, and (C) $500,000 if EBITDA for the twelve month period ending on the last day of the prior calendar year is greater than or equal to $9,500,000.  The payment of Post Effective Date Management Fees shall be subject to the fixed charge coverage ratio not falling below 1.10x after giving effect to such payment and that both before and after giving effect to such payment no default or event of default shall exist or result therefrom under the Amended and  Restated Revolving Loan Facility and Amended and  Restated Term Loan Facility (as defined in the Amended and Restated Credit Facility Term Sheet) (clause (A) collectively, "Loan Compliance"); provided, however, that any amount not paid at that time shall accrue and be paid either upon Loan Compliance, and (B) the payment in full of |

| | all obligations due under the Amended and Restated Term Loan Facility, the Amended and Restated Revolving Loan Facility, and the New Preferred Stock. All Post Effective Management Fees shall be paid in cash on a quarterly basis in an amount equal to $1/4^{th}$ of the applicable amounts set forth above. In addition, ACAS shall be paid a bonus in the amount of $500,000 the first time EBITDA exceeds $11,000,000 for the twelve month period ending on the last day of the prior calendar year and a bonus in the amount of $200,000 the first time EBITDA exceeds $12,000,000 for the twelve month period ending on the last day of the prior calendar year. |
|---|---|
| **Revolving Loan Commitment:** | BOI will provide a revolving loan commitment in the amount of $4 million on the terms set forth in the Amended and Restated Credit Facility Term Sheet. |
| **Plan Distribution Account:** | On the Effective Date, the Debtors shall deposit into a segregated account (the "Plan Distribution Account") Cash in an amount equal to the aggregate amount (the "Plan Distribution Amount") of all asserted and unpaid Administrative Claims (including all incurred and unpaid Professional Fee Claims), Priority Tax Claims, Priority Claims, and up to $1,500,000 on account of JSC Unsecured Claims and Cure Claims against JSC incurred on or before the Effective Date (whether or not subject to dispute, but excluding Disallowed Claims). |
| **Plan Related Fees:** | On the Effective Date, the Debtors shall pay (i) the documented professional fees and expenses incurred by the Existing Agent in connection with the Chapter 11 Cases as of the Effective Date ("Lender Professional Fees"), (ii) $180,000 of the documented professional fees and expenses incurred by Cortec in connection with the Chapter 11 Cases as of the Effective Date (the "Cortec Professional Fees"), and (ii) the ACAS Effective Date Fees (collectively, the "Plan Related Fees"). The Debtors shall receive a credit for the $100,000 expense deposit held by Cortec (the "Cortec Deposit") and shall only be required to pay $80,000 of the Cortec Professional Fees. Cortec shall be entitled to keep the Cortec Deposit.<br><br>From time to time in the Reorganized Debtors' discretion, all Cash in the Plan Distribution Account in excess of the Reserve Fund and after payment of all |

| | Plan Related Fees, shall be remitted to the Agent, in each case on behalf of, and for distribution to, Existing Lenders in accordance with each Existing Lenders' Pro Rata Share (according to the respective amount of the Lender Claims held by each Existing Lender). As soon as practicable after the payment of all Plan Related Fees, Allowed Administrative Claims, Allowed Professional Fee Claims, Allowed Priority Tax Claims, Allowed Priority Claims and Allowed General Unsecured Claims (as capped), all remaining Cash in the Plan Distribution Account shall be remitted to the Agent on behalf of, and for distribution to Existing Lenders, in accordance with each Existing Lender's Pro Rata Share (according to the respective amount of the Lender Claims held by each Existing Lender). The post-Effective Date distributions, if any, from the Plan Distribution Account to the Agent on behalf of the Existing Lenders shall be considered distributions under the Plan and shall not be applied to the obligations arising out of the Amended and Restated Credit Facility or the New Preferred Stock. |
|---|---|
| **Conditions to Confirmation and Effective Date:** | The Plan shall contain various usual and customary conditions precedent to confirmation and to the Effective Date that must be satisfied or waived. Such conditions to the Effective Date shall include, without limitation, the following: |
| | (i)     an order confirming the Plan (the "Confirmation Order"), which Plan and Confirmation Order shall be in form and substance Reasonably Acceptable to the Parties and shall have been entered and shall not have been stayed or modified or vacated on appeal; |
| | (ii)    all statutory fees then due to the United States Trustee shall have been paid in full or shall be paid in full pursuant to the Plan; |
| | (iii)   the Reorganized Company shall have executed definitive documents Reasonably Acceptable to the Existing Agent, the Necessary Lenders, BOI in its capacity as revolving lender and Ares in its capacity as Agent with respect to the Amended and Restated Term Loan Facility, the Amended and Restated Revolving Loan Facility, the New Preferred Stock Term Sheet, the Stockholders' Agreement and |

| | corporate governance and management; |
|---|---|
| | (iv) the Reorganized Company shall have implemented a management incentive plan (the "Management Incentive Plan") on substantially the terms set forth in Annex D hereto (the "Management Incentive Plan Term Sheet"); |
| | (v) the Reorganized Company shall have been duly organized and in good standing and all organizational documents respecting the foregoing shall be in form and substance Reasonably Acceptable to the Parties and provision for the issuance of equity of Reorganized Parent to the Existing Lenders, ACAS and Cortec and shall have been made; |
| | (vi) that after all expenses and other payments required to be made upon consummation of the Plan pursuant to the terms thereof shall have been made or provided for including by the establishment of the Plan Distribution Account and payment of the New Facility Fee Amount and Plan Related Fees, the Reorganized Company's Cash On Hand shall be not less than $1,000,000 (exclusive of the proceeds of the Tax Refund) on the Effective Date; and |
| | (vii) all conditions precedent for the closing of the transactions contemplated by the Plan shall have occurred (or shall have been waived in accordance thereunder) other than the occurrence of the Effective Date. |
| | The Plan shall be deemed to be reasonably satisfactory to each of the Necessary Lenders (but not Existing Agent) if such party does not object to the Plan prior to or at the hearing on confirmation of the Plan. |
| **Corporate Governance and Management:** | *Board Composition*. The Board will consist of no more than 5 Directors. Holders of a majority of the New Preferred Stock will have the right to nominate and elect 1 "A" Director so long as there is at least $5 million of New Preferred Stock issued and outstanding and the Holders of a majority of the Lender Common Stock (if the lenders or their affiliates then own at least 25% of the Lender Common Stock they are to receive under the Plan) will have the right to nominate and |

elect 1 "A" Director (*provided* that such Holders will have the right to nominate and elect 2 "A" Directors at such time as there is less than $5 million of New Preferred Stock issued and outstanding); provided, however, that if lenders own less than 25%, but at least 10% of the Lender Common Stock issued under the Plan, such lenders shall retain the right to designate one Board observer. ACAS will have the right to nominate and elect 2 "B" Directors so long as ACAS or its affiliates own at least 25% of the New Common Stock it is to receive under the Plan (and ACAS shall retain observation rights on the Board so long as ACAS or its affiliates owns less than 25%, but at least 10% of the New Common Stock it is to receive under the Plan). The President of the Reorganized Parent shall serve as a "C" Director. So long as there are any "A" Directors, all Board committees shall include at least one "A" Director, and so long as there are any "B" Directors, all Board committees shall include at least one "B" Director. All Directors shall be provided indemnification agreements from the Reorganized Parent in form and substance consistent with the Debtors' current by-laws.

*Board Voting Rights.* Until delivery of a Trigger Notice (defined below), "A" Directors and "C" Directors will have 1 vote and "B" Directors will have 3 votes on all matters which come before the Board. Following delivery of a Trigger Notice, "B" Directors and "C" Directors will have 1 vote and "A" Directors will have 3 votes on all matters which come before the Board.

A "Trigger Notice" means the written notice (including pdf signatures circulated by electronic mail) of the occurrence of a Trigger Event (defined below) and the exercise of springing Board rights in respect thereof signed by lenders and/or their successors and assignees who hold a majority of the combined voting power of the New Preferred Stock and Lender Common Stock issued to lenders pursuant to the Plan and delivered within 180 days of a Trigger Event.

A "Trigger Event" shall mean any of the following: (a) if EBITDA (twelve month trailing tested on a quarterly basis) for each quarterly period through December 31,

2011 is less than 75% of projected EBITDA included in the base case used for setting financial covenant levels in the amended and restated credit agreement, (b) if the leverage ratio (tested on a quarterly basis) is greater than the Maximum Leverage Amount (as defined below) or (c) any event of default under the senior secured credit facility arising from a principal or interest payment default. For this purpose, EBITDA for a specific quarter will be defined to include mutually acceptable add-backs, including for restructuring charges and other non-recurring events and common equity investments made by ACAS within 10 business days of a Trigger Event being reported by the Reorganized Parent in its quarterly compliance certificate for such quarter *provided* that such equity investment is at least $5 million and is used to pay the lender debt.

Notwithstanding anything to the contrary contained herein, in the event of the conversion of any New Preferred Stock into debt, the associated increase in indebtedness and interest expense of the Reorganized Debtors shall be disregarded for purposes of calculating whether a Trigger Event has occurred.

"<u>Maximum Leverage Amount</u>" shall mean as follows:

| Quarter Ending | Maximum Leverage Amount |
|---|---|
| December 31, 2010 | 8.0:1.0 |
| March 31, 2011 | 7.9:1.0 |
| June 30, 2011 | 7.8:1.0 |
| September 30, 2011 | 7.7:1.0 |
| December 31, 2011 | 7.6:1.0 |
| March 31, 2012 | 7.4:1.0 |
| June 30, 2012 | 7.2:1.0 |
| September 30, 2012 | 7.0:1.0 |
| December 31, 2012 | 6.8:1.0 |
| March 31, 2013 | 6.6:1.0 |
| June 30, 2013 | 6.4:1.0 |
| September 30, 2013 | 6.2:1.0 |
| December 31, 2013 and thereafter | 6.0:1.0 |

*Major Actions.* Until delivery of a Trigger Notice, so

long as any of the Existing Lenders or their affiliates hold $5 Million of New Preferred Stock or <u>at least</u> 25% of the Lender Common Stock, the following actions ("<u>Major Actions</u>") will also require the approval of both of the "A" Directors:

1) add-on acquisitions (whether by way of stock purchase, merger, asset purchase or otherwise) (but excluding product line extensions in the ordinary course of the Debtors' business);

2) affiliate transactions (excluding the Amended and Restated Management Agreement, but including future modifications to such Agreement);

3) fundamental changes in the business of the Reorganized Company, including entry into new lines of business which are unrelated to the plumbing industry;

4) any amendment to or termination of the Management Incentive Plan (it being understood that approval is not required as to grant allocations, pricing, vesting or other terms of individual grants under the Management Incentive Plan) or adoption or amendment of any other long term management incentive plan;

5) issuance of management stock, options, appreciation rights, phantom stock or other similar rights in excess of the amounts set forth in the Management Incentive Plan;

6) the sale of all or substantially all of the Reorganized Company's assets, or the sale of the Reorganized Company by merger, stock sale or similar transaction.

7) the issuance of new equity (either senior, parity or common) by the Reorganized Parent or any subsidiary, or the issuance or granting of warrants, options, phantom stock, appreciation rights or other derivative equity rights by the

| | Reorganized Parent or any subsidiary (other than as provided in the Management Incentive Plan); |
|---|---|
| | 8) reclassifying, reconstituting or altering the rights or priorities of any class or series of capital stock, any stock-split or reverse stock split; |
| | 9) effecting a change in organizational form or, for tax pass through entities, any action that might have adverse tax consequences (including elections); |
| | 10) commencement of, consent to or acquiescence in (i) any bankruptcy, assignment for the benefit of creditors, debt arrangement, or other case or proceeding under any bankruptcy or insolvency law, (ii) the appointment of any trustee, receiver or conservator, or (iii) any dissolution, winding up or liquidation proceeding, in each case in respect of the Reorganized Parent or any subsidiary; |
| | 11) entry into any joint ventures or partnership arrangements other than in the ordinary course of the Reorganized Company's business, consistent with past practice; |
| | 12) any amendment to the terms of certificate of incorporation or bylaws or other constitutive documents of the Reorganized Parent or any subsidiary; |
| | 13) consent to transfers of equity securities in the Reorganized Parent or any subsidiary, except to the extent such transfers are permitted or required under the terms of the New Stockholders Agreement; |
| | 14) any amendment to the New Stockholders' Agreement; |
| | 15) changing the size or composition of the Board or any committee thereof; |

|  | 16) the declaration or payment of dividends; |
|  | 17) the redemption of capital stock; |
|  | 18) the issuance or taking on of new debt (other than obligations incurred in the ordinary course of business such as trade debt) or the refinancing of existing debt (other than the debt owed to the Lenders provided that the Preferred Stock is also to be refinanced in full at such time) by the Reorganized Parent or any subsidiary; |
|  | 19) the guarantee by the Reorganized Parent or any subsidiary of any debt or other obligations; |
|  | 20) the cessation or material reduction in the operation of a business location. |
|  | 21) the creation of any Board committee; and/or |
|  | 22) any change or reduction in Director & Officer insurance policy limits or deductibles. |
|  | *Shareholder Voting.* Holders of Preferred Stock and New Common Stock shall vote together as a single class on all matters (other than the election of Directors) subject to a vote of the stockholders of the Reorganized Parent. The relative voting rights applicable to the New Preferred Stock and the New Common Stock shall be structured so that the Holders of the New Preferred Stock would control a majority of the combined voting rights so long as there is at least $7.5 million of New Preferred Stock outstanding assuming no change in the ownership or capitalization of the Reorganized Parent since the Plan confirmation; provided, however, that the lenders or their affiliates will not undertake a cash-out squeeze out merger of New Common Stock or other interests held by ACAS or its affiliates without the prior written consent of ACAS. |
|  | *Major Actions following a Trigger Notice.* Following delivery of a Trigger Notice, so long as ACAS or its affiliates own at least 25% of the New Common Stock, any Major Action other than the Excepted Major |

| | |
|---|---|
| | Actions (defined below) will also require the approval of both of the "B" Directors. The "Excepted Major Actions" shall mean any Major Action set forth in paragraphs 6, 7, 10, or 11 of *Major Actions*, any Major Action relating to the refinancing of the senior debt and/or the New Preferred Stock undertaken in good faith and consistent with the Board members' fiduciary duties to stockholders on terms no less favorable to the Reorganized Parent and its subsidiaries than could be obtained from an unaffiliated third party, and any Major Action involving the creation of a Board committee in connection with a sale of the Reorganized Company or its assets, provided, that, any such Board committee shall include at least one "B" Director (who, for avoidance of doubt, shall not have a blocking or approval right with respect to any action or decision by such committee). In addition, ACAS shall have a 30-day right of first refusal with respect to the issuance of any new equity or other interests described in paragraph 7 of *Major Actions*. |
| **Stockholders Rights:** | All shareholders will have preemptive rights to maintain their pro rata ownership of the Reorganized Parent. In addition, in connection with a sale of securities of the Reorganized Parent, all shareholders will have customary tag-along rights, and in connection with a sale of a majority of the securities of the Reorganized Parent, a merger of the Reorganized Company or an equity financing, will be subject to customary limited drag-along obligations, that will include limited indemnity obligations which will be several, not joint, and will be allocated pro-rata in accordance with net cash proceeds received in respect of the New Preferred Stock and New Common Stock. No such co-sale or drag-sale transaction shall impose any non-compete or non-solicitation covenants or other similar restrictions on any institutional shareholder. Shareholders shall be prohibited from transferring their interests in the New Preferred Stock or New Common Stock to any competitor of the Reorganized Company. Transfers of equity securities of the Reorganized Parent shall be subject to rights of first refusal in favor of the Reorganized Parent, and if the Reorganized Parent does not exercise such rights, then such rights shall be in favor of the other shareholders of the class of shares being transferred and such other shareholders' affiliates and if not then exercised, |

| | |
|---|---|
| | thereafter in favor of all other shareholders and such other shareholders' affiliates. Any restrictions on transferability, or any co-sale or right of first refusal, will be subject to customary exemptions (*e.g.*, affiliate transfers, certain pledges, mergers, sale of the company via stock sale). Any acquirer of New Common Stock shall be bound by the terms of the New Stockholders' Agreement. In addition, the Existing Lenders (so long they hold at least 25% of the New Common Stock or at least $5 million New Preferred Stock in each case issued to them under the Plan) and ACAS (so long as it or its affiliates holds at least 25% of the New Common Stock issued to it under the Plan) shall each have periodic information reporting rights and access rights to management. The Existing Lenders, ACAS and Cortec shall be granted the same registration rights, if any. A shareholder and its affiliates will be treated as a single holder, for purposes of determining purchase and other rights under the New Stockholders' Agreement, and a shareholder and its affiliates will be able to allocate their respective purchase rights among themselves as they may determine. |
| **Post-Effective Date Management Incentive Plan:** | As set forth in the Management Incentive Plan Term Sheet in <u>Annex D</u> hereto. |
| **Executory Contracts and Unexpired Leases:** | The non-residential leases for the Debtors' facilities in Moody, Alabama and in Pottsville, Pennsylvania shall be assumed pursuant to the Plan. All employment agreements with Debtors' management shall be assumed subject to the following amendments (x) the term "Senior Executive" in the Employment, Confidentiality, Non-Competition, Non-Solicitation, Non-Association and Inventions Agreement with Byron Shaw (the "Employment Agreement") and in each severance agreement with management (the "Severance Agreements") shall be amended to include "Edward Moulin", and (y) the term "Affiliate" in shall in the Employment Agreement and Severance Agreements shall be amended to clarify that ACAS is an Affiliate for purposes of each such agreement. All other executory contracts and unexpired leases shall be assumed and rejected as of the Effective Date, as the case may be, in the Debtors' discretion to the extent that any such executory contracts and unexpired leases have not been assumed or rejected by the Debtors in their discretion during the pendency of the Chapter 11 Cases. |

| | |
|---|---|
| **Debtor Releases:** | Full releases to extent permitted by law by Debtors and their estates in favor of the Existing Agent, Existing Lenders, BOI in its capacity as revolving lender, Ares in its capacity as Agent, ACAS, Cortec and current and former officers, directors, employees, advisors, attorneys, professionals, accountants, consultants, agents and other representatives (including their respective officers, directors, employees, members and professionals) of the Debtors, Cortec, Existing Agent, Existing Lenders, BOI in its capacity as revolving lender, Ares in its capacity as Agent, and ACAS, from any claims and causes of action based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the Plan and the subject matter of, or the transactions or events giving rise to, any claim interest that is treated in the Plan (other than claims based on gross negligence or willful misconduct) arising on or prior to the Effective Date. |
| **Releases Among Certain Parties:** | Plan shall provide that each of the parties released by the Debtors shall release each other and the Debtors for pre-Effective Date matters based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the Plan and the subject matter of, or the transactions or events giving rise to, any claim or interest that is treated in the Plan. |
| **Indemnification/Exculpation:** | Customary indemnification and exculpation provisions. |
| **Discharge:** | Customary discharge provisions. |
| **Injunctions:** | Customary injunction provisions. |
| **Avoidance Actions:** | All claims and causes of action which any or all of the Debtors have or had the power to assert pursuant to any or all of sections 510, 544, 545, 547, 548, 549, 550, 551 and 553 of the Bankruptcy Code shall be waived. |

# Annex A

## Amended And Restated Credit Facility Term Sheet

Capitalized terms used but not defined herein shall have the meanings assigned to such terms in the Lender/ACAS Term Sheet or the Existing Credit Agreement, as applicable.

BORROWER: Jones Stephens Corp. (the "Company" or "JSC")

ADMINISTRATIVE AGENT: Ares Capital Corporation ("Agent" or "Ares")

ADMINISTRATIVE AGENT
FEE: $75,000 payable on the Effective Date and on each anniversary of the Effective Date.

RESTRUCTURED CREDIT
FACILITIES: (a) $4,000,000 Revolving Loan Commitment

(b) $32,500,000 Term Loan

CLOSING DATE: Effective Date of Plan ("Effective Date")

MATURITY DATES: Extend the Revolving Loan Maturity Date from September 7, 2011 to September 7, 2015 and the Term Loan Maturity Date from September 7, 2012 to September 7, 2015.

REVOLVER
COMMITMENT: The revolver commitment (the "Amended and Restated Revolving Loan Facility") will be $4,000,000 and shall be provided by Bank of Ireland ("BOI"). During the continuance of an Event of Default, the proceeds from any sale, other disposition of or realization upon any of the Collateral shall be applied to the repayment of Revolving Loans prior to the repayment of Term Loans, and shall reduce the revolver commitment on a dollar for dollar basis. The Revolving Credit Commitment Fee shall be 1.00%. An up-front fee of 1.00% shall be payable to BOI on the Effective Date. The pricing on the Revolver will be LIBOR plus 500bps with a 2.00% LIBOR floor. The Revolver shall not be drawn upon to fund the Plan Distribution Account or pay Plan Related Fees.

AMORTIZATION AND
INTEREST PAYMENTS: Quarterly Term Loan amortization payments will remain at $250,000 through June 30, 2015, with the remaining bullet payment to be made at the Term Loan Maturity Date. Interest payment due dates will remain unchanged. The first amortization payment will be due on March 31, 2011.

MANDATORY
PREPAYMENT: Beginning with the fiscal year ended December 31, 2011 and with respect to each fiscal year thereafter, the Mandatory Prepayment will be fifty percent (50%) of Excess Cash Flow if the average daily cash balance for that fiscal year is less than $5,000,000 and seventy five

percent (75%) of Excess Cash Flow if the average daily cash balance for the year is greater than or equal to $5,000,000. Excess Cash Flow shall be calculated after subtracting Installment Fees paid during the relevant fiscal year.

INTEREST RATES:  The Applicable Rate for Eurodollar Loans shall be increased to 500 basis points per annum.

The Applicable Rate for ABR Loans shall be increased to 275 basis points per annum, but in no event will ABR Loans have an interest rate less than 7.00% per annum.

LIBOR FLOOR:  A floor of 2.00%.

COVENANT WAIVER:  All covenant violation(s) for the quarterly periods ending December 31, 2008, March 31, 2009, June 30, 2009, September 30, 2009, December 31, 2009, March 31, 2010, June 30, 2010 and September 30, 2010 will be waived. On the Effective Date, the quarterly covenants will be reset as outlined below.

FINANCIAL COVENANTS[1]:  The Leverage Ratio, Interest Coverage Ratio and Fixed Charge Coverage Ratio tests will exclude the impact of any Term Loan amounts or interest expense associated with the conversion of New Preferred Stock to Term Loan. The revised financial covenants will be as follows:

a) Leverage Ratio:

| Fiscal Quarter Ending On | Ratio |
|---|---|
| December 31, 2010 through December 31, 2011 | None |
| March 31, 2012 | 6.0:1.0 |
| June 30, 2012 | 5.7:1.0 |
| September 30, 2012 | 5.3:1.0 |
| December 31, 2012 | 5.0:1.0 |
| March 31, 2013 | 4.8:1.0 |
| June 30, 2013 | 4.6:1.0 |
| September 30, 2013 | 4.4:1.0 |
| December 31, 2013 | 4.2:1.0 |
| March 31, 2014 | 4.0:1.0 |
| June 30, 2014 | 3.75:1.0 |
| September 30, 2014 | 3.6:1.0 |
| December 31, 2014 and thereafter | 3.5:1.0 |

---

[1] All covenants exclude non-cash charges including adjustments from purchase price and fresh start accounting.

**b)  Interest Coverage Ratio;**

| Fiscal Quarter Ending On | Ratio |
|---|---|
| December 31, 2010 through December 31, 2011 | None |
| March 31, 2012 | 2.20:1:00 |
| June 30, 2012 | 2.25:1:00 |
| September 30, 2012 | 2.30:1:00 |
| December 31, 2012 | 2.40:1.00 |
| March 31, 2013 | 2.50:1.00 |
| June 30, 2013 | 2.50:1.00 |
| September 30, 2013 | 2.50:1.00 |
| December 31, 2013 | 2.50:1.00 |
| March 31, 2014 | 2.75:1.00 |
| June 30, 2014 | 2.75:1.00 |
| September 30, 2014 | 2.75:1.00 |
| December 31, 2014  and thereafter | 2.75:1.00 |

**c)  Minimum Fixed Charge Coverage[2]**

| Fiscal Quarter Ending On | Ratio |
|---|---|
| December 31, 2010 through December 31, 2011 | None |
| March 31, 2012 | 0.80:1.00 |
| June 30, 2012 | 0.85:1.00 |
| September 30, 2012 | 0.95:1.00 |
| December 31, 2012 | 1.00:1.00 |
| March 31, 2013 | 1.05:1.00 |
| June 30, 2013 through December 31, 2013 | 1.10:1.00 |

---

[2]  The Minimum Fixed Charge Coverage tests will exclude the impact of any one-time restructuring changes, which includes the impact of cancellation of debt and taxes related thereto.

June 30, 2014 and thereafter                                    1.20:1.00

**d)  Adjusted EBITDA**

| **Date** | **Amount** |
|---|---|
| December 31, 2010 | None |
| March 30, 2011 | $4,870,000 |
| June 30, 2011 | $4,880,000 |
| September 30, 2011 | $4,900,000 |
| December 31, 2011 | $4,910,000 |
| March 31, 2012 | $5,215,000 |
| June 30, 2012 | $5,530,000 |
| September 30, 2012 | $5,850,000 |
| December 31, 2012 | $6,120,000 |
| March 31, 2013 | $6,350,000 |
| June 30, 2013 | $6,630,000 |
| September 30, 2013 | $6,900,000 |
| December 31, 2013 | $7,130,000 |
| March 31, 2014 | $7,350,000 |
| June 30, 2014 | $7,650,000 |
| September 30, 2014 | $7,925,000 |
| December 31, 2014 | $8,135,000 |
| March 31, 2015 | $8,250,000 |
| June 30, 2015 | $8,500,000 |

**e)  Capital Expenditures**

| **Period** | **Amount** |
|---|---|
| September 30, 2010 through December 31, 2011 | $1,200,000 |
| For the fiscal year ending December 31, 2012, December 31, 2013, December 31, 2014 and December 31, 2015 | $1,000,000 |

EBITDA:       The following add-backs are added to the definition of EBITDA for financial covenant compliance: (1) all one-time costs related to the recapitalization of JSC, (2) the amount of the non-cash reversal of the $973,000 copper coil inventory allowance established at December 31, 2008, required in conjunction with the sale of such inventory, (3) expenses related to severance of up to $150,000 and expenses related to retention bonuses for Company executives of up to $250,000, (4) any Installment Fees paid during the relevant fiscal year, (5) subject to

Agent's agreement, non-cash charges including adjustments from purchase price and fresh start accounting, and (6) notwithstanding anything to the contrary contained in the Existing Credit Agreement, (i) inventory write-downs taken after the Effective Date up to $400,000 in the aggregate for the combined fiscal years 2010 and 2011 will be added back for purposes of calculating EBITDA on a last-twelve-months basis, and (ii) for inventory write-downs occurring after December 31, 2011, an amount approved in writing by the Agent. Additionally, up to $400,000 of third party consulting costs, retained search costs and relocation costs incurred by the Company through December 31, 2011 will be added back for purposes of calculating EBITDA.

OTHER:

(i)  Subject to documentation including all applicable security documents in form and substance acceptable to Agent, Necessary Lenders, ACAS and Borrower; provided, that any documentation or matter consistent with a term specifically addressed in the Lender/ACAS Term Sheet and this Amended and Restated Credit Facility Term Sheet shall be deemed acceptable.

(ii)  Except to the extent agreed to by the Agent, Necessary Lenders, ACAS and Borrower, all other terms and conditions contained in the Credit Agreement and other Financing Documents will remain in full force and effect.

## Annex B

### New Preferred Stock Term Sheet

ISSUANCE:

$17,500,000.  The Company shall not be permitted to issue any additional New Preferred Stock except for New Preferred Stock issued on account of accrued PIK dividends.

DIVIDENDS:

Payment-in-kind ("PIK") dividend of 9.00% per annum compounded and accrued quarterly, increasing to 10% PIK upon maturity of the Amended and Restated Credit Facility; to 12% PIK one year after maturity; and to 14% PIK two years after maturity.  The Company shall not have the right to suspend the dividends payable to the New Preferred Stock.

CONVERSION:

Each Holder of New Preferred Stock shall have the right to permanently convert New Preferred Stock to Term Loan debt on a bi-annual basis subject to the total amount of senior debt outstanding (after giving effect to any New Preferred Stock to be converted) being less than 3.5x EBITDA measured as of December 31st and June 30th for the prior 12 month period.  All conversions shall be on a Pro Rata basis and subject to a minimum aggregate conversion in any given period of $500,000 and in increments of $500,000 thereafter.

All Term Loan debt converted from New Preferred Stock will be treated as Term Loan debt in accordance with the Amended and Restated Credit Facility Term Sheet (except in respect of those financial covenants which are measured without regard to any Term Loan amounts or interest expense associated with the conversion of the New Preferred Stock).

PRIORITY:

The New Preferred Stock shall be subordinate and junior in right of payment to the Amended and Restated Credit Facility.  The New Preferred Stock shall be senior in right of payment to the New Common Stock.

TRANSFERABILITY:

The New Preferred Stock shall be transferable.

DOCUMENTATION:

Subject to documentation Reasonably Acceptable to the Existing Agent, Necessary Lenders, Agent (with respect to the terms governing or affecting the Agent), BOI (with respect to the terms governing or affecting the Revolving Loan), ACAS and the Reorganized Company.

<u>**Annex C**</u>

**Post-Effective Date Management Incentive Plan Term Sheet**

<u>OPTION GRANT:</u>    The Reorganized Company will adopt a management incentive plan authorizing the grant options ("<u>Options</u>"), to purchase from Reorganized Parent shares of common stock representing 12.5% of the common shares of the Reorganized Parent on a fully diluted basis at the option exercise price of $0.01 per share.

<u>VESTING:</u>    50% of the Options shall become vested and exercisable in accordance with the following schedule and 50% of the Options will be subject to reasonable vesting requirements including performance criteria to be established by the board of directors at the time of the grant. The Options will immediately vest upon a sale of the Reorganized JSC.

| Date | Cumulative Percentage Vested |
|------|------------------------------|
| First Anniversary of Grant Date | 20% |
| Second Anniversary of Grant Date | 40% |
| Third Anniversary of Grant Date | 60% |
| Fourth Anniversary of Grant Date | 80% |
| Fifth Anniversary of Grant Date | 100% |

<u>TERMINATION:</u>    If employee is terminated for cause or resigns all options will expire. If employee is terminated for convenience, death or disability, the employee will retain all options that have vested at the time of termination.

FP01/ 6378178.9